UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re DAVIS NEW YORK VENTURE FUND FEE LITIGATION | Master File No. 1:14-cv-4318 (LTS) (HBP)<br><br>**CONSOLIDATED AMENDED COMPLAINT**<br><br>Jury Trial Demanded |

Plaintiffs Gary A. Hebda, Deborah L. Hebda, Saul Chill, Sylvia Chill, and Schuyler Hoffman (together, "Plaintiffs") bring this action against Defendants Davis Selected Advisers, L.P. ("Davis Advisors") and Davis Selected Advisers-NY, Inc. ("Davis-NY") (together, "Davis" or "Defendants"). Plaintiffs allege the following upon information and belief except for those allegations as to themselves, which are alleged upon personal knowledge. The allegations are based upon an investigation conducted by and through Plaintiffs' counsel, which included, *inter alia*, a review of documents filed with the Securities and Exchange Commission (the "SEC") and other public information.

## OVERVIEW OF ACTION

1.      Plaintiffs bring this action against Defendants on behalf of and for the benefit of the Davis New York Venture Fund (the "Fund") pursuant to Section 36(b) of the Investment Company Act of 1940 (the "1940 Act"), 15 U.S.C. § 80a-35(b) ("Section 36(b)").

2.      Defendants are investment advisers to the Fund and receive an annual fee from the Fund for providing investment advisory services, including managing the Fund's portfolio of assets.

3.      Under Section 36(b), Defendants owe a fiduciary duty to the Fund with respect to the investment advisory fees paid by the Fund.

4.      Defendants breached that fiduciary duty by receiving investment advisory fees from the Fund that are so disproportionately large that they bear no reasonable relationship to the value of the services provided by Defendants and could not have been the product of arm's-length bargaining.

5.      The investment advisory fee rate charged to the Fund is as much as 96% higher than the rates negotiated at arm's length by Davis with other clients for the same or substantially the same investment advisory services.

6.      As a result of its higher fee rate, the Fund pays as much as $51.4 million more in fees each year than it would pay for Davis's investment advisory services had the fee arrangement been negotiated at arm's length.

7.      The investment advisory fees charged to the Fund are disproportionate to the low quality of the investment advisory services provided by Davis.

8.      Under Davis's management, the Fund's investment performance has lagged behind both its benchmark and the investment performance of other, comparable mutual funds over the last 10 years.

9.      Other clients have terminated their contracts with Davis in response to poor investment performance under Davis's management, but the Fund's Board of Directors has continued to approve the Fund's investment advisory agreement on an annual basis at fee rates exceeding the rates negotiated at arm's length by other clients for Davis's services.

10.      Plaintiffs bring this action to recover for the Fund the excessive and unlawful investment advisory fees charged in violation of Section 36(b), as well as lost profits and other actual damages caused by the Fund's payment of those fees.

## JURISDICTION AND VENUE

11.     The claim asserted herein arises under Section 36(b) of the 1940 Act, 15 U.S.C.

§ 80a-35(b).

12.     This Court has jurisdiction of the claim pursuant to Sections 36(b)(5) and 44 of

the 1940 Act, 15 U.S.C. §§ 80a-35(b)(5), 80a-43, and 28 U.S.C. § 1331.

13.     Venue is proper in this judicial district pursuant to Section 44 of the 1940 Act, 15

U.S.C. § 80a-43, and 28 U.S.C. § 1391 because Defendants are inhabitants of this district,

maintain offices in this district, and/or transact business in this district, and because certain of the

acts and transactions giving rise to Plaintiffs' claim occurred in this district.

## PARTIES

14.     Plaintiffs Gary A. and Deborah L. Hebda, residents of the State of Michigan, are

shareholders in the Fund and have continuously owned shares in the Fund since at least February

2011.

15.     Plaintiffs Saul and Sylvia Chill, residents of the State of New York, are

shareholders in the Fund and have continuously owned shares in the Fund since at least July

2005.

16.     Plaintiff Schuyler Hoffman, a resident of the State of California, is a shareholder

in the Fund and has continuously owned shares in the Fund since at least February 2005.

17.     Defendant Davis Advisors is a limited partnership organized under Colorado law,

with its principal office in Tucson, Arizona.

18.     Defendant Davis-NY is a corporation organized under Delaware law, with its

principal office located at 620 Fifth Avenue, New York, New York.  Davis-NY is a wholly

owned affiliate of Davis Advisors, and its only business is to provide investment advisory services on behalf of Davis Advisors.

## THE FUND'S ORGANIZATION AND OPERATIONS

19.    The Fund is an open-end management investment company, also known as a "mutual fund," registered under the 1940 Act.

20.    The Fund is organized as a series within Davis New York Venture Fund, Inc., which is a corporation organized under Maryland law.

21.    Like other mutual funds, the Fund is a type of collective investment that pools money from investors and invests the money in a portfolio of securities.

22.    The Fund issues shares to investors, such as Plaintiffs, who invest money in the Fund, and those investors become shareholders in the Fund.  Each share issued by the Fund represents, and may be redeemed for, a *pro rata* interest in the Fund's underlying portfolio of securities (less any fees and other liabilities).

23.    Like most other mutual funds, the Fund does not have employees or facilities of its own.  The Fund's operations are conducted by external service providers pursuant to contracts with the Fund.

24.    Defendants serve as the Fund's investment advisers and, in that capacity, are responsible for managing the Fund's portfolio of securities, including researching potential investments and deciding which securities will be purchased for or sold from the portfolio.

25.    Other service providers, including certain of Defendants' affiliates, provide other services to the Fund and its shareholders, such as communicating with shareholders about the Fund, maintaining records of each shareholder's ownership of Fund shares, and managing the process by which Fund shares are purchased by or redeemed from shareholders.

26.     The Fund is overseen by a Board of Directors (the "Board"), which is responsible for selecting and monitoring the Fund's service providers, among other things.

27.     The same Board oversees 12 other mutual funds managed by Defendants or their affiliates.

**DEFENDANTS' INVESTMENT ADVISORY SERVICES TO THE FUND**

28.     Defendants serve as investment advisers to the Fund pursuant to an Investment Advisory Agreement between Davis Advisors and the Fund (the "IAA") and a subadvisory agreement between Davis Advisors and Davis-NY.

29.     The IAA requires Davis to provide certain investment advisory services to the Fund, including researching potential investments, deciding which securities to purchase for or sell from the Fund's investment portfolio, and arranging for the execution of purchase and sale orders on behalf of the Fund.

30.     The IAA requires Davis to maintain certain books and records relating to the investment advisory services provided to the Fund and to report to the Fund's Board regarding the investment advisory services.

31.     The Fund's prospectus, filed with the SEC annually, provides additional information about the investment advisory services provided by Davis to the Fund, including the Fund's investment objective, the types of securities in which it invests, and the strategies to be employed in managing the Fund.

32.     According to the Fund's prospectus dated December 2, 2013 (the "2013 Prospectus"), the Fund's investment objective is "long-term growth of capital."

33.     The 2013 prospectus states that the Fund invests "principally in common stocks . . . issued by large companies with market capitalizations of at least $10 billion."

34.    The 2013 Prospectus describes the investment strategies employed by Davis in managing the Fund:

> Davis Advisors manages equity funds using the Davis Investment Discipline.  Davis Advisors conducts extensive research to try to identify businesses that possess characteristics that Davis Advisors believes foster the creation of long-term value, such as proven management, a durable franchise and business model, and sustainable competitive advantages.  Davis Advisors aims to invest in such businesses when they are trading at discounts to their intrinsic worth.  Davis Advisors emphasizes individual stock selection and believes that the ability to evaluate management is critical.  Davis Advisors routinely visits managers at their places of business in order to gain insight into the relative value of different businesses . . . .

> After determining which companies Davis Advisors believes the Fund should own, Davis Advisors then turns its analysis to determining the intrinsic value of those companies' equity securities.  Davis Advisors seeks companies whose equity securities can be purchased at a discount from Davis Advisors' estimate of the company's intrinsic value based upon fundamental analysis of cashflows, assets and liabilities, and other criteria which Davis Advisors deems to be material on a company by company basis.  Davis Advisors' goal is to invest in companies for the long term (ideally five years or longer, although this goal may not be met).  Davis Advisors considers selling a company's equity securities if the securities' market price exceeds Davis Advisors' estimates of intrinsic value, if the ratio of the risks and rewards of continuing to own the company's equity securities is no longer attractive, or to raise cash to purchase a more attractive investment opportunity, satisfy net redemptions, or other purposes.

35.    The Fund's prior prospectus dated November 28, 2012 (the "2012 Prospectus"), provides additional information about the investment strategies employed by Davis in managing the Fund:

> Over the years, Davis Advisors has developed a list of characteristics that it believes help companies to create shareholder value over the long term and manage risk.  While few companies possess all of these characteristics at any given time, Davis Advisors searches for companies that demonstrate a majority or an appropriate mix of these characteristics.

*First Class Management*

- Proven Track Record
- Significant Alignment of Interests in Business
- Intelligent Application of Capital

*Strong Financial Condition and Satisfactory Profitability*

- Strong Balance Sheet
- Low Cost Structure
- High Returns on Capital

*Strong Competitive Positioning*

- Non-Obsolescent Products/Services
- Dominant or Growing Market Share
- Global Presence and Brand Names

36.     The team of Davis portfolio managers, research analysts, and traders who are responsible for providing investment advisory services to the Fund is known as the Large Cap Value Team.

37.     Until December 31, 2013, the Large Cap Value Team was led by portfolio managers Christopher Davis and Kenneth Feinberg.

38.     Effective January 1, 2014, Danton Goei replaced Mr. Feinberg as a portfolio manager for the Fund and other accounts managed by the Large Cap Value Team.

39.     Mr. Davis, Mr. Goei, and the other members of the Large Cap Value Team are, and Mr. Feinberg was until his replacement, based in Davis-NY's office in New York, New York.

40.     In providing investment advisory services to the Fund, Davis must comply with the 1940 Act and related rules and regulations issued by the SEC, as well as with various provisions of federal tax law.

7

41.     The Large Cap Value Team is supported by a staff of legal, compliance, and administrative personnel, who are responsible for ensuring that Davis's investment advisory services comply with applicable law, including the 1940 Act, for maintaining books and records relating to Davis's investment advisory services to the Fund, and for assisting with reports about Davis's investment advisory services.

**INVESTMENT ADVISORY FEES CHARGED TO THE FUND BY DAVIS**

42.     In exchange for the investment advisory services provided by Davis to the Fund, the IAA requires the Fund to pay Davis Advisors an annual fee that is calculated as a percentage of the Fund's assets under management or "AUM."

43.     Davis Advisors, in turn, allocates a portion of the investment advisory fees it receives from the Fund to Davis-NY pursuant to the subadvisory agreement between Defendants.

44.     The Fund's investment advisory fee rate is determined according to the following breakpoint schedule, which reduces the rate paid as the Fund's AUM increase.

| AUM | Fee Rate |
|---|---|
| up to $3 billion | 0.55% |
| from $3 billion to $4 billion | 0.54% |
| from $4 billion to $5 billion | 0.53% |
| from $5 billion to $6 billion | 0.52% |
| from $6 billion to $7 billion | 0.51% |
| from $7 billion to $10 billion | 0.50% |
| from $10 billion to $18 billion | 0.485% |
| from $18 billion to $25 billion | 0.47% |
| from $25 billion to $33 billion | 0.455% |

| AUM | Fee Rate |
|---|---|
| from $33 billion to $40 billion | 0.44% |
| from $40 billion to $48 billion | 0.425% |
| from $48 billion to $55 billion | 0.41% |
| over $55 billion | 0.395% |

45.     The Fund paid an effective investment advisory fee rate of 50 basis points, or 0.50%, during its fiscal year ended July 31, 2013 pursuant to the above fee schedule.  Also called a "blended" rate, the effective investment advisory fee rate of 50 basis points is the weighted average of the rates paid by the Fund on each level of AUM—*i.e.*, 55 basis points on the first $3 billion, 54 basis points on the next $1 billion, 53 basis points on the next $1 billion, *etc*.

46.     The Fund paid more than $101,000,000 in investment advisory fees during fiscal year 2013.

**DAVIS PROVIDES THE SAME OR SUBSTANTIALLY THE SAME INVESTMENT ADVISORY SERVICES TO SUBADVISED FUNDS FOR LOWER FEES**

47.     Davis provides investment advisory services to other clients.

48.     Those clients include two mutual funds:  (a) the John Hancock Fundamental Value Trust (the "Hancock Subadvised Fund"); and (b) the EQ/Davis New York Venture Portfolio (the "AXA Subadvised Fund").

49.     Davis previously provided investment advisory services to four other mutual funds:  (a) the Columbia Variable Portfolio Davis New York Venture Fund (the "Columbia Subadvised Fund") until November 2012; (b) the ING Davis New York Venture Portfolio (the "ING Subadvised Fund") until April 2013; (c) the AZL Davis New York Venture Fund (the "Allianz Subadvised Fund") until November 2013; and (d) the MetLife Davis Venture Value Portfolio (the "MetLife Subadvised Fund") until February 2014.

50.     The mutual funds identified in the immediately preceding paragraphs are collectively referred to herein as the "Subadvised Funds."

51.     Each of the Subadvised Funds was organized and sponsored by a financial institution independent of Defendants.

52.     Like the Fund, each of the Subadvised Funds is (or was) an open-end management investment company and is (or was) registered under the 1940 Act.

53.     Like the Fund, each of the Subadvised Funds is (or was) part of a business trust or corporation organized under state law.

54.     Like the Fund, each of the Subadvised Funds issues (or issued) shares to investors who invest money in the fund, and each share represents (or represented), and may (or could) be redeemed for, a *pro rata* interest in the Subadvised Fund's underlying portfolio of securities (less any fees and other liabilities).

55.     The Subadvised Funds' financial institution sponsors nominally serve (or served) as the Subadvised Funds' investment advisers.  They have (or had) investment advisory contracts with the Subadvised Funds, and receive (or received) investment advisory fees from the Subadvised Funds.

56.     Each of the financial institution sponsors has (or had) subcontracted with Davis to provide investment advisory services to the Subadvised Funds.   Pursuant to subadvisory agreements between Davis and each of the financial institution sponsors, Davis acts (or acted) as a so-called "subadviser" and provides (or provided) investment advisory services to each Subadvised Fund in exchange for a fee.

57.     The fees that Davis receives (or received) for providing investment advisory services to the Subadvised Funds are (or were) paid by the financial institution sponsors of those funds.

58.     The investment advisory services that Davis provides (or provided) as subadviser to the Subadvised Funds are the same or substantially the same as the services Davis provides to the Fund pursuant to the IAA.

59.     The subadvisory agreements require (or required) Davis to provide the same or substantially the same types of investment advisory services as are required by the Fund's IAA. For example, like the Fund's IAA, the subadvisory agreement for the AXA Subadvised Fund requires Davis to:  (a) "coordinate the investment and reinvestment of the assets" of the AXA Subadvised Fund; (b) "determine the composition of the assets" of the AXA Subadvised Fund; and (c) "arrang[e] for the purchase and sale of securities and other investments" on behalf of the AXA Subadvised Fund.

60.     Like the Fund's IAA, the subadvisory agreements require (or required) Davis to maintain books and records relating to its investment advisory services to the Subadvised Funds and to report to the Subadvised Funds' boards of directors and/or financial institution sponsors regarding its services.

61.     The Large Cap Value Team manages (or managed) each Subadvised Fund's investment portfolio.

62.     Mr. Davis and Mr. Feinberg served as portfolio managers for each Subadvised Fund until December 31, 2013, with Mr. Goei replacing Mr. Feinberg effective January 1, 2014.

63.     The Large Cap Value Team uses (or used) the same or substantially the same investment strategies, research and analysis, systems, technology, and other resources in

providing investment advisory services to the Subadvised Funds as it uses in providing investment advisory services to the Fund.

64.     According to the Fund's Statement of Additional Information, dated December 2, 2013 (the "SAI"), the accounts of other clients of the Large Cap Value Team, such as the Subadvised Funds, are "patterned after" the Fund.  The other clients "usually have all of [their] trading . . . aggregated with that of" the Fund, and the Large Cap Value Team purchases and sells the same securities for the Fund and the other clients except "[i]n unusual circumstances."

65.     Each of the Subadvised Funds has (or had) the same or substantially the same investment objective as the Fund:  growth of capital.

66.     Like the Fund, each of the Subadvised Funds invests (or invested) primarily in the equity securities of large-capitalization companies.

67.     The prospectus for each of the Subadvised Funds states that Davis uses (or used) the same or substantially the same investment strategies in managing those funds as described in the Fund's 2012 and 2013 Prospectuses (*see* ¶¶ 34-35, *supra*).  For example, the April 29, 2013 prospectus for the MetLife Subadvised Fund includes the following description of the investment strategies employed by Davis.

> Davis manages equity funds using the Davis Investment Discipline.  Davis conducts extensive research to identify well-managed companies, with durable business models, that can be purchased at attractive valuations relative to their intrinsic value. Davis emphasizes individual stock selection and believes that the ability to evaluate management is critical.  Davis routinely visits managers at their places of business in order to gain insight into the relative value of different businesses . . . .
>
> Over the years, Davis has developed a list of characteristics that it believes allow companies to create shareholder value over the long term and manage risk.  While few companies possess all of these characteristics at any given time, Davis searches for companies

that demonstrate a majority or an appropriate mix of these characteristics:

- Proven track record
- Significant alignment of interest in business
- Intelligent application of capital
- Strong balance sheet
- Low cost structure
- High returns on capital
- Non-obsolescent products and services
- Dominant or growing market share
- Global presence and brand names

After Davis decides which common stocks it wishes to own, it attempts to determine the intrinsic value of those stocks. Davis seeks common stocks which can be purchased at attractive valuations relative to their intrinsic value. Davis' goal is to invest in companies for the long term. It considers selling a stock if it believes the stock's market price exceeds Davis' estimate of the stock's intrinsic value, or if the ratio of the risks and rewards of continuing to own the stock is no longer attractive.

68.     In providing investment advisory services to the Subadvised Funds, Davis must comply with the same or substantially the same provisions of the 1940 Act, SEC regulations, and federal tax law as apply to Davis in providing investment advisory services to the Fund.

69.     The same or substantially the same legal, compliance, and administrative personnel are (or were) responsible for ensuring that Davis's investment advisory services comply with applicable law, for maintaining books and records relating to Davis's provision of investment advisory services to the Subadvised Funds, and for assisting with reports about Davis's investment advisory services. The personnel use (or used) the same or substantially the same systems, technology, and other resources in performing those tasks for the Subadvised Funds as they use for the Fund.

70.     The fees that Davis receives (or received) for providing investment advisory services to the Subadvised Funds are lower than the fees paid by the Fund for the same or substantially the same services.

71.     As shown in the following chart, the Fund's effective investment advisory fee rate of 50 basis points is as much as 96% higher than the effective fee rate the Fund would pay at current levels of AUM (approximately $20.8 billion as of March 31, 2014) pursuant to the fee schedules for the Subadvised Funds.

| Fund | Fee Schedule | Effective Rate (at $20.8B in AUM) | Diff. |
|---|---|---|---|
| Davis New York Venture Fund | 0.55% - up to $3 billion in AUM<br>0.54% - $3 billion to $4 billion<br>0.53% - $4 billion to $5 billion<br>0.52% - $5 billion to $6 billion<br>0.51% - $6 billion to $7 billion<br>0.50% - $7 billion to $10 billion<br>0.485% - $10 billion to $18 billion<br>0.47% - $18 billion to $25 billion<br>0.455% - $25 billion to $33 billion<br>0.44% - $33 billion to $40 billion<br>0.425% - $40 billion to $48 billion<br>0.41% - $48 billion to $55 billion<br>0.395% - over $55 billion in AUM | 0.50% | |
| Columbia Subadvised Fund | 0.45% - up to $100 million in AUM<br>0.40% - $100 million to $500 million<br>0.30% - $500 million to $1 billion<br>0.25% - over $1 billion in AUM | 0.2550% | 96% |
| MetLife Subadvised Fund | 0.35% - up to $50 million in AUM<br>0.325% - $50 million to $500 million<br>0.30% - over $500 million in AUM | 0.3007% | 66% |
| ING Subadvised Fund | 0.35% - up to $50 million in AUM<br>0.325% - $50 million to $500 million<br>0.30% - over $500 million in AUM | 0.3007% | 66% |

| Fund | Fee Schedule | Effective Rate (at $20.8B in AUM) | Diff. |
|------|--------------|-----------------------------------|-------|
| Hancock Subadvised Fund | 0.40% - up to $50 million in AUM<br>0.35% - $50 million to $500 million<br>0.30% - over $500 million in AUM | 0.3013% | 66% |
| AXA Subadvised Fund | 0.43% - up to $150 million in AUM<br>0.40% - $150 million to $500 million<br>0.35% - over $500 million in AUM | 0.3514% | 42% |
| Allianz Subadvised Fund | 0.45% - up to $100 million in AUM<br>0.40% - $100 million to $500 million<br>0.35% - over $500 million in AUM | 0.3514% | 42% |

72.    If the Fund's investment advisory fees were calculated using the fee schedules for the Subadvised Funds, the Fund would pay as much as $51.4 million less in fees annually at current asset levels, as shown in the following chart.

| Fee Schedule | Fees Paid (at $20.8B in AUM) | Difference |
|--------------|-----------------------------|------------|
| Davis New York Venture Fund | $104,460,000 | |
| Columbia Subadvised Fund | $53,050,000 | $51,410,000 |
| MetLife Subadvised Fund | $62,537,500 | $41,922,500 |
| ING Subadvised Fund | $62,537,500 | $41,922,500 |
| Hancock Subadvised Fund | $62,675,000 | $41,785,000 |
| AXA Subadvised Fund | $73,095,000 | $31,365,000 |
| Allianz Subadvised Fund | $73,100,000 | $31,360,000 |

73.    The higher fees paid by the Fund pursuant to the IAA as set forth in the preceding paragraphs are not justified by any additional services provided to the Fund by Defendants or their affiliates.

74.     Insofar as Defendants or their affiliates provide other services to the Fund, beyond the investment advisory services discussed above, those services are provided pursuant to separate contracts for separate compensation, in addition to the fees paid to Defendants under the IAA.

75.     Although the IAA requires Davis to pay certain expenses on behalf of the Fund, including the compensation of the Fund's officers and directors who also are officers, directors, shareholders, or employees of Davis, those expenses are *de minimis* and do not justify the as much as $51.4 million in additional investment advisory fees paid by the Fund each year relative to the Subadvised Funds.

76.     The Fund's SAI identifies 6 individuals who are both officers or directors of the Fund and officers, directors, shareholders, or employees of Davis.

77.     All 6 of those individuals also serve as officers or directors of 16 other mutual funds managed by Defendants and their affiliates.

78.     On information and belief, all 6 of those individuals devote a majority of their time to their responsibilities as employees of Davis, including providing investment advisory services on behalf of Davis, and not to their responsibilities as officers or directors of the Fund.

79.     Any portion of the annual compensation paid by Davis to the Fund's officers that is fairly allocable to those individuals' service as officers or directors of the Fund (as opposed to their responsibilities as employees of Davis and their responsibilities as officers and directors of the other Davis-managed mutual funds) is *de minimis* compared to the additional investment advisory fees paid by the Fund relative to the Subadvised Funds.

## DEFENDANTS REALIZED FALL-OUT BENEFITS
## FROM THEIR RELATIONSHIP WITH THE FUND

80.     "Fall-out benefits" are income, profits, or other indirect or collateral benefits that accrue to an investment adviser from its relationship with a mutual fund in addition to the investment advisory fees charged to the fund.

81.     Defendants realized fall-out benefits from their relationship with the Fund in the form of fees received from the Subadvised Funds and other clients of the Large Cap Value Team whose accounts are "patterned after" the Fund.

82.     Defendants' management of the Fund has enabled Defendants to compete more effectively to be retained by the Subadvised Funds and other clients of the Large Cap Value Team who employ a competitive selection process and negotiate at arm's length with investment advisers, as discussed in ¶¶ 110-114, *infra*.

## THE FUND'S POOR INVESTMENT PERFORMANCE
## UNDER DEFENDANTS' MANAGEMENT

83.     The investment advisory services provided by Defendants to the Fund are of low quality, are inferior to the services provided by other mutual fund investment advisers, and have caused the Fund's investment portfolio to perform poorly.

84.     Like other mutual funds, the Fund reports its investment performance relative to a benchmark.

85.     At all relevant times, the Fund's benchmark has been the S&P 500 Index (the "S&P 500"), which is an unmanaged index of 500 common stocks, consisting primarily of large-capitalization companies listed on the New York Stock Exchange.

86.     According to Morningstar, Inc., a provider of research regarding mutual funds and other investments, the Fund's investment performance has been lower than the S&P 500 for each of the 1-, 3-, 5-, and 10-year periods ended May 31, 2014, as shown in the following chart.

| Total Return Through May 31, 2014 | 1-Year | 3-Year | 5-Year | 10-Year |
|---|---|---|---|---|
| Davis New York Venture Fund | 18.12% | 11.82% | 15.37% | 6.78% |
| S&P 500 | 20.45% | 15.15% | 18.40% | 7.77% |
| Difference | -2.32% | -3.32% | -3.03% | -0.99% |

87.     Morningstar also reports the Fund's investment performance relative to the performance of other mutual funds that Morningstar has determined are comparable to the Fund.

88.     Morningstar categorizes the Fund as a "Large Blend" fund.

89.     As shown in the following chart, the Fund's investment performance has been below average relative to other funds in Morningstar's Large Blend category for each of the 1-, 3-, 5-, and 10-year periods ended May 31, 2014.

| Total Return Through May 31, 2014 | 1-Year | 3-Year | 5-Year | 10-Year |
|---|---|---|---|---|
| Davis New York Venture Fund | 18.12% | 11.82% | 15.37% | 6.78% |
| Large Blend Category Average | 19.22% | 13.40% | 16.95% | 7.31% |
| Difference | -1.10% | -1.58% | -1.58% | -0.53% |

90.     Morningstar assigns mutual funds, including the Fund, a rating of 1 to 5 "stars" based on risk-adjusted returns.

91.     The top 10% of funds within each Morningstar category (*e.g.*, Large Blend) receive 5 stars, the next 22.5% receive 4 stars, the next 35% receive 3 stars, the next 22.5% receive 2 stars, and the bottom 10% receive 1 star.

92.     Morningstar rates funds separately for each of the most recent 3-, 5-, and 10-year periods.

93.     Morningstar also assigns each fund an "overall" rating.

94.     As of May 31, 2014, Morningstar rated the Fund 1 star for the most recent 3-year period, putting the Fund in the bottom 10% of the Large Blend category for that time period.

95.     As of May 31, 2014, Morningstar rated the Fund 2 stars for each of the most recent 5- and 10-year periods and assigned the Fund an "overall" rating of 2 stars, putting the Fund in the bottom third of the Large Blend category for those time periods and overall.

## THE FEES DAVIS IS PAID BY THE FUND ARE NOT NEGOTIATED AT ARM'S LENGTH

96.     The investment advisory fees paid by the Fund under the IAA are determined by Davis.

97.     The Fund's Board is required to approve the IAA and the fees paid by the Fund under the IAA on an annual basis.

98.     The Board has approved the IAA each year on the terms proposed by Davis without devoting the time and attention necessary to independently assess the investment advisory fees paid by the Fund or to effectively represent the interests of Fund shareholders *vis-à-vis* Defendants.

99.     Serving on the Board is a part-time job for the Directors, most of whom are employed full-time in senior-level positions in management, finance, or law, or serve on the boards of directors of other public and privately-held companies and institutions.

100.    The Board is required to oversee not only the Fund, but also 12 other Davis-managed mutual funds.   This includes approving investment advisory and other services contracts for each fund, as well as other oversight responsibilities, including, among many others, monitoring each fund's compliance with federal and state law and its stated investment policies, overseeing the daily pricing of each fund's security holdings, and approving each fund's prospectus, annual and semi-annual shareholder reports, and other required regulatory filings.

101.    In approving the IAA, the Board has relied on information and analyses that were prepared by Davis or were designed to support Davis's rationalization for the fees charged to the Fund.

102.    The Board has not considered information or analyses reflecting the interests of the Fund or its shareholders with respect to the investment advisory fees or critically assessing Davis's rationalization for those fees.

103.    With respect to the fees paid by other clients, the Board has accepted Davis's representations that the lower fees paid by other clients reflect differences in the services provided to those clients.   The Board has not appropriately examined whether the investment advisory services provided to those clients are different from the services provided to the Fund under the IAA or the extent of any such differences.   Nor has the Board considered appropriate information about the cost of providing any additional services required by the IAA to assess whether the difference in fees is warranted by any such differences in the services provided.

104.    The Board has not negotiated a "most favored nation" provision into the IAA, which would require that the fee rate paid by the Fund be at least as favorable as the lowest rate other clients pay for the same or substantially the same investment advisory services.

20

105.    The Board has approved the payment by the Fund of investment advisory fees that are higher than the fees other clients pay for the same or substantially the same investment advisory services.

106.    The Board has not taken appropriate action to address the Fund's poor investment performance.

107.    The Board has not solicited proposals from other advisers to provide investment advisory services to the Fund.

108.    The Board has not negotiated a performance adjustment into the IAA, which would reduce the Fund's investment advisory fee rate during periods when the Fund underperforms its benchmark (*i.e.*, the S&P 500).

109.    Nor has the Board negotiated a waiver or required reimbursement of the investment advisory fees paid by the Fund in response to the Fund's poor investment performance relative to its benchmark and comparable mutual funds.

110.    In contrast, Davis's fees for providing investment advisory services to the Subadvised Funds are determined by negotiations between two sophisticated financial institutions:  Davis on the one hand and the sponsors of the Subadvised Funds on the other.

111.    The sponsors of the Subadvised Funds negotiate at arm's length with Davis regarding the fees paid to Davis for providing investment advisory services to the Subadvised Funds.

112.    The Subadvised Funds' sponsors retain as profit any portion of the investment advisory fees received from the funds that remains after the sponsors pay Davis's subadvisory fees.  By negotiating lower fees with Davis, the Subadvised Funds' sponsors increase the amount of their retained profits.

113.   The Subadvised Funds' sponsors select investment advisers through a competitive selection process, with multiple candidates submitting proposals.

114.   The Subadvised Funds' sponsors negotiate with investment advisers regarding the fees to be charged at the outset of the relationship and when contracts are subject to renewal. The negotiations include exchanges of proposals and counterproposals, resulting in reductions in the fee rates paid by the sponsors to the investment advisers.

115.   The Subadvised Funds' sponsors have taken action to address the poor quality of Davis's investment advisory services, including terminating Davis as subadviser and retaining a different investment adviser to serve as subadviser to the fund.

116.   The sponsor of the Columbia Subadvised Fund replaced Davis as subadviser to that fund effective November 2012 "primarily due to consistent underperformance" under Davis's management, according to proxy disclosures filed by that fund with the SEC.

117.   The sponsor of the Allianz Subadvised Fund replaced Davis effective November 2013 due to, among other factors, "[t]he [Allianz Subadvised] Fund's past performance" under Davis's management, and it replaced Davis with another investment adviser whose funds "significantly outperformed the [Allianz Subadvised] Fund" over the previous 10 years, according to proxy disclosures filed by the Allianz Subadvised Fund with the SEC.

118.   The sponsor of the MetLife Subadvised Fund replaced Davis as subadviser to that fund effective February 2014 "because of the [MetLife Subadvised Fund's] underperformance relative to its benchmark" under Davis's management, according to proxy disclosures filed by that fund with the SEC.

**THE EXCESSIVE INVESTMENT ADVISORY FEES HARM THE FUND**

119.     The investment advisory fees are paid out of the Fund's assets.  Each dollar in fees paid by the Fund directly reduces the value of the Fund's investment portfolio.

120.     The payment of excessive investment advisory fees to Davis harms the Fund on a going forward basis because the Fund loses investment returns and profits it could earn on the amounts paid out as fees if those amounts remained in the Fund's portfolio and were available for investment.

121.     The Fund has sustained millions of dollars in damages due to the excessive investment advisory fees paid to Davis.

**COUNT I**
**AGAINST DEFENDANTS FOR VIOLATION OF SECTION 36(b)**

122.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

123.     Plaintiffs assert this Count on behalf of and for the benefit of the Fund.

124.     Defendants are investment advisers to the Fund.

125.     Under Section 36(b), Defendants owe a fiduciary duty to the Fund with respect to their receipt of investment advisory fees and other compensation from the Fund.

126.     Defendants breached their fiduciary duty under Section 36(b) by charging investment advisory fees to the Fund that are so disproportionately large that they bear no reasonable relationship to the value of the services provided by Defendants and could not have been the product of arm's-length bargaining.

127.     As a direct, proximate, and foreseeable result of Defendants' breach of their fiduciary duty under Section 36(b), the Fund has sustained millions of dollars in damages.

128.    Pursuant to Section 36(b)(3), Plaintiffs seek to recover, on behalf of and for the benefit of the Fund, the actual damages resulting from Defendants' breach of their fiduciary duty, including the excessive investment advisory fees paid by the Fund to Defendants and investment returns that would have accrued to the Fund had those fees remained in the portfolio and available for investment.

129.    Alternatively, under Section 47 of the 1940 Act, 15 U.S.C. § 80a-46, Plaintiffs seek rescission of the IAA and restitution of all excessive investment advisory fees paid by the Fund pursuant to the IAA.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment on behalf of and for the benefit of the Fund as follows:

A.    declaring that Defendants have violated Section 36(b), 15 U.S.C. § 80a-35(b), through the receipt of excessive investment advisory fees from the Fund;

B.    permanently enjoining Defendants from further violations of Section 36(b);

C.    awarding compensatory damages against Defendants, including repayment to the Fund of all unlawful and excessive investment advisory fees paid to Defendants by the Fund from one year prior to the commencement of this action through the date of trial, lost investment returns on those amounts, and interest thereon;

D.    rescinding the IAA pursuant to Section 47 of the 1940 Act, 15 U.S.C. § 80a-46, including restitution to the Fund of the excessive investment

24

advisory fees paid to Defendants by the Fund from one year prior to the commencement of this action through the date of trial, lost investment returns on those amounts, and interest thereon;

E.     awarding Plaintiffs their reasonable costs in this action, including attorneys' fees, expert witness fees, and such other items as may be allowed to the maximum extent permitted by law; and

F.     such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury.

Dated:  December 19, 2014

**ZWERLING, SCHACHTER &**
**ZWERLING, LLP**

By: s/ Robin F. Zwerling

Robin F. Zwerling
Jeffrey C. Zwerling
Susan Salvetti
Andrew W. Robertson
41 Madison Avenue
New York, NY 10010
Tel:  (212) 223-3900
Fax:  (212) 371-5969
rzwerling@zsz.com
jzwerling@zsz.com
ssalvetti@zsz.com
arobertson@zsz.com

*Lead Counsel for Plaintiffs*

**AULO I. GONANO, P.C.**
Aulo I. Gonano
1932 Ford Avenue
Wyandotte, MI 48192
Tel:  (734) 285-3333
Fax:  (734) 285-3399
aulo@aol.com

*Counsel for the Hebda Plaintiffs*

**ROBBINS ARROYO LLP**
Stephen J. Oddo
Edward B. Gerard
Justin D. Rieger
Daniel L. Sachs
600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
soddo@robbinsarroyo.com
egerard@robbinsarroyo.com
jrieger@robbinsarroyo.com
dsachs@robbinsarroyo.com

*Counsel for Plaintiff Schuyler Hoffman*

**KIRBY McINERNEY LLP**
Ira Press
825 Third Avenue, 16th Floor
New York, NY 10022
Tel:  (212) 371-6600
Fax:  (212) 751-2540
ipress@kmllp.com

*Counsel for the Chill Plaintiffs*