UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re DAVIS NEW YORK VENTURE FUND FEE LITIGATION | Master File No. 1:14-cv-4318 (LTS) (HBP) |

**PLANTIFFS' MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANTS' MOTION TO DISMISS**

Robin F. Zwerling
Jeffrey C. Zwerling
Susan Salvetti
Andrew W. Robertson
**ZWERLING, SCHACHTER
   & ZWERLING,** LLP
41 Madison Avenue
New York, NY 10010
Tel:  (212) 223-3900
Fax:  (212) 371-5969

*Lead Counsel for Plaintiffs*

Dated:  April 15, 2015

[Additional counsel listed on signature block]

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................... 1

BACKGROUND REGARDING SECTION 36(b) .............................................. 3

STATEMENT OF RELEVANT FACTS ............................................................ 4

ARGUMENT ...................................................................................................... 8

I.      THE APPLICABLE PLEADING STANDARD ...................................... 8

II.     RULE 8(a) IS SATISFIED WHERE THE FACTS ALLEGED SUPPORT A
        PLAUSIBLE INFERENCE THAT THE FEES ARE DISPROPORTIONATE TO THE
        SERVICES PROVIDED AND ARE OUTSIDE AN ARM'S-LENGTH NEGOTIATED
        RANGE .......................................................................................................... 9

III.    DEFENDANTS CHARGE ADVISORY FEES TO THE FUND OUTSIDE THE
        RANGE OF WHAT COULD BE NEGOTIATED AT ARM'S LENGTH .................... 10

        A.      The Large Disparity Between the Fees Charged to the Fund and Subadvised
                Funds Cannot Be Explained by Differences in the Advisory Services ................... 11

                1.      The Large Disparity in Fees Charged. ........................................ 11

                2.      The Higher Fees Charged to the Fund Are Not Justified by Any
                        Meaningful Difference in the Investment Advisory Services Provided. ..... 11

                3.      The Subadvised Funds' Fees Were Negotiated at Arm's Length. ............... 12

                4.      The Fee Comparisons to the Subadvised Funds Support a Plausible
                        Inference that the Fees Charged to the Fund Are Excessive. ...................... 13

        B.      Defendants' Argument that the Subadvised Fund Fee Comparisons Are Inapt
                Is Contrary to Applicable Law ................................................................. 15

        C.      Defendants' Alternative Fee Comparisons Are Inapt. ............................................. 16

        D.      Plaintiffs' § 36(b) Claim Is Not Based Upon a Lack of "Fee Parity." ..................... 18

IV.     DEFENDANTS' REALIZATION OF FALL-OUT BENEFITS .................................... 20

V.      THE FUND'S SUSTAINED UNDERPERFORMANCE AND THE INFERIOR
        QUALITY OF DAVIS'S ADVISORY SERVICES ........................................ 20

VI.     APPROVAL OF THE ADVISORY FEES BY THE BOARD IS ENTITLED TO
        LITTLE OR NO DEFERENCE ............................................................................ 21

i

VII.    THE DISMISSAL OF THE *TURNER* COMPLAINT NEARLY SIX YEARS BEFORE
        THE COMMENCEMENT OF THIS ACTION DOES NOT PRECLUDE THE
        CLAIM ASSERTED HERE ............................................................................................. 25

        A.    The Issue of Whether the Advisory Fees Charged to the Fund in 2013-14 Are
              Excessive, as Alleged in the Amended Complaint, Was Not Litigated, or
              Decided, in *Turner*. ................................................................................................ 26

        B.    Plaintiffs Have Not Had a Full and Fair Opportunity to Litigate Their Claims. ..... 28

VIII.   RESCISSION IS AVAILABLE PURSUANT TO SECTION 47(b) .............................. 30

CONCLUSION ...................................................................................................................... 30

# TABLE OF AUTHORITIES

**Cases**

*Am. Chem. & Equip., Inc. 401(K) Ret. Plan v. Principal Mgmt. Corp.*,
No. 4:14-cv-00044, 2014 WL 5426908 (S.D. Iowa Sept. 10, 2014) ....................... 9, 11, 16, 23

*Amron v. Morgan Stanley Inv. Advisors Inc.*,
464 F.3d 338 (2d Cir. 2006) .................................................................................. 19, 21, 24

*Arduini ex rel. Int'l Game Tech. v. Hart*,
No. 3:11-cv-00255, 2012 WL 893874 (D. Nev. Mar. 14, 2012) ............................................. 27

*Ashare v. Brill*,
560 F. Supp. 18 (S.D.N.Y. 1983) ............................................................................................ 29

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ................................................................................................................... 8

*BBS Norwalk One, Inc. v. Raccolta, Inc.*,
117 F.3d 674 (2d Cir. 1997) ................................................................................................... 25

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ................................................................................................................... 8

*Benjamin v. Coughlin*,
905 F.2d 571 (2d Cir. 1990) ................................................................................................... 27

*Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*,
750 F.3d 227 (2d Cir. 2014) ..................................................................................................... 8

*Curran v. Principal Mgmt. Corp.*,
No. 4:09-cv-00433, 2010 WL 2889752 (S.D. Iowa June 8, 2010) ................................. 9, 14, 17

*Daily Income Fund, Inc. v. Fox*,
464 U.S. 523 (1984) ..................................................................................................... 3, 4, 22, 29

*Dumond v. Mass. Fin. Servs. Co.*,
No. Civ. A. 04-11458, 2006 WL 149038 (D. Mass. Jan. 19, 2006) ........................................ 10

*Gallus v. Ameriprise Fin., Inc.*,
675 F.3d 1173 (8th Cir. 2012) ................................................................................................ 24

*Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*,
573 F. Supp. 1293 (S.D.N.Y. 1983) *aff'd*, 740 F.2d 190 (2d Cir. 1984) ............... 21, 25, 28, 29

*Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*,
694 F.2d 923 (2d Cir. 1982)................................................................. 28

*Givens v. City of New York*,
No. 11 Civ. 2568, 2012 WL 75027 (S.D.N.Y. Jan. 10, 2012).................................................. 28

*Goodman v. J.P. Morgan Inv. Mgmt., Inc.*,
No. 2:14-cv-414, 2015 WL 965665 (S.D. Ohio Mar. 4, 2015) ........................................ passim

*Green v. Nuveen Advisory Corp.*,
295 F.3d 738 (7th Cir. 2002) ................................................................. 24

*Hamilton v. Allen*,
396 F. Supp. 2d 545 (E.D. Pa. 2005) ....................................................... 30

*Harkins Amusement Enters., Inc. v. Harry Nace Co.*,
890 F.2d 181 (9th Cir.1989) ................................................................ 27

*Henik ex rel. LaBranche & Co., Inc. v. LaBranche*,
433 F. Supp. 2d 372 (S.D.N.Y. 2006)....................................................... 27

*Hoffman v. UBS-AG*,
591 F. Supp. 2d 522 (S.D.N.Y. 2008)....................................................... 16

*Hunt v. Invesco Funds Group, Inc.*,
No. H-04-02555, 2006 WL 1581846 (S.D. Tex. June 5, 2006)................................. 10, 13, 23

*In re Am. Mut. Funds Fee Litig.*,
No. CV 04-5593, 2009 WL 5215755 (C.D. Cal. Dec. 28, 2009) ........................... 20

*In re Bed Bath & Beyond Inc. Deriv. Litig.*,
Civ. No. 06-5107, 2007 WL 4165389 (D.N.J. Nov. 19, 2007) .......................... 27

*In re BlackRock Mut. Funds Advisory Fee Litig*,
Civ. No. 14-1165, 2015 WL 1418848 (D.N.J. Mar. 27, 2015)........................................ passim

*In re Federated Mut. Funds Excessive Fee Litig.*,
No. 2:04-cv-352, 2009 WL 5821045 (W.D. Pa. Sept. 30, 2009) ........................... 9, 13

*In re Franklin Mut. Funds Fee Litig.*,
478 F. Supp. 2d 677 (D.N.J. 2007) ..................................................... 14

*In re Goldman Sachs Mut. Funds Fee Litig.*,
No. 04 Civ. 2567, 2006 WL 126772 (S.D.N.Y. Jan. 17, 2006)................................. 9

*In re Scudder Mut. Funds Fee Litig.*,
No. 04 Civ. 1921, 2007 WL 2325862 (S.D.N.Y. Aug. 14, 2007) ........................... 24

*Irish Lesbian and Gay Org. v. Giuliani*,
    143 F.3d 638 (2d Cir. 1998)..................................................................... 27

*Jones v. Harris Assocs. L.P.*,
    537 F.3d 728 (7th Cir. 2008) ................................................................... 11

*Jones v. Harris Assocs. L.P.*,
    559 U.S. 335 (2010)......................................................................... passim

*Kamen v. Kemper Fin. Servs., Inc.*,
    500 U.S. 90 (1991)................................................................................... 4

*Kasilag v. Hartford Inv. Fin. Servs., LLC*,
    Civ. No. 11-1083, 2012 WL 6568409 (D.N.J. Dec. 17, 2012)........................ passim

*Krantz v. Prudential Inv. Fund Mgmt. LLC*,
    305 F.3d 140 (3d Cir. 2002)..................................................................... 14

*Krinsk v. Fund Asset Mgmt., Inc.*,
    875 F.2d 404 (2d Cir. 1989)................................................................ 19, 20

*Lanza v. Drexel & Co.*,
    479 F.2d 1277 (2d Cir. 1973)................................................................... 24

*Lawlor v. Nat'l Screen Serv. Corp.*,
    349 U.S. 322 (1955)............................................................................... 26

*LeBoyer v. Greenspan*,
    No. CV 03-5603, 2007 WL 4287646 (C.D. Cal. June 13, 2007) ..................... 27

*Lerner v. Reserve Mgmt. Co.*,
    80 Civ. 1238, 1981 WL 1641 (S.D.N.Y. June 17, 1981)............................... 29

*Li v. Asphalt Green, Inc.*,
    581 Fed. Appx. 6 (2d Cir. 2014)............................................................... 26

*Meyer v. Oppenheimer Mgmt. Corp.*,
    895 F.2d 861 (2d Cir. 1990)..................................................................... 20

*Migdal v. Rowe Price-Fleming Int'l, Inc.*,
    248 F.3d at 327 (4th Cir. 2001) ..................................................... 14, 17, 24

*Mintz v. Baron*,
    No. 05 Civ. 4904, 2009 WL 735140 (S.D.N.Y. Mar. 20, 2009) ..................... 19

*NML Capital, Ltd. v. Banco Cent. de la Republica Argentina*,
    652 F.3d 172 (2d Cir. 2011)..................................................................... 25

*Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt., LLC*,
    595 F.3d 86 (2d Cir. 2010) ............................................................................ 28

*Purdy v. Zeldes*,
    337 F.3d 253 (2d Cir. 2003) .......................................................................... 27

*R.W. Grand Lodge of F. & A.M. of Penn. v. Salomon Bros. All Cap Value Fund*,
    425 Fed. Appx. 25 (2d Cir. 2011) ................................................................. 14

*Reso v. Artisan Partners Ltd. P'ship*,
    No. 11-CV-873, 2011 WL 5826034 (E.D. Wis. Nov. 18, 2011) ............... 9, 13, 17, 23

*Richards v. Jefferson County, Ala.*,
    517 U.S. 793 (1996) ..................................................................................... 30

*Santomenno v. John Hancock Life Ins. Co.*,
    677 F. 3d 178 (3d Cir. 2012) ........................................................................ 30

*Schuyt v. Rowe Price Prime Reserve Fund, Inc.*,
    622 F. Supp. 169 (S.D.N.Y. 1985) ............................................................... 25

*Siemers v. Wells Fargo & Co., C*,
    No. 05-04518, 2006 WL 2355411 (N.D. Cal. Aug. 14, 2006) ................... 21

*Sins v. Janus Capital Mgmt., LLC*,
    No. 04-cv-01647, 2006 WL 3746130 (D. Colo. Dec. 15, 2006) ............... 10, 20

*Sonus Networks, Inc., S'holder Deriv. Litig.,*,
    499 F.3d 47 (1st Cir. 2007) ......................................................................... 27

*Steinberg v. Janus Capital Mgmt. LLC*,
    457 Fed. Appx. 261 (4th Cir. 2011) ............................................................ 30

*Stone ex rel. AmSouth Bancorporation v. Ritter*,
    911 A.2d 362 (Del. 2006) ............................................................................ 24

*Turner v. Davis Selected Advisers, L.P.*,
    No. 08-421 (D. Ariz. June 1, 2011) ....................................................... passim

*Wicks v. Putnam Inv. Mgmt., LLC*,
    No. Civ.A.04-10988, 2005 WL 705360 (D. Mass. Mar. 28, 2005) ........... 10, 29

*Yameen v. Eaton Vance Distributors, Inc.*,
    394 F. Supp. 2d 350 (D. Mass 2005) ........................................................... 14

*Zehrer v. Harbor Capital Advisors, Inc.*,
    No. 14 C 789, 2014 WL 6478054 (N.D. Ill. Nov. 18, 2014) .................. passim

**Statutes**

15 U.S.C. § 80a-35(b) ........................................................................................................ 3, 30

**Rules**

Fed. R. Civ. P. 8(a) ................................................................................................................ 2

Fed. R. Civ. P. 8(a)(2) ............................................................................................................ 8

Fed. R. Civ. P. 41(a)(1) ........................................................................................................ 29

**Miscellaneous**

University of Pennsylvania's Wharton School of Finance and Commerce.  *See* A STUDY OF
    MUTUAL FUNDS, H.R. REP. NO. 87-2274 (1962) ...................................................... 4

*Senate Committee on Banking & Currency*,
    S. REP. NO. 184, 91st Cong., 1st Sess. (1969) ........................................................ 4

Plaintiffs Gary A. Hebda, Deborah L. Hebda, Saul Chill, Sylvia Chill, and Schuyler Hoffman (together, "Plaintiffs") respectfully submit this memorandum of law in opposition to the Motion to Dismiss the Consolidated Amended Complaint ("Amended Complaint") filed by Defendants Davis Selected Advisers, L.P. ("Davis Advisors") and Davis Selected Advisers-NY, Inc. ("Davis-NY") (together, "Davis" or "Defendants").

## PRELIMINARY STATEMENT

Defendants' investment advisory fee arrangements with the Davis New York Venture Fund (the "Fund") epitomize the conflicts of interest and potential for abuse that led Congress to enact § 36(b). Unconstrained by competitive pressures, Defendants charge the Fund advisory fees that are as much as 96% higher than the fees negotiated at arm's length by other, independent mutual funds (the "Subadvised Funds") for Davis's investment advisory services. Despite the substantially higher fees charged to the Fund, the Fund's investment performance has lagged behind both its benchmark and other comparable mutual funds for the past ten years. Approval of the fees by the Fund's Board of Directors (the "Board") has not served as an effective check on the fees charged.

The facts and circumstances pertaining to the advisory fees charged to the Fund fall squarely within the standard of liability for evaluating § 36(b) claims established by the U.S. Supreme Court in *Jones v. Harris Assocs. L.P.*, 559 U.S. 335 (2010). The large disparity between fees charged to the Fund and the Subadvised Funds provides support for a plausible inference that the fees charged to the Fund are disproportionate to the services provided and outside the range of what could be negotiated at arm's length. Allegations regarding the Fund's poor track record over the past decade and "fall-out benefits" that Defendants were able to capture further evidence that the fees are disproportionate to the services. Also, the Board's

failure to negotiate at arm's length or consider information necessary to properly evaluate Davis's advisory fees requires that little deference be given to the Board. The foregoing facts, taken together and considered as a whole, as they must be, satisfy the applicable pleading standard under Fed. R. Civ. P. 8(a) by establishing a plausible inference that the fees charged by Defendants to the Fund violate § 36(b).

Unable to contest the legitimacy of Plaintiffs' fee comparisons, Defendants ask the court to ignore them and instead proffer comparisons with fees charged by Davis to another one of its captive mutual funds and with the fees charged by other investment advisers to their captive mutual funds.  However, *Jones* cautions against exactly those types of comparisons, and holds that the arm's-length range of fees for services—established here by the fees charged to the Subadvised Funds—is the benchmark for evaluating challenged fees.

Defendants' arguments that the allegations are not properly pled would compel far greater detail than is required by notice pleading and raise questions of fact that cannot be the basis for a motion to dismiss, as recognized by numerous recent decisions upholding similar complaints.  Rather than addressing (let alone distinguishing) those decisions, Defendants instead impugn Plaintiffs' counsel for involvement in other § 36(b) litigation.[1]  Defendants' attacks aside, Plaintiffs do not broadly challenge the validity of the adviser-subadviser structure. (Defs.' Br. at 14.)  Rather, consistent with *Jones*, Plaintiffs rely upon fee rates negotiated at arm's length for Defendants' services within adviser-subadviser structures to allege that the fees charged to the Fund by Defendants are outside of the arm's-length range and disproportionate to the services provided.

Finally, the dismissal of § 36(b) claims asserted in *Turner v. Davis Selected Advisers,*

---

[1]     While Defendants cite cases in which Plaintiffs' counsel have been involved, (*see* Defendants' Memorandum of Law in Support of Their Motion to Dismiss the Consolidated Amended Complaint ("Defs.' Br.") at 1), the claims in those cases were upheld in the face of similar challenges as those raised by Defendants here.

*L.P.*, Civ. No. 08-421 (D. Ariz.)—an action filed by an unrelated plaintiff nearly six years before this action was commenced—provides no basis for preclusion here.[2]   The *Turner* court's finding that the plaintiff there failed to adequately **plead** a § 36(b) claim with respect to fees charged to the Fund in ***2007-08***, says nothing about whether the Amended Complaint states a claim with respect to the advisory fees charged to the Fund in ***2013-14***, particularly where the Amended Complaint includes critical allegations never considered by the *Turner* court.

## BACKGROUND REGARDING SECTION 36(b)

Congress adopted the 1940 Act to regulate investment companies, including mutual funds.   Typically, a mutual fund is created by an investment adviser, which is an entity separate from the fund.  *See Jones*, 559 U.S. at 338.   "The adviser selects the fund's directors, manages the fund's investments, and provides other services."  *Id*.   In this sense, a mutual fund is often referred to as "captive" of its adviser.  *Id*. at 349.   Recognizing that the relationship between an investment adviser and its captive mutual fund is "fraught with potential conflicts of interest," and concerned about the "potential for abuse" in this structure, Congress enacted protections for mutual fund shareholders in the 1940 Act.  *Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 536-38 (1984) (quotation marks and citations omitted).

Congress amended the 1940 Act in 1970 to provide additional protections to shareholders.  Among other amendments, Congress added a new § 36(b), which provides:

> [T]he investment adviser of a [mutual fund] shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by [the mutual fund], or by the security holders thereof, to such investment adviser or any affiliated person of such investment adviser.

15 U.S.C. § 80a-35(b).  Section 36(b) creates a private right of action for fund shareholders to

---

[2]     The decision on the motion to dismiss in *Turner* is attached as Exhibit CC to the Declaration of Stephen G. Topetzes in Support of Defendants' Motion to Dismiss the Amended Complaint ("Topetzes Decl.") (Dkt. No. 59).

enforce the fiduciary duty created by the statute on behalf of the fund.  *See id.*

Section 36(b) reflects Congress's determination that "the forces of arms-length bargaining do not work in the mutual fund industry in the same manner as they do in other sectors of the American economy." S. Rep. No. 91-184, at 4 (1969), *reprinted in* 1970 U.S.C.C.A.N. 4897, 4901.   This conclusion was based in part on a study of the mutual fund industry by the University of Pennsylvania's Wharton School of Finance and Commerce.  *See* A Study of Mutual Funds, H.R. Rep. No. 87-2274 (1962) ("Wharton Report").[3]  The Wharton Report determined that "investment advisers often charged mutual funds higher fees than those charged the advisers' other clients," *Daily Income Fund*, 464 U.S. at 537 (citing Wharton Report at 28-30), and the "principal reason for the differences in rates" was that "competitive factors which tend to influence rates charged other clients have not been substantially operative in fixing the advisory fee rates paid by mutual funds."  Wharton Report at 493-94.

Finally, § 36(b) reflects Congress's conclusion that "shareholders should not have to rely solely on the fund's directors to assure reasonable adviser fees."  *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 108 (1991) (quotation marks and citation omitted).   Congress established § 36(b) as a "mechanism by which the fairness of" the investment advisory fees "could be tested in court." S. Rep. No. 91-184, at 5 (1969), *reprinted in* 1970 U.S.C.C.A.N. 4897, 4901.

## STATEMENT OF RELEVANT FACTS

### Nature and Quality of Defendants' Investment Advisory Services to the Fund

Defendants serve as investment advisers to the Fund pursuant to an Investment Advisory Agreement between Davis Advisors and the Fund (the "IAA") and a subadvisory agreement

---

[3]          Also available at: http://www.sechistorical.org/museum/galleries/tbi/gogo_c.php.

between Davis Advisors and Davis-NY.  ¶ 28.[4]  The IAA requires Davis to provide certain investment advisory services to the Fund, including researching potential investments, deciding which securities to purchase for or sell from the Fund's investment portfolio, and arranging for the execution of purchase and sale orders on behalf of the Fund.  ¶ 29.  The IAA also requires Davis to maintain certain books and records.  ¶ 30.

In exchange for the investment advisory services provided by Davis to the Fund, the IAA requires the Fund to pay Davis Advisors an annual fee that is calculated as a percentage of the Fund's assets under management or "AUM."  ¶ 42.  Davis Advisors then allocates a portion of the investment advisory fees to Davis-NY pursuant to a subadvisory agreement.  ¶ 43.

**Fees Paid by Other Clients for Davis's Investment Advisory Services**

Davis also provides, or provided, investment advisory services to other mutual fund clients.  ¶¶ 47-49.  These mutual funds ("Subadvised Funds") are organized and sponsored by financial institutions independent of Davis (the "adviser-sponsors").  ¶¶ 51, 55.  The Subadvised Funds are "independent," rather than "captive" mutual funds of Defendants.  Each adviser-sponsor has subcontracted with Davis to provide investment advisory services to its funds.  ¶ 56.  Pursuant to subadvisory agreements between Davis and each adviser-sponsor, Davis acts (or acted) as a subadviser and provides (or provided) investment advisory services to each Subadvised Fund in exchange for a fee which is paid by the adviser-sponsor.  ¶ 56.

The investment advisory services provided to the Subadvised Funds by Davis are the same or substantially the same as the services it provides to the Fund pursuant to the IAA.  ¶ 58.  For example, like the Fund's IAA, the subadvisory agreement for the AXA Subadvised Fund requires Davis to:  (a) "coordinate the investment and reinvestment of the assets" of the AXA

---

[4]      All ¶ references are to the Amended Complaint (Dkt. No. 48).

Subadvised Fund; (b) "determine the composition of the assets" of the AXA Subadvised Fund; and (c) arrang[e] for the purchase and sale of securities and other investments" on behalf of the AXA Subadvised Fund.  *Compare* ¶ 59 *with* ¶ 29.  Also, like the Fund's IAA, the subadvisory agreements require Davis to maintain books and records relating to its provision of investment advisory services to the Subadvised Funds.  *Compare* ¶ 60 *with* ¶ 30.

For both the Fund and the Subadvised Funds, Davis employs the same or substantially the same investment strategies and invests in the same or substantially the same types of securities.  ¶¶ 63, 65-67.  The same portfolio managers and other investment professionals who manage each of the Funds also manage the corresponding Subadvised Funds.  ¶¶ 61-62.  Davis uses the same or substantially the same research and analysis, and systems, technology, and other resources in providing investment advisory services to the Subadvised Funds as it uses in providing investment advisory services to the Fund.  ¶ 63.  The same or substantially the same legal, compliance, and administrative personnel are (or were) responsible for ensuring that Davis's investment advisory services for both the Fund and the Subadvised Funds comply with applicable law, and for maintaining books and records relating to Davis's provision of investment advisory services to both the Fund and the Subadvised Funds.  ¶¶ 68-69.

Despite the virtually complete overlap in services provided, the fees that Davis receives for providing investment advisory services to the Subadvised Funds are significantly lower than the fees paid by the Fund for those same services, resulting in the Fund paying more than $51.4 million annually in excessive fees.  ¶¶ 70-72.

The higher fees paid by the Fund pursuant to the IAA are not justified by any additional services provided to the Fund by Defendants or their affiliates.  ¶ 73.  Any other services provided to the Fund, beyond investment advisory and administrative services, are provided

pursuant to separate contracts for separate, additional compensation.  ¶ 74.

**Fall-Out Benefits Realized by Defendants**

"Fall-out benefits" are income, profits, or other indirect or collateral benefits that accrue to an investment adviser from its relationship with a mutual fund in addition to the investment advisory fees charged to the fund.  Defendants realized "fall-out" benefits from their relationship with the Fund in the form of fees received from the Subadvised Funds and other clients of the Large Cap Value Team whose accounts are "patterned after" the Fund.  ¶ 81.  Specifically, Defendants' management of the Fund has enabled Defendants to compete more effectively to be retained by the Subadvised Funds and other clients of the Large Cap Value Team who employ a competitive selection process and negotiate at arm's length with investment advisers. ¶ 82.

**The Fund's Poor Investment Performance**

The Fund's investment portfolio has performed poorly as a result of the low quality advisory services provided by Defendants.  ¶ 83.  The Fund's investment performance has been lower than its benchmark, the S&P 500, for each of the prior 1-, 3-, 5-, and 10-year periods ended May 31, 2014.  ¶ 86.  The Fund's performance has also been below average relative to other funds in its "Large Blend" peer group.  ¶¶ 88-89.  As of May 31, 2014, Morningstar rated the Fund in the bottom 10% of the Large Blend category for the most recent 3-year period, and in the bottom third for the most recent 5- and 10-year periods.  ¶¶ 94-95.  As a consequence of Davis's low quality services, several of its other mutual fund clients have terminated Davis as their investment adviser, specifically citing "performance" issues.  ¶¶ 115-118.

**Board Approval of the Advisory Fees Charged to the Fund**

The Fund's Board has approved the IAA each year without devoting the time and attention necessary to assess the advisory fees charged to the Fund.  ¶ 98.  The Board passively

accepted Davis's rationalization for the fees charged and did not appropriately examine, among other things, the disparity between fees charged to the Fund and to the Subadvised Funds or any purported justification for such disparity.   ¶¶ 101-103.   In contrast to the sponsors of the Subadvised Funds, the Board has not taken any action to address the poor quality of Davis's investment advisory services in relation to the fees it continues to charge to the Fund.  ¶ 115.

## ARGUMENT

### I.    THE APPLICABLE PLEADING STANDARD

While Defendants attempt to impose a heightened pleading requirement—referring to a purportedly "difficult burden" and "daunting standard" (Defs.' Br. at 1)—it is Rule 8 of the Federal Rules of Civil Procedure that governs the pleading sufficiency of a § 36(b) claim.  *See Zehrer v. Harbor Capital Advisors, Inc.,* No. 14 C 789, 2014 WL 6478054, at *2 (N.D. Ill. Nov. 18, 2014).  Rule 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief."   Fed. R. Civ. P. 8(a)(2).   This standard "do[es] not require heightened fact pleading of specifics…."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

To survive a motion to dismiss, a complaint must simply contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).   While this plausibility standard requires a plaintiff to show that success on the merits is more than a "sheer possibility," it is not a "probability requirement."  *Id*.   A district court must "accept[] the complaint's factual allegations as true and draw[] all reasonable inferences in the plaintiff's favor."  *Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 232 (2d Cir. 2014).

## II.  RULE 8(a) IS SATISFIED WHERE THE FACTS ALLEGED SUPPORT A PLAUSIBLE INFERENCE THAT THE FEES ARE DISPROPORTIONATE TO THE SERVICES PROVIDED AND ARE OUTSIDE AN ARM'S-LENGTH NEGOTIATED RANGE

Under § 36(b), the pleading stage inquiry is whether Plaintiffs "allege facts which would satisfy the basic standard articulated in *Gartenberg*, 'that the fees are disproportionately large, that they bear no reasonable relationship to the services rendered or that they could not have been the product of arm's-length bargaining.'" *In re Goldman Sachs Mut. Funds Fee Litig.,* No. 04 Civ. 2567, 2006 WL 126772, at *9 (S.D.N.Y. Jan. 17, 2006) (citation omitted); *see also Jones*, 559 U.S. at 351.  Plaintiffs "may state a § 36(b) claim by alleging any combination of facts that plausibly support an inference that a particular fee, given all of the surrounding facts and circumstances, is disproportionately large to the services rendered in exchange for that fee."  *In re BlackRock Mut. Funds Advisory Fee Litig.*, Civ. No. 14-1165, 2015 WL 1418848, at *4 (D.N.J. Mar. 27, 2015) (citation omitted).

The *Gartenberg* factors, while pertinent, are non-exclusive and Plaintiffs are not required to plead facts with respect to all of the factors.  *See In re BlackRock*, 2015 WL 1418848, at *4; *Goodman v. J.P. Morgan Inv. Mgmt., Inc.*, No. 2:14-cv-414, 2015 WL 965665, at *4 (S.D. Ohio Mar. 4, 2015); *Zehrer*, 2014 WL 6478054, at *2; *Kasilag v. Hartford Inv. Fin. Servs., LLC,* Civ. No. 11-1083, 2012 WL 6568409, at *2 (D.N.J. Dec. 17, 2012); *In re Federated Mut. Funds Excessive Fee Litig.*, No. 2:04-cv-352, 2009 WL 5821045, at *3 (W.D. Pa. Sept. 30, 2009).[5]

Defendants conveniently ignore the numerous district court decisions upholding the pleading sufficiency of § 36(b) claims founded upon allegations similar to those here.  *See, e.g.*, *In re BlackRock*, 2015 WL 1418848; *Goodman*, 2015 WL 965665; *Zehrer*, 2014 WL 6478054; *Am. Chem. & Equip., Inc. 401(K) Ret. Plan v. Principal Mgmt. Corp.*, No. 4:14-cv-00044, 2014

---

[5]        Even Defendants' authority recognizes as much.  *See In re Goldman Sachs,* 2006 WL 126772, at *8-9.

WL 5426908, at *4 (S.D. Iowa Sept. 10, 2014); *Kasilag,* 2012 WL 6568409; *In re Federated*, 2009 WL 5821045; *Reso v. Artisan Partners Ltd. P'ship*, No. 11-CV-873, 2011 WL 5826034 (E.D. Wis. Nov. 18, 2011); *Curran v. Principal Mgmt. Corp.*, No. 4:09-cv-00433, 2010 WL 2889752, at *9 (S.D. Iowa June 8, 2010); *Sins v. Janus Capital Mgmt.*, *LLC*, No. 04-cv-01647, 2006 WL 3746130 (D. Colo. Dec. 15, 2006); *Hunt v. Invesco Funds Group, Inc.*, No. H-04-02555, 2006 WL 1581846 (S.D. Tex. June 5, 2006); *Dumond v. Mass. Fin. Servs. Co.*, No. Civ. A. 04-11458, 2006 WL 149038 (D. Mass. Jan. 19, 2006); *Wicks v. Putnam Inv. Mgmt., LLC*, No. Civ.A.04-10988, 2005 WL 705360 (D. Mass. Mar. 28, 2005).

## III. DEFENDANTS CHARGE ADVISORY FEES TO THE FUND OUTSIDE THE RANGE OF WHAT COULD BE NEGOTIATED AT ARM'S LENGTH

The Supreme Court in *Jones* held that courts considering claims under § 36(b) must "use[] the range of fees that might result from arm's-length bargaining as the benchmark for reviewing challenged fees." *Jones*, 559 U.S. at 347.  The Supreme Court further explained that the fees paid by the adviser-defendant's other clients should be given "the weight that they merit in light of the ***similarities and differences between the services*** that the clients in question require . . . ."  *Id.* at 350 (emphasis added).  The fees paid by other clients are probative of a breach of fiduciary duty under § 36(b) "where plaintiffs have shown a large disparity in fees that cannot be explained by the different services" provided to other clients.  *Id.* at 350 n.8.

The Supreme Court emphasized that, in order to be probative under § 36(b), the fees used as comparison points must have been the result of negotiations conducted at arm's-length (like the Subadvised Funds' fees).  *Id*. at 350-51.  Contrary to Defendants' position, *Jones* cautioned that "courts should not rely too heavily on comparisons with fees charged to mutual funds by other advisers."  *Id*. at 350.  "These comparisons are problematic because these fees, like those challenged, may not be the product of negotiations conducted at arm's length."  *Id.* at 350-351

(citing *Jones v. Harris Assocs. L.P.*, 537 F.3d 728, 732 (7th Cir. 2008) (Posner, J., dissenting)).

A.     **The Large Disparity Between the Fees Charged to the Fund and Subadvised Funds Cannot Be Explained by Differences in the Advisory Services**

Consistent with *Jones*, Plaintiffs have alleged that: (1) there is a large disparity between the investment advisory fees charged to the Fund by Davis and the investment advisory fees charged to the Subadvised Funds by Davis; (2) the disparity cannot be explained by any purported differences in the services provided because Davis provides the same or substantially the same investment advisory services to the Fund and to the Subadvised Funds; and (3) the fees charged by Davis to the Subadvised Funds were the result of arm's-length negotiations.

1.   **The Large Disparity in Fees Charged.**

Plaintiffs allege that the fees charged to the Fund for Defendants' investment advisory services are disproportionately higher than the fees charged by Defendants to the Subadvised Funds for the same or substantially the same services.  *See* ¶¶ 4-6, 46-79.  The fee rates charged by Defendants to the Fund are as much as 96% higher than the fee rates charged by Defendants to the Subadvised Funds.  *See* ¶ 71.  The difference in fees is even more pronounced in dollars paid, with the Fund paying as much as $51.4 million more in fees per year for Defendants' services than they would pay pursuant to the fee schedules of the Subadvised Funds.  *See* ¶ 72.

2.   **The Higher Fees Charged to the Fund Are Not Justified by Any Meaningful Difference in the Investment Advisory Services Provided.**

"At the heart of a 36(b) claim is the relationship between the fees charged to the fund and the services rendered to the fund."  *Am. Chem.,* 2014 WL 5426908, at *5.  Because Davis provides the same or substantially the same investment advisory services to the Fund and to the Subadvised Funds, there is no justification for charging significantly higher fees.  For example, the Fund's IAA and a Subadvised Fund's subadvisory agreement both require Davis to provide the same or substantially the same types of investment advisory services.  *Compare* ¶ 29 *with* ¶

11

59.  The significantly higher fees charged to the Fund, therefore, cannot be justified by any meaningful difference in Davis's investment advisory services.  ¶¶ 73-75.

The disclosures in the prospectuses of the Fund and the Subadvised Funds also show that the services are substantively identical.  Defendants employ substantially the same investment strategies and invest in substantially the same types of securities for both the Fund and the Subadvised Funds.  ¶¶ 58, 63-67.  The same portfolio managers and other investment professionals are involved in providing investment advisory services to both sets of funds, and use the same research and analysis, systems, technology, and other resources.  *See* ¶¶ 61-69. Finally, because both the Fund and the Subadvised Funds are mutual funds registered under the 1940 Act, *see* ¶ 52, the same laws and regulations govern Davis's provision of investment advisory services to both sets of funds, *see* ¶ 68.  Assessing strikingly similar allegations, the court in *Goodman* denied defendant's motion to dismiss, finding:

> Plaintiffs have pled a notable disparity in the fees obtained for servicing the three funds with which they are involved and the subadvised funds, while concurrently pleading that the services provided to and resources involved in all of the funds are substantially the same. This latter point is important because it is the work done and not the label given to the work that will likely and ultimately prove dispositive of Plaintiffs' claims. The prospectus disclosures and involvement by the same portfolio managers and investment professionals support the similarity allegations.

*Goodman*, 2015 WL 965665, at *5; *see also In re BlackRock*, 2015 WL 1418848, at *5.

### 3.  The Subadvised Funds' Fees Were Negotiated at Arm's Length.

Defendants do not contest that the fees charged by Davis to the Subadvised Funds were the result of arm's-length negotiations.[6]  The result of those negotiations is that Davis charges fees to the Subadvised Funds that are significantly lower than those it charges to the Funds.  The

---

[6]  The adviser-sponsors of the Subadvised Funds select investment advisers, such as Davis, through a competitive selection process (¶ 113), and they negotiate at arm's-length with Davis and other investment advisers regarding the fees charged to provide investment advisory services to the Subadvised Funds (¶ 111), including exchanging proposals and counterproposals and seeking reductions in the fee rates charged (¶ 114).

Subadvised Funds' fees are not lower due to any meaningful difference in the advisory services provided by Davis.  Thus, the subadvised fees provide the range of fees that could be negotiated at arm's length for Davis's investment advisory services.  *See Jones*, 559 U.S. at 349.

### 4. The Fee Comparisons to the Subadvised Funds Support a Plausible Inference that the Fees Charged to the Fund Are Excessive.

That the Fund pays as much as 96% higher fee rates for advisory services than the independent Subadvised Funds pay for the same or substantially the same services supports the inference that the Fund's fees are disproportionately large and outside the range of what could be negotiated at arm's length for Davis's advisory services.  *See Jones*, 559 U.S. at 350 & n.8.

Defendants ignore that numerous courts—both before and after *Jones*—have denied motions to dismiss § 36(b) claims with strikingly similar allegations as here.  *See, e.g.*, *In re BlackRock*, 2015 WL 1418848, at *6 ("[A]ssuming that the Funds pay as much as 106% higher fees for BlackRock advisory services than the Sub-Advised Funds pay for the same or substantially the same services, Plaintiffs' allegations support the inference that the Funds' fees are disproportionately large and outside the range of what could be negotiated at arm's length for BlackRock's advisory services."); *Goodman*, 2015 WL 965665, at *5 (noting the disparity in fees charged by defendant for servicing the funds at issue and certain subadvised funds while accepting allegations that the services provided to all of the funds are "substantially the same"); *Reso*, 2011 WL 5826034, at *8 (comparing fees charged by defendant to other funds that it managed for providing "similar services" and holding that the higher fees charged to the captive funds "give rise to the inference that [defendant] has comparatively over-charged the funds in this case"); *In re Federated,* 2009 WL 5821045, at *6-7 (denying motion to dismiss where complaint alleged, *inter alia*, that defendants provide the same advisory services to other clients, who are able to negotiate at arm's-length, for substantially lower fees); *Hunt*, 2006 WL 1581846,

13

at *3 ("This Court agrees with other district courts that have found such allegations, that investment managers charge fund shareholders higher fees than other clients for equivalent advisory services, to be indicative of a disproportionate relationship between fees and service.").

Courts have also denied motions to dismiss in analogous cases where an investment adviser charged its captive funds an advisory fee rate substantially higher than the fee rate it paid to an independent subadviser to perform the same or substantially the same services. *See, e.g.*, *Zehrer*, 2014 WL 6478054, *2 (upholding claim alleging that defendant delegated primary investment management responsibilities to subadvisor yet retained almost half of the fees); *Kasilag*, 2012 WL 6568409, at *3 (where plaintiffs alleged that defendant charged the funds an average of three times what it cost to provide "essentially the same investment management services" a plausible inference that the fees are excessive under § 36(b) was raised); *Curran*, 2010 WL 2889752, at *9 (finding allegations that adviser-sponsor "charges more than the subadvisors, who allegedly provide the bulk of investment advice" support the reasonable inference that adviser collected excessive advisory fees).[7]

In a parallel situation, the Second Circuit had "little trouble concluding" that plaintiffs had adequately alleged a claim under § 36(b) where defendant charged its captive funds a transfer agency fee that was significantly higher than the rate it negotiated at arm's length with an unaffiliated entity to provide transfer agency services. *R.W. Grand Lodge of F. & A.M. of Penn. v. Salomon Bros. All Cap Value Fund*, 425 Fed. Appx. 25, 30 (2d Cir. 2011). The court held that "the transfer agent arrangement . . . constitutes a garden variety breach of fiduciary duty" and stated a claim under § 36(b) because "Defendants knowingly inflated the price of the

---

[7]      Defendants' citation to cases that were dismissed for failure to allege that fees were excessive in relation to the services provided (*see* Defs.' Br. at 11 n.21), have no relevance here where Plaintiffs set forth those very allegations. *Cf. Krantz v. Prudential Inv. Fund Mgmt. LLC*, 305 F.3d 140 (3d Cir. 2002); *Migdal*, 248 F.3d 321; *In re Franklin Mut. Funds Fee Litig.*, 478 F. Supp. 2d 677 (D.N.J. 2007); *Yameen v. Eaton Vance Distributors, Inc.* 394 F. Supp. 2d 350 (D. Mass 2005).

transfer agent services provided to Plaintiffs and pocketed the difference between what they charged and what the services were worth." *Id.* at 30-31.  Plaintiffs here make essentially the same allegation based on the Subadvised Funds fee comparisons.

Defendants' contention to the contrary, Plaintiffs do not "broadly attack adviser-subadviser management structures for mutual funds." (Defs.' Br. at 14.)   Rather, Plaintiffs specifically attack the investment advisory fees charged to the Fund for Defendants' advisory services.  This challenge has nothing to do with the Fund's management structure or whether the SEC has approved of "manager of manager" fund structures.  (*See* Defs.' Br. at 14-15.)

### B.   Defendants' Argument that the Subadvised Fund Fee Comparisons Are Inapt Is Contrary to Applicable Law.

Defendants deride the Subadvised Fund fee comparisons as "inapt" based upon mere nomenclature:  that is, the Davis Fund pays what is called an "advisory fee" and the Subadvised Funds pay what is called a "subadvisory fee."  (Defs.' Br. at 12-17.)  But this is a distinction without a difference.   Regardless of whether the label is "adviser" or "subadviser," Plaintiffs have alleged the correct comparison—Defendants provide the same or substantially the same services.   *See Jones*, 559 U.S. at 350 (fee comparisons should be given "the weight that they merit in light of the similarities and differences ***between the services*** that the clients in question require") (emphasis added).

The court in *In re BlackRock* rejected the same, so-called "apples-to-oranges" (Def. Br. at 2) argument raised by Defendants here, finding:

> This argument, however, misses the mark.  Plaintiffs' claim is based on their assertion that the total amount of advisory fees charged to the Funds is excessive in relation to the value of the advisory services provided by all the Defendants. Accordingly, Plaintiffs' fee comparison is appropriate, as they have alleged that BRIM, in its capacity as a sub-adviser to the Sub-Advised Funds, provides the same or substantially the same investment advisory services as all the Defendants provide to the Funds.  For purposes of this claim, the ultimate weight of this comparison is not before the Court….

*In re BlackRock*, 2015 WL 1418848, at \*5; *see also Goodman*, 2015 WL 965665, at \*5 ("[I]t is the work done and not the label given to the work that will likely and ultimately prove dispositive of Plaintiffs' claims.").

Defendants' attempts to distinguish their role as subadviser from their role as adviser to the Fund fall short. Defendants' argument that they have a "more limited role" when serving as a subadviser (Defs.' Br. at 13), flies in the face of the express terms of the Subadvised Funds' agreements. Those agreements require Defendants to provide the same or substantially the same services to the Subadvised Funds as they provide to the Fund, notwithstanding any purported oversight by the adviser-sponsors of the Subadvised Funds. Further, insofar as Defendants provide services to the Fund in addition to investment advisory services, they provide those services pursuant to separate contracts for separate compensation, in addition to the advisory fees at issue here. *See* ¶ 74. Thus, Defendants' argument that the higher fees charged to the Fund are justified based on any purported additional work or greater "legal responsibility and risk" (Defs.' Br. at 13-14) raises "an evidence-dependent contention that cannot be afforded dispositive force in [] motion-to-dismiss context." *Goodman,* 2015 WL 965665, at \*5; *see also In re BlackRock*, 2015 WL 1418848, at \*5; *Zehrer*, 2014 WL 6478054, at \*4; *Am. Chem.,* 2014 WL 5426908, at \*6; *Kasilag*, 2012 WL 6568409, at \*3.[8]

## C.    Defendants' Alternative Fee Comparisons Are Inapt.

Defendants submit two alternative fee comparisons that they contend support a competing inference that the advisory fees charged to the Fund are within the range that could be negotiated at arm's-length and appropriate under § 36(b). Defendants compare: (1) the advisory

---

[8]       Defendant's reliance on *Hoffman v. UBS-AG*, 591 F. Supp. 2d 522 (S.D.N.Y. 2008) is misplaced because the plaintiffs there "offer[ed] no allegations about the actual services provided by the funds." *Id*. at 539. Moreover, the plaintiffs **acknowledged in their Complaint** that advisers and subadvisers "perform[ed] **distinct** services." *Id*. at 540 (emphasis added). The district court in *In re BlackRock* also rejected the applicability of *Hoffman* to allegations similar to those asserted here. *See In re BlackRock*, 2015 WL 1418848, at \*6 n.7.

16

fees charged by Davis to the Fund with the fees charged by Davis to the Clipper Fund; and (2) "where on the range of comparable mutual fund fees the Fund's advisory fee falls." (*See* Defs.' Br. at 16.)  However, just as the court found in *Reso*, these comparisons are of "little value." *Reso*, 2011 WL 5826034, at *8.

Despite Defendants' contention that the Clipper Fund had no affiliation with Davis nearly ten years ago (Defs.' Br. at 16), the Clipper Fund is a Davis-controlled captive mutual fund exactly like the Fund here.[9]  Thus, Defendants' comparison is precisely the type of fee comparison that the Supreme Court cautioned against in *Jones* because the fees may not be the product of negotiations conducted at arm's-length.  *Jones*, 559 U.S. at 350-51.

Defendants' second comparison with respect to the fees charged by other advisers to their captive mutual funds (Defs.' Br. at 16-17), fails for the same reason.  The record before the Court on this Motion does not include any facts: that the fees charged by the adviser-sponsors to the other so-called "comparable mutual funds" were negotiated at arm's-length; that any services provided by the adviser-sponsors to other "comparable mutual funds" are comparable to the services provided by Davis to the Fund; or that those fees are not excessive themselves.

Even Defendants' authority rejects their arguments and recognizes that comparisons to the fees charged by other adviser-sponsors to their captive mutual funds are "not particularly meaningful precisely because [they] do[] not address the particular services offered by the defendants in this case." *Migdal v. Rowe Price-Fleming Int'l, Inc.*, 248 F.3d 321, 327 (4th Cir. 2001).  Fee arrangements between other captive mutual funds and their adviser-sponsors may themselves violate § 36(b).  *See Jones*, 559 U.S. at 350-51; *Kasilag*, 2012 WL 6568409, at *3; *Curran*, 2010 WL 2889752, at *9.

---

[9]      Davis has served as investment adviser to the Clipper Fund since 2006.  *See* Topetzes Decl. Ex. L.

### D.    Plaintiffs' § 36(b) Claim Is Not Based Upon a Lack of "Fee Parity."

Defendants' argument that the 1940 Act does not ensure "fee parity" or the "best deal possible" (Defs.' Br. at 16), is irrelevant because there are no such allegations in the Amended Complaint.  Plaintiffs do not "merely allege that the Fund's fee was higher than some of Davis's other independent clients" in order to demonstrate the excessiveness of Defendants' advisory fees.  (*Id.*)   Neither do Plaintiffs allege that Defendants must charge the same fees to all of their clients.  (*Id.* at 15-16.)  Rather, consistent with *Jones*, Plaintiffs allege facts demonstrating that the Fund pays advisory fees to Defendants that are disproportionately higher than the fees negotiated at arm's length by the Subadvised Funds for Defendants' advisory services, and that the difference in fees cannot be explained by any difference in the services provided.  Such allegations cannot be characterized as a fee "parity" claim.[10]

Defendants' argument that the allegations regarding the fees paid by the Subadvised Funds are not enough to state a claim, notwithstanding Plaintiffs' showing that the services provided by Defendant are the same or substantially the same, cannot be squared with the Supreme Court's holding in *Jones* that such comparisons should be given "the weight that they merit in light of the similarities and differences between the services that the clients in question require," *Jones*, 559 U.S. at 350; cannot be squared with *Jones'* repeated instruction that courts should "use[] the range of fees that might result from arm's-length bargaining as the benchmark for reviewing challenged fees," *id.* at 347; and cannot be squared with the numerous cases, both before and after *Jones,* discussed herein, holding that such comparisons are probative of a claim under § 36(b), all of which Defendants ignore.  In any event, as discussed below, Plaintiffs do not rely solely on comparisons to the Subadvised Funds, and have alleged other facts supporting

---

[10]      Contrary to Defendants' arguments, Plaintiffs do not merely "allege that a Fund has paid more than institutional clients for an adviser's services."  (Def. Br. at 17.)  Plaintiffs' fee comparisons all involve comparisons with other mutual fund clients.

an inference of disproportionality, including Defendants' realization of fall-out benefits, the Fund's poor performance under Defendants' management, and the failure of the Board to negotiate at arm's length on behalf of the Fund.

The cases cited by Defendants only serve to illustrate the differences between the Amended Complaint and complaints grounded in "speculation, inference and generalized observations about the securities industry…." *Amron v. Morgan Stanley Inv. Advisors Inc.*, 464 F.3d 338, 343 (2d Cir. 2006). In *Amron*, the Second Circuit upheld the dismissal of § 36(b) claims where the plaintiffs "***failed to allege any facts pertinent to th[e] relationship between fees and services***." *Id*. at 344 (quotation marks and citation omitted) (emphasis added). The Court aptly concluded that the omission of these critical facts—including the failure to even allege the total amount of fees—precludes a finding that the fees are excessive. *See id*. Similarly, in *Mintz v. Baron*, No. 05 Civ. 4904, 2009 WL 735140 (S.D.N.Y. Mar. 20, 2009), this Court was presented with a bare-bones complaint that was "silent with respect to facts addressing [five of the six] *Gartenberg* factors." *Id*. at *3. And with respect to the only *Gartenberg* factor addressed in the complaint—the nature and quality of the services—the Court found the complaint's central allegations that "no marketing services and no 'new' administrative services were provided after the funds were partially closed" were "conclusory and bereft of sufficient factual support to render plausible any contention premised on the first *Gartenberg* factor…." *Id*. The same cannot be said of the Amended Complaint.[11]

---

[11]     Defendants' reliance on *Krinsk v. Fund Asset Mgmt., Inc.*, 875 F.2d 404 (2d Cir. 1989) is equally unavailing. As an initial matter, *Krinsk* was dismissed ***after trial***. Moreover, although plaintiffs in *Krinsk* relied on a comparison to another mutual fund managed by the defendant, that other fund received different services from the defendant. *Id.* at 412. Here, in contrast, Plaintiffs have alleged that Defendants provide the same or substantially the same services to the Fund and the Subadvised Funds. Thus, the *Krinsk* holding, after trial, that the other mutual fund was not a proper comparison point for the fund at issue because of differences in the services provided offers nothing as to whether the Amended Complaint's allegations are sufficient to survive a motion to dismiss.

## IV.    DEFENDANTS' REALIZATION OF FALL-OUT BENEFITS

Defendants realized fall-out benefits from their relationship with the Fund in the form of fees received from the Subadvised Funds and other clients whose accounts are "patterned after" the Fund.   ¶¶ 81-82.   All of the infrastructure, research and personnel required to furnish investment advisory services to these other "cloned" funds were provided and paid for by virtue of the investment advisory fees charged to the Fund itself.   Davis's management of the Fund has enabled it to capture for itself additional fees in the form of investment advisory fees paid by clients for whom Davis copied the advisory services originally developed and provided to the Fund that would not have existed but for the Fund.[12]

That the Fund had already paid for the development of these investment advisory services allowed Davis to offer copies of such services to arm's-length clients at rates far lower than those charged to the Fund.    These allegations provide further support for a finding of disproportionality. *See, e.g., Sins*, 2006 WL 3746130, at *3 (finding "allegation concerning savings effected by reselling investment services…could support an inference that fees are disproportionate to services provided").[13]

## V.    THE FUND'S SUSTAINED UNDERPERFORMANCE AND THE INFERIOR QUALITY OF DAVIS'S ADVISORY SERVICES

To further support that the advisory fees charged to the Fund are disproportionate to the services provided, Plaintiffs set forth allegations regarding the sustained underperformance of the

---

[12]    These allegations are consistent with Defendants' definition of "fall-out benefits."  (Def. Br. at 19-20.)

[13]    Defendants rely on post-trial decisions where plaintiffs failed to ***prove*** the existence of fall-out benefits. *See Krinsk*, 875 F.2d 404; *In re Am. Mut. Funds Fee Litig.*, No. CV 04-5593, 2009 WL 5215755 (C.D. Cal. Dec. 28, 2009).  These decisions offer little guidance on whether the Amended Complaint sufficiently ***alleges*** the existence of fall-out benefits.  *Meyer v. Oppenheimer Mgmt. Corp.*, 895 F.2d 861 (2d Cir. 1990) and *Turner v. Davis Selected Advisers, L.P.,* No. 08-421 (D. Ariz. June 1, 2011), cited by Defendants (Defs.' Br. at 20), are also inapplicable. Unlike there, Plaintiffs are not challenging the aggregation of separate fees, each of which was found not to be excessive in relation to the services rendered.  Neither do Plaintiffs attempt to state a claim on the basis that Davis is profitable or receives "very large fees" as in the remaining cases cited by Defendants. (Defs.' Br. at 20 & n.32.)

Fund over the past decade.  Whether judged against the Fund's benchmark or other comparable mutual funds, the Fund's investment performance has lagged behind for each of the prior 1-, 3-, 5- , and 10-year periods ended May 31, 2014.  ¶¶ 86-95.

Defendants ask the Court to simply ignore these allegations "in light of *Amron*."  (Defs.' Br. at 18.)   However, unlike in *Amron*, Plaintiffs here do not argue that allegations of underperformance **alone** are sufficient.   *See Amron*, 464 F.3d at 344.  Rather, those allegations provide additional support that the fees charged to the Fund are disproportionate to the services provided.  *See, e.g., Siemers v. Wells Fargo & Co*., C 05-04518, 2006 WL 2355411, at *18 (N.D. Cal. Aug. 14, 2006) (holding that allegations of underperformance may support a § 36(b) claim and "[w]hether the underperformance…was serious enough to suggest a breach of fiduciary duty is a question to be resolved on the evidentiary record."); *Gartenberg v. Merrill Lynch Asset Mgmt., Inc.,* 573 F. Supp. 1293, 1316 (S.D.N.Y. 1983) ("*Gartenberg II*") (holding that "relative performance of the Fund in terms of return on investment" is a factor to be considered in evaluating a § 36(b) claim), *aff'd*, 740 F.2d 190 (2d Cir. 1984).

Defendants' attempt to minimize the Fund's underperformance over the last ten years (Defs.' Br. at 19) is belied by the market's response to the results of Defendants' management in recent years.  Many of the Subadvised Funds' independent sponsors have terminated Davis as subadviser in response to poor performance.  *See* ¶¶ 115-118.  Defendants' arguments based on the Fund's performance in time periods beginning more than three decades ago should be rejected in view of the market's response to Defendants' performance in the last decade.

## VI.   APPROVAL OF THE ADVISORY FEES BY THE BOARD IS ENTITLED TO LITTLE OR NO DEFERENCE

The Court in *Jones* held that "a measure of deference to a board's judgment may be appropriate in some instances," but "the appropriate measure of deference varies depending on

the circumstances." *Jones*, 559 U.S. at 349.

> [W]here the board's process was deficient or the adviser withheld important information, the court must take a more rigorous look at the outcome.  When an investment adviser fails to disclose material information to the board, greater scrutiny is justified because the withheld information might have hampered the board's ability to function as an independent check upon the management.

*Id.* at 351-52 (internal quotation marks and citation omitted).

Consistent with Congress's intent "not to rely solely on the fund's directors to assure reasonable adviser fees" and to establish § 36(b) as an "independent check[] on excessive fees," *Daily Income Fund*, 464 U.S. at 540-41, *Jones* emphasized that even a "robust" process will not by itself insulate the adviser from liability for excessive fees.  *See Jones*, 559 U.S. at 351.

Plaintiffs adequately allege that the board approval process for the Fund was "deficient," rather than "robust," and, therefore, the Fund's fees should be subject to "greater scrutiny" under *Jones*.  The approval process was neither competitive nor conducted at arm's length, in contrast to the process by which the adviser-sponsors of the Subadvised Funds select investment advisers for those funds. ¶¶ 98-118.  For example, whereas the adviser-sponsors of the Subadvised Funds solicited proposals from multiple candidates and negotiated with the candidates regarding the fees to be charged (¶¶ 110-118), the Board has not solicited proposals from other investment advisers to provide investment advisory services to the Fund (¶ 107).  Further, the Board has not negotiated a "most favored nation" provision into the IAA, which would enable the Fund to benefit from fees negotiated at arm's length even if the Board did not engage in such negotiations with Davis.  ¶ 104.

Moreover, the Board, *inter alia*: (i) relied on information and analyses that Davis prepared or were designed to support Davis's rationalization for the fees charged to the Fund; (ii) did not consider information or analyses reflecting the interests of the Fund when assessing

the investment advisory fees or Davis's rationalization for those fees; (iii) approved the IAA charging the Fund investment advisory fees as much as 96% higher than other mutual fund clients pay for the same or substantially the same services; (iv) accepted Davis's representations that the lower fees paid by other clients reflect differences in the services provided to those clients without appropriately examining whether the services actually are different and without considering information necessary to assess whether the difference in fees is warranted by any purported differences in the services provided; (v) has not taken appropriate action to address the Fund's poor investment performance; and (vi) did not devote adequate time to their consideration of the Fund's advisory contracts.  ¶¶ 5, 98-103; 105-109.

Courts have found similar allegations sufficient to withstand a motion to dismiss.  *See Goodman*, 2015 WL 965665, at *3, *5 (assessing substantially similar allegations and finding them to support an inference of "rubber stamping" by the Board); *In re BlackRock*, 2015 WL 1418848, at *7 (same).   The court in *Goodman* explained that allegations of "a flawed negotiation or oversight process would inform the amount of deference given to the board's approval and consideration of all of the relevant factors that will decide the merits of the claims involved."  2015 WL 1418848, at *5.  Thus, the issue is not whether allegations relating to board approval process by themselves could support a plausible claim.  *Id*.[14]

Defendants' citations are easily distinguished.  Unlike in the cases cited by Defendants, Plaintiffs do not allege that either a deficient board approval process or the Board's reliance on

---

[14]     *See also Kasilag*, 2012 WL 6568409, at *7 (finding that "the directors' approval requires somewhat less deference than it would have had they diligently performed their 'watchdog' role")*; Am. Chem.*, 2014 WL 5426908, at *7 (finding allegations, including that "[f]unds' board of directors is not sufficiently independent and conscientious in reviewing the[] fees" and "meet Rule 8's liberal pleading standard"); *Reso*, 2011 WL 5826034, at *6 (recognizing the evidentiary difficulties associated with pleading facts regarding a board of directors' approval process, and deeming allegations "to be specific enough to raise an inference of lack of independence."); *Hunt*, 2006 WL 1581846, at *4 (holding that "a failure of the trustees to receive full information and act conscientiously may be indicative of a breach of fiduciary duty under section 36(b)").

information provided by Davis, standing alone, pleads a violation of § 36(b).  *See Migdal*, 248 F.3d at 328 ("[P]laintiffs assert that they do not need to allege excessive fees because they instead alleged that the directors of the funds were not independent."); *Gallus v. Ameriprise Fin., Inc.*, 675 F.3d 1173, 1180 n.4 (8th Cir. 2012) ("We disagree with the plaintiffs' argument that '[a] defective process implies an excessive fee.'" (alteration in original)).[15]    Further, Defendants' reliance on *Amron* and *Turner* for the mundane proposition that service on multiple boards of other mutual funds is insufficient as a matter of law to challenge trustee independence (Defs.' Br. at 21-22), does not advance their position because that is not what Plaintiffs allege.

Plaintiffs have set forth numerous facts and circumstances, which when read as a whole, plausibly support their § 36(b) claim, including allegations that the Board's approval process was deficient and, therefore, should be afforded little deference requiring the court to "take a more rigorous look at the outcome."  *Jones*, 559 U.S. at 351; *see also Goodman*, 2015 WL 965665, at *5.  Even if the board approval process had been "robust," Plaintiffs state a claim under § 36(b) based on allegations that Defendants charge significantly higher fees to the Fund than are charged to the Subadvised Funds for the same or substantially the same services.  *See Jones*, 559 U.S. at 351 ("[A] fee may be excessive even if it was negotiated by a board in possession of all relevant information . . . .").[16]

---

[15]    *Gallus* was decided at summary judgment and the court held that "[a]lthough the disparity in fees charged to [defendant's] different [institutional] clients is likely relevant to whether the fees fall within the arm's length range, the plaintiffs have failed to set forth the additional evidence required to survive summary judgment."  675 F.3d at 1180-81 (citation omitted).

[16]    Defendants rely on other inapposite authority.  *See Green v. Nuveen Advisory Corp.*, 295 F.3d 738, 742 (7th Cir. 2002) (plaintiffs argued that advisers had a "personal monetary incentive to act in a manner that may not be best for the common shareholders" and that "incentive alone…violates the ICA § 36(b)"); *In re Scudder Mut. Funds Fee Litig.*, No. 04 Civ. 1921, 2007 WL 2325862, at *18 (S.D.N.Y. Aug. 14, 2007) ("[I]n light of Plaintiffs' failure elsewhere to allege that Defendants' fees were so disproportionately large that they could not have been the fruit of an arm's-length negotiation, any suggestion that the Funds' Trustees actually did adhere to improper interests is without support."); *Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362 (Del. 2006) (derivative case alleging that directors failed to ensure that a reasonable compliance and reporting system existed); *Lanza v. Drexel*

## VII.   THE DISMISSAL OF THE *TURNER* COMPLAINT NEARLY SIX YEARS BEFORE THE COMMENCEMENT OF THIS ACTION DOES NOT PRECLUDE THE CLAIM ASSERTED HERE

The dismissal of § 36(b) claims asserted in *Turner*—an action filed by an unrelated plaintiff nearly six years before this action was commenced—provides no basis for a finding of preclusion with respect to the claim asserted in this action.  If Defendants were correct, then virtually any dismissal of a § 36(b) claim (even at the pleading stage) would forever insulate an investment adviser from liability for charging excessive fees.  That is not what Congress intended in enacting § 36(b):

> ***The[] doctrines of preclusion should be applied warily when Congress has acted to create an ongoing duty, such as the fiduciary duty to avoid excessive fees that is created by Section 36(b) of the Act.***  The fact that a Fund's advisor has received a favorable judicial determination that the advisory fee was not excessive does not insulate the advisor from future claims under changed circumstances that future fees are excessive and in violation of Section 36(b).

*Gartenberg II*, 573 F. Supp. at 1299 (emphasis added); *see also Schuyt v. Rowe Price Prime Reserve Fund, Inc.*, 622 F. Supp. 169, 176 (S.D.N.Y. 1985) (explaining that Congress' overall purpose in enacting § 36(b) was "to enhance and expand rather than restrict mutual fund shareholders' rights and remedies under the ICA").

Issue preclusion applies where: "(1) the issues in both proceedings are identical, (2) the issue in the prior proceeding was actually litigated and actually decided, (3) there was a full and fair opportunity for litigation in the prior proceeding, and (4) the issues previously litigated were necessary to support a valid and final judgment on the merits."  *NML Capital, Ltd. v. Banco Cent. de la Republica Argentina*, 652 F.3d 172, 185 (2d Cir. 2011).  Defendants bear the burden of demonstrating the requirements for issue preclusion are satisfied.  *BBS Norwalk One, Inc. v. Raccolta, Inc.*, 117 F.3d 674, 677 (2d Cir. 1997).  They have failed to do so.

---

*& Co.*, 479 F.2d 1277, 1306 (2d Cir. 1973) (outside directors characteristically "are not full-time employees of the corporation").

**A. The Issue of Whether the Advisory Fees Charged to the Fund in 2013-14 Are Excessive, as Alleged in the Amended Complaint, Was Not Litigated, or Decided, in *Turner*.**

While *Turner* involved § 36(b) claims with respect to the same fund at issue here, the similarities between the two lawsuits end there.  Beyond the obvious fact that the plaintiffs are different, some of the more significant differences between the two actions include:

- *Turner* challenged fees charged to the Fund in 2007-08, whereas the instant action challenges fees charged to the Fund in 2013-14;

- The *Turner* Complaint did not include any allegations comparing the investment advisory fees charged to the Fund with the fees Davis charges other clients for the same or substantially the same services, whereas the Amended Complaint includes detailed allegations with respect to six separate funds; and

- The Amended Complaint includes factual allegations that were not, and could not have been, alleged in *Turner* including those relating to the Fund's sustained poor performance in the six years following the commencement of the *Turner* action and other clients terminating Davis as their investment adviser as a result of Davis's provision of inferior investment advisory services (¶¶ 86-95; 115-118).

Given that the aforementioned allegations could not have been assessed in evaluating the claims asserted in *Turner*, there is no preclusive effect here.  *See Lawlor v. Nat'l Screen Serv. Corp.*, 349 U.S. 322, 327 (1955) ("That both suits involved 'essentially the same course of wrongful conduct' is not decisive"); *Li v. Asphalt Green, Inc.*, 581 Fed. Appx. 6, 7 (2d Cir. 2014) ("'While the [prior] judgment precludes recovery on claims arising prior to its entry, it cannot be given the effect of extinguishing claims which did not even then exist and which could not possibly have been sued upon in the previous case.'") (alteration in original) (citation omitted).

Defendants contend that "[i]t makes no difference" that the *Turner* Complaint failed to include allegations demonstrating that Davis charged the Fund more for advisory services than it charged the Subadvised Funds for subadvisory services.  (Defs.' Br. at 9.)  But it does.  The *Turner* court's dismissal was based upon entirely different fee comparisons—comparisons which the court found to "have little probative value and…cannot be the foundation for a claim under §

26

36(b)." *Turner v. Davis Selected Advisers, L.P.,* No. 08-CV-421 (D. Ariz. June 1, 2011), at 15. Here, the fee comparisons alleged are based upon the very type of arm's-length fee rates that *Jones* instructs are "the benchmark for reviewing challenged fees." *Jones*, 559 U.S. at 347.[17]

Thus, the *Turner* court's finding that the plaintiff failed to adequately **plead** a § 36(b) claim with respect to fees charged to the Fund in *2007-08*, says nothing about whether the Amended Complaint states a claim with respect to the fees charged to the Fund in *2013-14*, particularly in light of the additional allegations never considered by the *Turner* court.[18]

The cases Defendants cite are not remotely analogous to the present case. Defendants rely primarily on traditional derivative cases where courts precluded the relitigation of demand futility. In those cases, the subsequent actions were essentially seeking a "second bite at the apple" to plead demand futility (not applicable to § 36(b claims) based on facts that could have been asserted in the earlier suit.[19] That is not the case here where different Plaintiffs rely on facts that were not and could not have been asserted by the *Turner* plaintiffs.[20]

---

[17]    Although the Fund's SEC filings do not disclose the identity of Defendants' other clients or the fee rates charged to those clients for investment advisory services, Plaintiffs here have identified the Subadvised Funds and determined the fees charged to those Funds specific to the time period at issue. Plaintiffs should not be precluded from pursuing their claims based on those facts merely because *Turner*—filed before *Jones* clarified the critical importance of these arm's-length fee rates under § 36(b)—did not include such facts.

[18]    *See, e.g., Harkins Amusement Enters., Inc. v. Harry Nace Co.*, 890 F.2d 181, 183 (9th Cir.1989) (noting that the "[f]ailure to gain relief for one period of time does not mean that the plaintiffs will necessarily fail for a different period of time" and that "[t]he defendants by winning [the prior action] did not acquire immunity in perpetuity from the antitrust laws"). Further, the Board "must 'review and approve the contracts of the investment adviser' annually." *Jones*, 559 U.S. at 340 (citation omitted). Thus, each year, the adviser's fees are subject to challenge.

[19]    *See In re Sonus Networks, Inc., S'holder Deriv. Litig.*, 499 F.3d 47 (1st Cir. 2007); *Arduini ex rel. Int'l Game Tech. v. Hart*, No. 3:11-cv-00255, 2012 WL 893874, at *3 (D. Nev. Mar. 14, 2012); *In re Bed Bath & Beyond Inc. Deriv. Litig.*, Civ. No. 06-5107, 2007 WL 4165389 (D.N.J. Nov. 19, 2007); *LeBoyer v. Greenspan*, No. CV 03-5603, 2007 WL 4287646 (C.D. Cal. June 13, 2007); *Henik ex rel. LaBranche & Co., Inc. v. LaBranche*, 433 F. Supp. 2d 372, 379 (S.D.N.Y. 2006).

[20]    Other cases cited by Defendants are equally unavailing. *See Purdy v. Zeldes,* 337 F.3d 253, 257 (2d Cir. 2003) (plaintiff estopped from litigating legal malpractice claim after losing habeas petition concerning "essentially the same [alleged] deficiencies in defendants' representation of him"); *Irish Lesbian and Gay Org. v. Giuliani*, 143 F.3d 638, 647 (2d Cir. 1998) (precluding same plaintiff from challenging facial validity of statute where it did not appeal previous dismissal, but allowing it to challenge the application of the statute in subsequent years and refusing to insulate law from judicial review by another plaintiff); *Benjamin v. Coughlin,* 905 F.2d 571 (2d Cir. 1990)

The only § 36(b) case involving preclusion cited by Defendants is *Gartenberg*, but it does not support preclusion here.  In the first *Gartenberg* action, the plaintiff litigated a § 36(b) claim through to trial and lost.  The Second Circuit affirmed the dismissal, but noted that the case turned on the plaintiffs' failure to **prove** certain facts.  *Gartenberg v. Merrill Lynch Asset Mgmt., Inc.* 694 F.2d 923, 933 (2d Cir. 1982).  The same plaintiff then filed a second lawsuit against the same defendants asserting another claim under § 36(b), this time challenging the fees charged to the same fund in the subsequent year.  *See Gartenberg II*, 573 F. Supp. at 1297.

As Defendants do here, the defendants in *Gartenberg II* argued that the doctrines of *res judicata* and/or collateral estoppel barred the later-filed action.  *Id*. at 1298.  While the district court held that certain unchanged findings of fact made by the court in connection with the first trial were controlling in the second case, the court refused to bar the second action from proceeding.  *Id*.  The plaintiff was permitted to litigate the second action.[21]

### B.  Plaintiffs Have Not Had a Full and Fair Opportunity to Litigate Their Claims.

Defendants, relying primarily on traditional derivative cases, assert that differences between the identity of the plaintiffs in this action and the *Turner* action is "beside the point" to the preclusion analysis.  (Defs.' Br. at 10.)  However, § 36(b) actions are not derivative actions.[22]

---

(finding application of collateral estoppel appropriate to bar subsequent challenge to the validity of a regulation that party had already challenged, relying on much of the same evidence, in prior state court proceedings); *Givens v. City of New York*, No. 11 Civ. 2568, 2012 WL 75027, at *3, *6 (S.D.N.Y. Jan. 10, 2012) (*pro se* plaintiff precluded from bringing claims under the ADA when her complaint repeated "essentially verbatim the allegations" made in her prior complaint and where prior administrative decision "necessarily resolved the issues of accommodation and retaliation under the ADA").

[21]     Defendants' argument that the Fund's advisory fee rate has not increased since the *Turner* dismissal (Defs.' Br. at 8) is beside the point.  The same fee schedule was also in place in *Gartenberg I* and *II*.  *See Gartenberg II*, 573 F. Supp. at 1311.  Defendants also attempt to distinguish *Gartenberg II* on the basis that the plaintiff "pointed to major changes" since the first lawsuit.  (Defs.' Br. at 9 n.17.)  However, just as here, the defendants in *Gartenberg II* argued that "[t]he so-called additions" were matters that were either raised but not proven in the first lawsuit or were matters that could have been raised.  *Gartenberg II*, 573 F. Supp. at 1298.

[22]     *Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt., LLC*, 595 F.3d 86 (2d Cir. 2010), cited by Defendants, simply holds that damages in a § 36(b) action inure to the benefit of the mutual fund, and not, as the plaintiff in that case argued, directly to itself.  The only other cases involving claims under § 36(b) cited by

In *Daily Income Fund*, the Supreme Court explained why a cause of action under § 36(b) "differs significantly from those traditionally asserted in shareholder derivative suits."  464 U.S. 523 at 535.   The Court explained that the right of action under the statute belongs to the individual shareholders, and not to the fund itself.   Thus, although a § 36(b) plaintiff sues "on behalf of" the fund, the right of action belongs to the plaintiff and is not "derivative" of a right of action belonging to the fund, as in traditional derivative actions.  *Id*. at 542.

The difference between § 36(b)'s right of action "on behalf of" a mutual fund and traditional derivative actions has important implications for preclusion and related doctrines.  For example, in applying the "two dismissal rule" under Fed. R. Civ. P. 41(a)(1), the court in *Wicks* held that only the individual named shareholder was precluded from reasserting claims that he had previously asserted and then dismissed.  *Wicks*, 2005 WL 705360, at *3.  The court refused to extend any preclusive effect more generally to the fund or other fund shareholders who were not involved in the prior actions because "under [*Daily Income Fund*], the [fund] cannot be a plaintiff with respect a claim it does not have."  *Id.*

For the same reasons, the fact that Donald Turner failed to successfully plead a § 36(b) claim in 2008 does not preclude Plaintiffs here from asserting a § 36(b) claim on behalf of the Fund six years later based upon subsequent conduct.  Neither the Fund nor any of the Plaintiffs in this action were plaintiffs in the *Turner* action, and they cannot be bound by any preclusive effect from that action.  *See Wicks*, 2005 WL 705360, at *3.

Furthermore, the Hebda Plaintiffs did not purchase shares in the Fund until February 2011 (¶ 14), ***after*** the *Turner* Complaint was dismissed.  Accepting Defendants' arguments, they,

---

Defendants involved lawsuits that were challenging fees that had been bargained for and established pursuant to a court-approved settlement. *See Lerner v. Reserve Mgmt. Co.*, 80 Civ. 1238, 1981 WL 1641 (S.D.N.Y. June 17, 1981); *Ashare v. Brill*, 560 F. Supp. 18 (S.D.N.Y. 1983).  Plaintiffs here do not challenge fees that were the product of a court-approved settlement. The district court in *Gartenberg II* also rejected the applicability of *Lerner* and *Ashare* to defendants' preclusion argument.  *See Gartenberg II*, 573 F. Supp. at 1300.

and all future shareholders, are forever precluded from asserting claims that did not even exist at

the time of the *Turner* dismissal, as well as claims for which the *Turner* action did not purport to

recover damages.   Under such circumstances, due process prohibits the application of res

judicata or collateral estoppel.  *See Richards v. Jefferson County, Ala.*, 517 U.S. 793, 801 (1996)

("[T]o contend that the plaintiffs in [earlier action] somehow represented petitioners, let alone

represented them in a constitutionally adequate manner, would be 'to attribute to them a power

that it cannot be said that they had assumed to exercise.'") (citation omitted).

## VIII.   RESCISSION IS AVAILABLE PURSUANT TO SECTION 47(b)

Plaintiffs do not assert a separate cause of action under § 47(b) of the 1940 Act.  Rather,

Plaintiffs seek rescission as a remedy for Defendants' § 36(b) violation.  Thus, once the § 36(b)

claims are sustained, § 47(b) provides recessionary relief to the Fund.

Two district courts have recently rejected similar arguments seeking to strike requests for

rescission under § 47(b) at the pleading stage.  In *Zehrer*, the court explained that § 36(b) "does

not [] explicitly foreclose other equitable remedies, such as injunctive relief or rescission."

*Zehrer*, 2014 WL 6478054, at *4.  Accordingly, the court declined to strike plaintiff's alternative

request for rescission at the motion to dismiss stage.   *Id.*    Similarly, the court in *Goodman*

declined to strike the remedy of rescission under § 47(b) "because a Rule 12(b)(6) motion

properly targets claims, not remedies."  *Goodman*, 2015 WL 965665, at *6.[23]

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants'

motion to dismiss.

---

[23]      In the cases cited by Defendants, the plaintiffs failed to adequately plead an underlying violation of § 36(b).
*See Santomenno v. John Hancock Life Ins. Co.*, 677 F. 3d 178 (3d Cir. 2012); *Steinberg v. Janus Capital Mgmt.
LLC*, 457 Fed. Appx. 261 (4th Cir. 2011); *Turner v. Davis Selected Advisers, L.P.*, No. 08-421 (D. Ariz. June 1,
2011); *Hamilton v. Allen*, 396 F. Supp. 2d 545 (E.D. Pa. 2005).  Thus, there would be no remedy—rescission or
otherwise.

Dated:  April 15, 2015

**ZWERLING, SCHACHTER &**
**  & ZWERLING, LLP**

/s/ Robin F. Zwerling
Robin F. Zwerling
Jeffrey C. Zwerling
Susan Salvetti
Andrew W. Robertson
41 Madison Avenue
New York, NY 10010
Tel:  (212) 223-3900
Fax:  (212) 371-5969
rzwerling@zsz.com
jzwerling@zsz.com
ssalvetti@zsz.com
arobertson@zsz.com

*Lead Counsel for Plaintiffs*

**AULO I. GONANO, P.C.**
Aulo I. Gonano
1932 Ford Avenue
Wyandotte, MI 48192
Tel:  (734) 285-3333
Fax:  (734) 285-3399
aulo@aol.com

*Counsel for the Hebda Plaintiffs*

**ROBBINS ARROYO LLP**
Stephen J. Oddo
Edward B. Gerard
Justin D. Rieger
Daniel L. Sachs
600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
soddo@robbinsarroyo.com
egerard@robbinsarroyo.com
jrieger@robbinsarroyo.com
dsachs@robbinsarroyo.com

*Counsel for Plaintiff Schuyler Hoffman*

**KIRBY McINERNEY LLP**
Ira Press
825 Third Avenue, 16th Floor
New York, NY 10022
Tel:  (212) 371-6600
Fax:  (212) 751-2540
ipress@kmllp.com

*Counsel for the Chill Plaintiffs*