**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re DAVIS NEW YORK VENTURE FUND FEE LITIGATION | Master File No. 1:14-cv-4318 (LTS) (HBP) |
| | ORAL ARGUMENT REQUESTED |

### MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**K&L GATES LLP**
Joanna A. Diakos
599 Lexington Avenue
New York, NY  10022

Stephen G. Topetzes (*pro hac vice*)
Jeffrey B. Maletta (*pro hac vice*)
Nicholas G. Terris
Nicole A. Baker (*pro hac vice*)
Amy J. Eldridge (*pro hac vice*)
Meghan E. Flinn (*pro hac vice*)
1601 K Street, NW
Washington, DC  20006

*Counsel for Defendants*
*Davis Selected Advisers, L.P. and*
*Davis Selected Advisers-NY, Inc.*

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...............................................................................1

BACKGROUND ..................................................................................................3

I. The Relevant Entities ...............................................................................3

    A. The Fund and Davis .........................................................................3

    B. The Independent Directors and Their Independent Counsel ...................4

    C. The Subadvised Funds ......................................................................5

II. The Independent Directors' Annual Review and Approval of the IAA ............5

III. Plaintiffs' Challenge to the Advisory Fees in this Litigation ........................8

STANDARD OF REVIEW ....................................................................................8

ARGUMENT ......................................................................................................9

I. Plaintiffs Bear a Heavy Burden in a Section 36(b) Action ............................9

II. The Independent Directors Reached an Informed and Conscientious Business Judgment to Approve the IAA .................................................................10

    A. The Independent Directors Are Indisputably Well-Qualified ...............11

    B. The Board's Annual Review and Approval Process for the IAA Was Robust and Conscientious ...............................................................11

    C. Substantial Deference Is Owed to the Board's Process .......................12

III. Plaintiffs Have Not Adduced Evidence Creating a Genuine Issue of Material Fact that the Fees Are "So Disproportionately Large" that They Cannot Have Been the Product of Arm's-Length Bargaining ...............................................................12

    A. Differences in Fees for Subadvisory Services Do Not Demonstrate a Genuine Issue of Material Fact ........................................................13

        1. Subadvisory Fees Davis Charged for Portfolio Management Services Present an Inapt Comparison to the Advisory Fees Paid by the Fund .............................................................................14

            a. Differences in the Responsibilities and Services Provided by Davis to the Fund and Subadvised Funds ................................14

i

b.      The Substantial Services the Subadvised Fund Advisers Performed for the Subadvised Funds Demonstrate Davis's Limited Role as Subadviser ..........................................................18

2.      Plaintiffs' Fee Parity Theory Has Been Rejected by Several Courts.........19

3.      Plaintiffs Have Failed to Meet Their Burden to Show that the Fees Charged to the Fund Were Outside the Range of Acceptable Fees...........20

B.      There Are No Genuine Issues of Material Fact That Warrant a Trial on Any of the Gartenberg Factors.................................................................................22

1.      There are No Genuine Disputes of Material Fact as to the Nature and Quality of the Services that Davis Provided to the Fund....................22

2.      A Trial Is Not Warranted as to Profitability .............................................24

3.      Plaintiffs Have Not Produced Evidence Showing a Genuine Dispute Regarding Comparative Fee Structures........................................24

CONCLUSION....................................................................................................................26

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

In re AllianceBernstein Mut. Fund Excessive Fee Litig.,
    No. 04 Civ. 4885, 2006 WL 1520222 (S.D.N.Y. May 31, 2006)............................................16

In re Am Mut. Funds Fee Litig.,
    No. CV 04–5593, 2009 WL 5215755 (C.D. Cal. Dec. 28, 2009)................................10, 23, 25

Amron v. Morgan Stanley,
    464 F.3d 338 (2d Cir. 2006)..........................................................................................................23

Anderson v. Liberty Lobby, Inc.,
    477 U.S. 242 (1986)..........................................................................................................................9

Burks v. Lasker,
    441 U.S. 471 (1979)........................................................................................................................10

Celotex Corp. v. Catrett,
    477 U.S. 317 (1986)..........................................................................................................................9

D'Amico v. City of New York,
    132 F.3d 145 (2d Cir. 1998)............................................................................................................8

Gallus v. Ameriprise Fin. Inc.,
    675 F.3d 1173 (8th Cir. 2012) .......................................................................................10, 11, 21

Gartenberg v. Merrill Lynch Asset Mgmt., Inc.,
    528 F. Supp. 1038 (S.D.N.Y.), aff'd, 694 F.2d 923 (2d Cir. 1981)..................................10, 24

Gartenberg v. Merrill Lynch Asset Mgmt., Inc.,
    573 F. Supp. 1293 (S.D.N.Y. 1983), aff'd, 740 F.2d 190 (2d Cir. 1984)...................10, 11, 23

Goodman v. J.P. Morgan Inv. Mgmt., Inc.,
    No. 2:14-cv-414, 2018 WL 1247459 (S.D. Ohio Mar. 9, 2018) ...................................... *passim*

Jones v. Harris Assoc. L.P.,
    611 F. App'x 359 (7th Cir. 2015) ...................................................................................10, 25

Jones v. Harris Assoc. L.P.,
    No. 04-cv-8305, 2007 WL 627640 (N.D. Ill. Feb. 27, 2007)................................................21

Jones v. Harris Assocs., L.P.,
    559 U.S. 335 (2010).......................................................................................................... *passim*

Jones v. Harris Assocs. L.P.,
    611 F. App'x 259 (7th Cir. 2015) ...........................................................20

Kalish v. Franklin Advisers, Inc.,
    742 F. Supp. 1222 (S.D.N.Y. 1990), aff'd, 928 F.2d 590 (2d Cir. 1991).............10, 13, 23, 25

Kasilag v. Hartford Inv. Fin. Serv., LLC,
    No. 11-1083, 2016 WL 1394347 (D.N.J. Apr. 7, 2016)......................................9, 10

Krantz v. Prudential Invs. Fund Mgmt. LLC,
    77 F. Supp. 2d 559 (D.N.J. 1999) ...........................................................10

Krinsk v. Fund Asset Mgmt., Inc.,
    715 F. Supp. 472 (S.D.N.Y. 1988), aff'd, 875 F.2d 404 (2d Cir. 1989)................10

Meyer v. Oppenheimer,
    707 F. Supp. 1394 (S.D.N.Y. 1988), aff'd 895 F.2d 861 (2d Cir. 1990)...............25

Meyer v. Oppenheimer Mgmt. Corp.,
    715 F. Supp. 574 (S.D.N.Y. 1989), aff'd, 895 F.2d 861 (2d Cir. 1990)................10

Migdal v. Rowe Price-Fleming Int'l, Inc.,
    248 F.3d 321 (4th Cir. 2001) ...........................................................10, 23

Pac. M. Int'l Corp. v. Raman Int'l Gems, Ltd.,
    888 F. Supp. 2d 385 (S.D.N.Y. 2012)......................................................9

Paskowitz v. Prospect Capital Mgmt., LP,
    232 F. Supp. 3d 498 (S.D.N.Y. 2017)................................................ passim

Pirundini v. J.P. Morgan Inv. Mgmt., Inc.,
    No. 17 Civ 3070, 2018 WL 1084140 (S.D.N.Y. Feb. 14, 2018) .................1, 10, 23

Schuyt v. Rowe Price Prime Reserve Fund, Inc.,
    663 F. Supp. 962 (S.D.N.Y. 1987), aff'd, 835 F.2d 45 (2d Cir. 1987)............10, 25

Sivolella v. AXA Equitable Life Ins. Co.,
    No. 11-cv-4194, 2016 WL 4487857 (D.N.J. Aug. 25 2016) .......................10, 19, 21

Strougo v. BEA Assocs.,
    188 F. Supp. 2d 373 (S.D.N.Y. 2002).....................................................10, 13, 25

Zehrer v. Harbor Capital Advisors, Inc.,
    No. 14 C 000789, 2018 WL 1293230 (N.D. Ill. Mar. 13, 2018) ............................1, 10, 13, 24

**Statutes**

15 U.S.C. § 77k ..................................................................................................16

15 U.S.C. § 80a-2(a)(19) .......................................................................................4

15 U.S.C. § 80a-15(c) ...........................................................................................5

15 U.S.C. § 80a-35(b) ...........................................................................................9

15 U.S.C. § 80a-41 ..............................................................................................16

# GLOSSARY OF ABBREVIATED TERMS

| | |
|---|---|
| 15(c) meeting | The Board meeting held in March of each year devoted specifically to issues involving contract renewal under Section 15(c) of the ICA |
| 15(c) process | The process by which the Independent Directors annually review and determine whether to renew the Fund's contract with its investment adviser under Section 15(c) of the ICA |
| Board | Board of Directors of Davis New York Venture Fund |
| CCO | Chief Compliance Officer |
| Davis | Davis Selected Advisers, L.P. |
| FASA | Fund Administrative Services Agreement between the Fund and Davis |
| Fund | Davis New York Venture Fund |
| IAA | Investment Advisory Agreement between the Fund and Davis |
| ICA | Investment Company Act of 1940 |
| Independent Directors | The disinterested members of the Board of Directors of the Davis New York Venture Fund |
| SSA | Shareholder Services Agreement between the Fund and Davis |
| Subadvised Fund Advisers | The investment advisers for the Subadvised Funds |
| Subadvised Funds | The following mutual funds for which Davis served as subadviser:<br>• AXA EQ/Davis New York Venture Portfolio<br>• AZL Davis New York Venture Fund<br>• ING Davis New York Venture Portfolio<br>• Metropolitan Series Fund Davis Venture Value Portfolio<br>• SunAmerica Series Trust Davis Venture Value Portfolio |
| SUF | Statement of Undisputed Material Fact |

# PRELIMINARY STATEMENT

In this case, a handful of investors in a mutual fund (the Davis New York Venture Fund, or "Fund") seek to use the limited remedy provided by Section 36(b) of the Investment Company Act of 1940 ("ICA") to displace the judgment of the Fund's independent board of directors in ("Board") setting the fees the Fund paid to its investment adviser, Defendant Davis Selected Advisers, L.P. ("Davis").

Plaintiffs' theory of liability has been rejected by multiple courts—including in recent decisions granting summary judgment in the past few months[1] and a decision by this Court dismissing a plaintiff's complaint earlier this year.[2]  It also runs counter to the undisputed facts. Plaintiffs assert that the fees at issue are "excessive," when the undisputed evidence shows that, for every year in the Relevant Period,[3] the fees were *lower* than those charged to similar funds in the market and third parties repeatedly gave the Fund positive ratings on fees.

After nearly 30 months of discovery, Plaintiffs have failed to adduce any evidence to sustain their burden of proof that the challenged fee is "***so disproportionately large*** that it bears ***no reasonable relationship*** to the services rendered ***and*** could not have been the product of arm's length bargaining."  Jones v. Harris Assocs., L.P., 559 U.S. 335, 346 (2010) (emphasis added).  To the contrary, the evidence is undisputed that the Fund's advisory fees were below the median and average for its peer group throughout the Relevant Period.  Moreover, the Board, comprised of a super-majority of directors unaffiliated with the adviser (the "Independent

---

[1]    Zehrer v. Harbor Capital Advisors, Inc., No. 14 C 000789, 2018 WL 1293230 (N.D. Ill. Mar. 13, 2018); Goodman v. J.P. Morgan Inv. Mgmt., Inc., No. 2:14-cv-414, __ F. Supp. 3d __, 2018 WL 1247459 (S.D. Ohio Mar. 9, 2018), appeal docketed, No. 18-3238 (6th Cir. Mar. 14, 2018).

[2]    Pirundini v. J.P. Morgan Inv. Mgmt., Inc., No. 17 Civ. 3070, 2018 WL 1084140 (S.D.N.Y. Feb. 14, 2018), appeal docketed, No. 18-733 (2d Cir. Mar. 16, 2018).

[3]    The "Relevant Period" is June 16, 2013 through the present.

Directors"), annually approved the fee after a deliberate and thoughtful process. That decision is entitled to "considerable weight" and deference. Id. at 351–52.

Plaintiffs rely on inaccurate and improper comparisons between the relationship that Davis had with the Fund as its *investment adviser* and the much more limited relationship it had with third-party mutual funds as a *subadviser*. This theory rests on false premises. First, the services Davis provided to the Fund were far more extensive in scale and scope than those it provided to any subadvised fund, and Davis's role as adviser entailed taking on markedly different and greater risks. As several courts have held, analyzing the fees received from these vastly different roles makes for an "inapt comparison." Second, Plaintiffs ignore a central premise of Section 36(b): that there is a *range* of fees that a well-informed board may agree upon with an adviser. Section 36(b) is not intended to facilitate rate setting, mandate fee parity, or find liability solely because Plaintiffs believe the board *could* have negotiated a better deal. Plaintiffs seek to do just that. They have adduced *no evidence* to identify what the "appropriate fee range" could be and instead rest solely on the fact that the fees the Fund paid for advisory services did not equal the fees Davis received as a subadviser. Even if such a comparison were proper, a showing of fee disparity will not defeat a supported motion for summary judgment without "other evidence that the fee is outside the arm's length range." Id. at 350 n.8. No such evidence exists.

The fees paid by the Fund are undeniably within the "arm's length range." In fact, it is undisputed that the advisory fees paid by the Fund were *less than the advisory fees charged by advisers to each of the third party mutual funds subadvised by Davis*. There is no genuine issue of material fact as to any of these matters. Summary judgment should be granted in Defendants' favor.

I.     **The Relevant Entities**

A.     **The Fund and Davis**

The Fund is registered with the Securities and Exchange Commission ("SEC") as a series of an open-end investment company. SUF ¶ 1. Its investment objective is long-term growth using a "value" strategy. SUF ¶ 1. From 1978 to 2016, the Fund's ten-year rolling returns outperformed its prospectus benchmark (the S&P 500) 34 out of 39 years and outperformed its peers 32 of those years. SUF ¶ 56.

As a mutual fund, the Fund is a pool of assets that, by itself, has no employees. Instead, it is overseen by a board of directors that contracts with other entities to provide services to the Fund. SUF ¶ 4. Davis[5] serves as the Fund's registered investment adviser pursuant to an Investment Advisory Agreement ("IAA") that is reviewed and approved annually by the Fund's Independent Directors. SUF ¶¶ 3, 10. The Fund pays Davis an advisory fee that includes "breakpoints" (i.e., marginal fee reductions based upon asset level increases) and has been renegotiated with the Board and lowered over time (most recently in 2009). SUF ¶ 11. During the Relevant Period, the fee ranged from 0.395-0.55 percent of the Fund's assets under management, with an effective fee rate (i.e., the blended average) of 0.50-0.51 percent. SUF ¶ 11-12. The Fund's total expense ratio for Class A shares was 0.86-0.89 basis points. SUF ¶ 12.

Davis and the Fund also entered into a Shareholder Services Agreement ("SSA") and a Fund Administrative Services Agreement ("FASA"), which the Independent Directors approve annually. SUF ¶¶ 13, 15. Pursuant to the SSA, Davis provided certain shareholder services,

---

[4]     Citations are to Defendants' separate Statement of Undisputed Material Facts ("SUF"), filed herewith.

[5]     Davis-NY, a wholly-owned subsidiary of Davis, is also a registered investment adviser and serves as the Fund's subadviser. SUF ¶ 3.

3

including a shareholder call center, general correspondence concerning redemptions and exchanges, account maintenance, account transfers, and information technology. SUF ¶ 13. The FASA reimbursed Davis a fixed amount for providing a subset of administrative services, such as preparation of certain SEC filings, reviewing tax returns, and determining the status and payment of dividends. SUF ¶¶ 15-16. As explained to the Board, each of these agreements reimburses Davis for only a portion of its total costs incurred in providing the services identified in the agreements. Neither agreement covers the full range of shareholder or administrative services Davis provides to the Fund. SUF ¶¶ 14, 16.

### B. The Independent Directors and Their Independent Counsel

The Board comprises eight individuals, a super-majority of whom are Independent Directors under the ICA.[6] SUF ¶¶ 4, 6. The six Independent Directors are highly qualified business professionals with extensive finance, investing, and leadership experience. SUF ¶ 6. All have experience working in financial management and/or at financial services companies. SUF ¶ 6. As Defendants' (unrebutted) expert has noted, based on his extensive knowledge of the mutual fund industry, the Independent Directors' collective and complementary experience makes them well-suited to critically evaluate information provided by Davis, provide oversight with respect to the Fund, and serve as independent watchdogs.[7]

The Board typically meets four times a year. SUF ¶ 5. The Board has adopted procedures and structures designed to ensure its independence, including having an Independent Director serve as Board Chairman and in every seat on the audit and nominating committees. SUF ¶ 6-7.[8] The Independent Directors also retained eminently qualified and independent

---

6    <u>See</u> 15 U.S.C. § 80a-2(a)(19)

7    <u>See</u> Expert Report of Jeffrey C. Keil ("Keil Rep.") ¶¶ 22-26, attached as Ex. 14 to Topetzes Decl.

8    These are consistent with industry best practice. <u>See</u> Keil Rep. ¶¶ 29, 36.

counsel at the law firm of Greenberg Traurig.  SUF ¶ 8.  Their independent counsel was present at every Board meeting to answer questions and advise on all matters.  SUF ¶ 9.

### C.    The Subadvised Funds

Davis served as "subadviser" to some other funds during the Relevant Period (the "Subadvised Funds").  SUF ¶ 18.  Each Subadvised Fund was managed by a financial services firm unaffiliated with Davis (the "Subadvised Fund Advisers").  Id.  Davis was responsible for providing portfolio management services (i.e., selecting investments) for the Subadvised Funds, but the Subadvised Fund Advisers ultimately were responsible for assisting those funds' boards in the management and oversight of those funds, and provided additional services. SUF ¶¶ 19, 53-54.

The advisory fee rate that Davis charged to the Fund (a maximum of 0.55 percent) was *lower* than each of the advisory fee rates that the Subadvised Fund Advisers charged the Subadvised Funds, which ranged from 0.625 to 0.85 percent.  SUF ¶ 21.  Of the advisory fees paid by the Subadvised Funds, Davis received a subadvisory fee rate ranging from 0.300 to 0.45 percent, SUF ¶ 21, and the Subadvised Fund Advisers retained the balance of the fees.

## II.    The Independent Directors' Annual Review and Approval of the IAA

Section 15(c) of the ICA requires that a majority of a mutual fund's independent directors annually approve the fund's contract with its investment adviser, after assessing "such information as may reasonably be necessary to evaluate the terms of any [such] contract."  15 U.S.C. § 80a-15(c).  This evaluation is known in the mutual fund industry as the "15(c) process."  For the Fund, the 15(c) process is a year-long endeavor.  SUF ¶ 63.

The Independent Directors evaluated information received throughout the year and discussed items pertinent to the 15(c) process at each quarterly Board meeting.  SUF ¶ 63.  They also designated the March Board meeting to review information specific to the 15(c) process and

assess whether it was in the Fund's interest to renew the IAA with Davis (the "15(c) meeting").

In preparation for that meeting, the Independent Directors, with guidance from their independent

counsel, requested that Davis furnish specific materials and respond to a detailed questionnaire

that asked for information that the Independent Directors, in their business judgment, deemed

important for their analysis. SUF ¶¶ 65, 82. The questionnaire evolved over time, as the

Independent Directors identified new topics of interest. SUF ¶ 66. The Independent Directors

also requested and received guidance from their counsel, including a detailed memorandum

discussing relevant judicial precedent and standards under Section 15(c). SUF ¶ 78.

Davis spent considerable time and devoted substantial resources to providing thorough

responses to the requests made during the 15(c) process. SUF ¶ 24. The materials provided to

the Board included information from Davis, as well as objective, statistical data from Lipper, Inc.

("Lipper") and Morningstar, Inc. ("Morningstar"), two well-recognized independent sources of

mutual fund data. SUF ¶¶ 11, 69. The materials included information regarding the following:

- *Davis's fees and the Fund's overall expense ratio, including Lipper reports with comparisons to a highly focused peer group of funds with similar size and strategy as well as a broader group of funds in the market.* SUF ¶ 69. Each year, the comparisons showed that the Fund's advisory fee and expense ratio were <u>below the average and median in the Fund's peer group</u>. SUF ¶ 12.

- *The fees that Davis charged other clients (including the Subadvised Funds), and various factors that caused differences in such fees (e.g., the services rendered, the clients' investment objectives and strategy, the account size, and differences in the level of work needed to comply with the applicable laws and regulations).* SUF ¶ 70. Davis explained that the "broad range of services" it provided to the Fund "go far

beyond simply selecting portfolio investments," and include more extensive shareholder servicing and preparation of shareholder reports, among other things. Davis also explained that, as adviser to the Fund, it assumes significant risk because of a complex overlay of regulatory, tax, and accounting issues, and that regulatory scrutiny has gotten more intense. SUF ¶¶ 51, 70, 73.

- *The Fund's performance over multiple time periods, including comparisons to prospectus benchmarks and the Lipper-identified peer groups.* SUF ¶¶ 67, 69. The Board also received quarterly Morningstar performance data, monthly performance reports, and holdings-specific data. SUF ¶ 69. The Board put more focus on long-term performance, recognizing that the Fund was designed to be a long-term investment vehicle. SUF ¶ 68. At the same time, the Board made detailed inquiries of Davis during periods of underperformance. SUF ¶¶ 83, 84.[9]

- *The types and quality of services provided to the Fund (e.g., personnel changes, potential conflicts of interest, changes in total fund assets, Fund compliance) and Davis's oversight of third-party service providers.* SUF ¶¶ 71-72.

- *Davis's profitability, including its operating revenue and expenses and the resulting operating margins.* SUF ¶¶ 74-75.

- *Potential economies of scale and tangible and intangible "fall-out benefits" that Davis might receive as a result of its work for the Fund.* As the Board knew, Davis had implemented fee breakpoints and reduced the advisory fee on five separate occasions from 2001 through 2009. SUF ¶¶ 10, 76-77.

---

[9]    The unrebutted conclusion of Defendants' expert is that, in his experience, the Board appropriately probed Davis to better understand the Fund's investments and the performance of particular stocks. Keil Rep. ¶ 74.

The Independent Directors evaluated all of this information in multiple settings. They typically received the 15(c) materials ten to fourteen days before the 15(c) meeting. SUF ¶ 80. Immediately prior to the 15(c) meeting, the Independent Directors met separately with their independent counsel in Executive Session to review collectively and discuss the 15(c) materials, the information provided by Davis, and relevant legal considerations. SUF ¶¶ 78, 82. Then, at the 15(c) meeting, the Independent Directors asked a range of questions of Davis personnel on topics that the Independent Directors, in their business judgment, deemed relevant to the contract renewal process. SUF ¶ 83. These included inquiries related to performance (including ways to improve performance during down periods), positions in particular stocks, global risk associated with the Fund, cost cutting, Davis's shareholder education efforts, and asset outflows. SUF ¶¶ 83-85. Questions relevant to the renewal of the IAA might also arise at the quarterly Board meeting held the next day. SUF ¶ 83.

After evaluating whether, in their informed business judgment, it was in the Fund's best interest to renew the IAA, the Independent Directors determined to approve the agreement. SUF ¶ 86.

## III. Plaintiffs' Challenge to the Advisory Fees in this Litigation

Plaintiffs assert that, during the Relevant Period, Defendants breached their fiduciary duty under Section 36(b) by charging the investment advisory fees approved pursuant to the above-described process, which Plaintiffs claim were "excessive."

## **STANDARD OF REVIEW**

"[S]ummary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law." D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998). "When a properly supported motion for summary judgment [has been] made, the adverse party 'must set forth specific facts

showing that there is a genuine issue for trial.'" Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986) (quoting Rule 56(e)). Disputes regarding "immaterial or minor facts" will not defeat an otherwise properly supported motion. Pac. M. Int'l Corp. v. Raman Int'l Gems, Ltd., 888 F. Supp. 2d 385, 394 (S.D.N.Y. 2012). If "the nonmoving party has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof," summary judgment is appropriate. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

## ARGUMENT

### I. Plaintiffs Bear a Heavy Burden in a Section 36(b) Action

Section 36(b) creates a narrow private right of action against a mutual fund adviser for breach of "a fiduciary duty with respect to the receipt of compensation for services." 15 U.S.C. § 80a-35(b). Plaintiffs must present *evidence* that raises a genuine issue of material fact as to their ultimate burden of proof: that the challenged fee is "so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining." Jones, 559 U.S. at 346.

A Section 36(b) action is not a vehicle for: (1) judicial second-guessing or an independent inquiry into what the fee should have been; (2) rate setting or seeking fee parity among different clients or across the mutual fund industry; or (3) substitution of a plaintiff's (or its expert's) judgment for that of a well-informed and conscientious board, or to argue that it could have achieved a better deal. See Jones, 559 U.S. at 350, 352; Paskowitz v. Prospect Capital Mgmt., LP, 232 F. Supp. 3d 498, 505 (S.D.N.Y. 2017) ("it is not for the court in a Section 36(b) suit to determine a reasonable rate"); Kasilag v. Hartford Inv. Fin. Serv., LLC, No. 11-1083, 2016 WL 1394347, *14 (D.N.J. Apr. 7, 2016). Instead, the inquiry is whether the plaintiff has proven that the fee the independent board approved was so disproportionately large that it *could not* have been within "the *range* of fees that *might* result from arm's length bargaining." Jones, 559 U.S.

at 347 (emphasis added). This standard presents "a very high hurdle to overcome." In re Am Mut. Funds Fee Litig., No. CV 04–5593, 2009 WL 5215755, *3 (C.D. Cal. Dec. 28, 2009). Accordingly, courts have routinely granted defendants' motions to dismiss[10] and motions for summary judgment,[11] and no plaintiff has ever won a Section 36(b) case.[12]

Summary judgment is warranted here because the decision by the Board to approve the advisory fee rate at issue is entitled to substantial deference, and Plaintiffs have not adduced any evidence that could allow them to meet their burden to overcome such deference.

## II.     The Independent Directors Reached an Informed and Conscientious Business Judgment to Approve the IAA

Plaintiffs' burden in a Section 36(b) action is heightened when the evidence reveals, as here, an effective and independent board process. "Congress [has] entrusted to the independent directors . . . the primary responsibility for looking after the interests of the funds' shareholders." Burks v. Lasker, 441 U.S. 471, 472 (1979). As the Supreme Court has explained:

> Where a board's process for negotiating and reviewing investment-adviser compensation is robust, a reviewing court should afford commensurate deference to the outcome of the bargaining process. . . . [I]f the disinterested directors considered the relevant factors, their decision to approve a particular fee agreement is entitled to considerable weight, even if a court might weigh the factors differently.

---

[10]   See, e.g., Pirundini, 2018 WL 1084140; Paskowitz, 232 F. Supp. 3d 498; Migdal v. Rowe Price-Fleming Int'l, Inc., 248 F.3d 321 (4th Cir. 2001); Krantz v. Prudential Invs. Fund Mgmt. LLC, 77 F. Supp. 2d 559 (D.N.J. 1999).

[11]   See, e.g., Jones v. Harris Assoc. L.P., 611 F. App'x 359 (7th Cir. 2015); Zehrer, 2018 WL 1293230; Goodman, 2018 WL 1247459; Gallus v. Ameriprise Fin. Inc., 675 F.3d 1173 (8th Cir. 2012); Strougo v. BEA Assocs., 188 F. Supp. 2d 373 (S.D.N.Y. 2002); Kasilag, 2016 WL 1394347.

[12]   Defendants prevailed in all eight Section 36(b) trials. Sivolella v. AXA Equitable Life Ins. Co., No. 11-cv-4194, 2016 WL 4487857 (D.N.J. Aug. 25 2016), appeal docketed, No. 16-4241 (3d Cir. Dec. 6, 2016); In re Am. Mut. Funds Fee Litig., No. 04-5593, 2009 WL 5215755 (C.D. Cal. Dec. 28, 2009), aff'd sub nom. Jelinek v. Capital Research & Mgmt. Co., 448 F. App'x 716 (9th Cir. 2011); Kalish v. Franklin Advisers, Inc., 742 F. Supp. 1222 (S.D.N.Y. 1990), aff'd, 928 F.2d 590 (2d Cir. 1991); Meyer v. Oppenheimer Mgmt. Corp., 715 F. Supp. 574 (S.D.N.Y. 1989), aff'd, 895 F.2d 861 (2d Cir. 1990); Krinsk v. Fund Asset Mgmt., Inc., 715 F. Supp. 472 (S.D.N.Y. 1988), aff'd, 875 F.2d 404 (2d Cir. 1989); Schuyt v. Rowe Price Prime Reserve Fund, Inc., 663 F. Supp. 962 (S.D.N.Y. 1987), aff'd, 835 F.2d 45 (2d Cir. 1987); Gartenberg v. Merrill Lynch Asset Mgmt., Inc., 573 F. Supp. 1293 (S.D.N.Y. 1983), aff'd, 740 F.2d 190 (2d Cir. 1984); Gartenberg v. Merrill Lynch Asset Mgmt., Inc., 528 F. Supp. 1038 (S.D.N.Y.), aff'd, 694 F.2d 923 (2d Cir. 1981).

Jones, 559 U.S. at 351-52.  Such weight and deference is appropriate here.[13]

## A. The Independent Directors Are Indisputably Well-Qualified

There is no evidence to reasonably contradict the fact that the Board was comprised of well-qualified, experienced professionals.  Six of the eight members (including the Board Chair and each audit committee member) are deemed "independent" under the ICA and any other common sense definition of the term.  They also engaged qualified independent counsel with 30 years of experience to assist them with the 15(c) process.

## B. The Board's Annual Review and Approval Process for the IAA Was Robust and Conscientious

Plaintiffs cannot offer a genuine dispute regarding the adequacy of the 15(c) process. The record evidences a robust process involving thoroughly-engaged and active Independent Directors (and their independent counsel) who received and reviewed large volumes of information, probed for additional detail, responsibly considered the relevant factors, and performed their duties with "care and conscientiousness."  Jones, 559 U.S. at 349.

During the 15(c) process, the Independent Directors specifically requested and reviewed a large catalogue of information they deemed necessary or helpful.  SUF ¶¶ 24, 65-66.  The pages contained information related to each of the "Gartenberg factors" identified by the courts, including: the services Davis provided (and differences in services provided to different clients); the Fund's investment advisory fees and expense ratios as compared to (independently-identified) peer groups; performance data over several time periods, with comparisons to prospectus benchmarks and independently-identified peer groups; and Davis's profits related to

---

[13]    In Gallus, the Eighth Circuit initially reversed an order granting summary judgment, but later affirmed that same order after the Supreme Court decided Jones, noting that the Supreme Court had instructed courts to give substantial deference when the independent directors' approval process was robust and had considered the relevant factors.  675 F.3d at 117879.

the Fund.[14]  SUF ¶¶ 24, 65-77.  The Independent Directors also considered information gained over the course of their Board tenure and the prior year's quarterly meetings.  SUF ¶ 63.

The Independent Directors' review of the materials—by themselves, with independent counsel, and in robust discussions with Davis personnel—reveals a thorough, responsible process.  Defendants' expert has offered the (unrebutted) opinion, based on his decades of mutual fund industry experience—including attendance at over 150 board and 15(c) meetings, review of the 15(c) process for hundreds of funds, and work at Lipper for 15 years—that the information requested and received by the Independent Directors met industry standards, enabled them to form a reliable opinion about the overall quality of Davis's services, and provided a sufficient basis for them to apply their collective business judgment in evaluating the IAA.[15]

### C.    Substantial Deference Is Owed to the Board's Process

"Considerable weight" and "commensurate deference" should be accorded to the Independent Directors' reasoned business judgment to approve the advisory agreement.  <u>Jones</u>, 559 U.S. at 351.

### III.    Plaintiffs Have Not Adduced Evidence Creating a Genuine Issue of Material Fact that the Fees Are "So Disproportionately Large" that They Cannot Have Been the Product of Arm's-Length Bargaining

A plaintiff can only overcome the considerable deference owed to a board's business judgment by presenting "***additional evidence*** that the fee exceeds the arm's length range."  <u>Jones</u>, 559 U.S. at 346, 351-52 (emphasis added).  It is not sufficient to argue that the fees *could* have been lower or that a board *could* have negotiated for a better deal.  <u>See, e.g.</u>, <u>Paskowitz</u>, 232

---

[14]    <u>See</u> <u>Jones</u>, 559 U.S. at 344-45; <u>Gartenberg</u>, 694 F.2d at 928930.

[15]    Keil Rep. ¶¶ 49-50, 55, 58, 63, 65, 69-70, 88, 95, 100, 113, 116, 122, 125.  Plaintiffs have not put forth any expert to address the adequacy of the Board's process in approving the IAA.

F. Supp. 3d at 508 ("Section 36(b) does not provide relief where more arduous bargaining could have resulted in lower fees.").[16]

Here, Plaintiffs' case is wholly premised on the erroneous argument that the amount of fees charged to Subadvised Funds should establish the amount of fees charged to the Fund. This assertion utterly ignores the record. The undisputed facts show meaningful and substantial differences between the services and roles of a mutual fund adviser and a subadviser.

### A. Differences in Fees for Subadvisory Services Do Not Demonstrate a Genuine Issue of Material Fact

Plaintiffs essentially argue that Davis provided the same services to the Fund and the Subadvised Funds and that it was therefore required to charge them the exact same fee rate. This is both incorrect as a matter of fact and premised on a rejected legal theory. Although fee comparisons may be relevant in Section 36(b) cases, "courts must be wary of inapt comparisons." Jones, 559 U.S. at 350. "If the services rendered are sufficiently different that a comparison is not probative, then courts must reject such a comparison." Id. See also Kalish, 742 F. Supp. at 1237 (must compare to members of appropriate universe); cf. Struogo, 188 F. Supp. 2d at 385 (the relevant comparison is to other mutual funds, not non-mutual fund clients). Rejecting such false comparisons is appropriate at summary judgment—a plaintiff's identification of some similarities between clients "will not 'doom any fund to trial.'" Jones, 559 U.S. at 350 n.8. See also Goodman, 2018 WL 1247459, at *7.

Here, Plaintiffs merely point to the (uncontested) fact that Davis charged the Subadvised Funds less for *subadvisory services* than it charged the Fund for *advisory services*. This does not create a genuine issue of material fact because (1) it falsely compares two different sets of

---

[16] See also Zehrer, 2018 WL 1293230, *7 ("Even if the Board might have driven a harder bargain, the legal standard does not require that.").

services provided to two different types of clients; (2) Plaintiffs rely upon the rejected theory of fee parity; and (3) Plaintiffs provide no "additional evidence" to support their allegation that the fees charged to the Fund were outside of arm's length range.

  **1.**  **Subadvisory Fees Davis Charged for Portfolio Management Services Present an Inapt Comparison to the Advisory Fees Paid by the Fund**

  Subadvisory services are inherently different than advisory services and are therefore compensated differently. <u>See generally</u> SUF ¶¶ 22-55.[17] The record is undisputed that Davis provided the Fund a much wider range of services than it provided to the Subadvised Funds, and the Subadvised Funds' own advisers performed (and were compensated for) many services Davis did not perform for the Subadvised Funds.

   **a.**  **Differences in the Responsibilities and Services Provided by Davis to the Fund and Subadvised Funds**

  Davis performed significant services and took on additional risks and responsibilities for the Fund beyond those it assumed for the Subadvised Funds. These additional risks and responsibilities included at least the following:

  **Board Reporting**. For the Fund, Davis personnel responded to inquiries or requests for information from the Independent Directors or their independent counsel, prepared memoranda on various topics of interest to the Board, provided monthly updates and quarterly reports on disparate issues, and created extensive materials for the 15(c) process, which involved personnel from several Davis departments. SUF ¶¶ 5, 24, 26-27, 67. Davis personnel also attended each Board meeting (to address multiple topics directly related to Davis) and engaged in ongoing communication with the directors and their counsel. SUF ¶¶ 26-27. In contrast, Davis provided

---

[17] Defendants' experts have offered the (unrebutted) opinion that, across the mutual fund industry, advisory fees are often twice the size of subadvisory fees, thereby demonstrating the difference in services ascribed to an adviser. <u>See</u> Expert Report of Dr. Jonathan Reuter ("Reuter Rep.") at ¶ 46; Expert Report of Kevin Cronin ("Cronin Rep.") at ¶ 33, attached as Exs. 15 and 16, respectively to Topetzes Decl.

only a small subset of materials for the Subadvised Funds that were directly related to portfolio management. SUF ¶¶ 25, 28. Moreover, Davis personnel attended Subadvised Funds board meetings rarely, and only for the portion related to Davis. SUF ¶ 28.

**Regulatory Reporting**. Davis was responsible for preparing and filing the Fund's financial statements and other federal and state regulatory reports. SUF ¶ 29. In contrast, as subadviser, Davis provided the Subadvised Fund Advisers with data that did not involve substantial additional effort beyond its work for the Fund and only related to the narrow piece of the Subadvised Funds' filings that mentioned Davis. SUF ¶ 31. Whereas the Fund's regulatory filings involved input from nearly all Davis departments, only legal personnel handled such work for the Subadvised Funds. SUF ¶¶ 24, 29. The Subadvised Fund Advisers were ultimately responsible for filings. SUF ¶ 32. Relatedly, Davis handled regulatory exams and corresponded with regulators on behalf of the Fund; it did not do so for the Subadvised Funds. SUF ¶ 30.

**Compliance**. As adviser to the Fund, Davis reviewed and analyzed new regulations and monitored the Fund's compliance with applicable laws, regulations, and industry standards. SUF ¶ 33. A large group of Davis personnel worked on compliance issues for the Fund, whereas only one person addressed the minimal compliance responsibilities attendant to its work for the Subadvised Funds. SUF ¶¶ 34, 38-39. Importantly, Davis personnel conducted an annual compliance review of the Fund per Rule 38a-1 under the ICA and then prepared an extensive compliance book reflecting their findings. SUF ¶ 35. The Chief Compliance Officer ("CCO") subsequently reported to the Board with respect to any compliance issues identified. SUF ¶¶ 34-36. The CCO also reported to the Board at each quarterly meeting. SUF ¶ 36. Davis did not undertake any of this work for the Subadvised Funds; each had its own CCO who was unaffiliated with Davis.

**Undertaking of Risk.** Davis's broad role and responsibilities, including the fact that it furnishes officers and directors for the Fund, subjects it to significant legal and reputational risk that is not borne by subadvisers. SUF ¶¶ 51, 52. Among other things, risk arises in connection with issues such as registration statement disclosure, pricing and operational errors;[18] as adviser to the Fund, Davis was responsible for the accuracy and appropriateness of the Fund's filings, disclosures, and compliance. SUF ¶¶ 29, 41, 49, 51. The adviser is also open to litigation risk, potential liabilities and regulatory enforcement exposure. See, e.g., 15 U.S.C. § 77k; 15 U.S.C. § 80a-41. As Davis informed the Board, mutual fund regulatory requirements have become more complex and burdensome, and scrutiny from regulators and shareholders has increased in intensity in recent years. SUF ¶ 51. The Board and shareholders ultimately look to the adviser (Davis for the Fund; the Subadvised Fund Advisers for the Subadvised Funds) to bear responsibility for all services provided and potentially to reimburse the Fund for errors by third parties. Id.

**Oversight and Ultimate Responsibility for Third-Party Service Providers.** As adviser to the Fund, Davis was responsible for selecting and monitoring the Fund's third-party service providers. SUF ¶ 49. Davis communicated daily with those entities, audited their efforts, and performed additional work before reporting to the Board or shareholders. SUF ¶ 49. Moreover, as part of the annual review, the CCO examined the adequacy and effectiveness of the policies and procedures of each service provider for the Fund, which required frequent discussions and in-person visits with third-party service providers. SUF ¶ 35. Davis was ultimately responsible for the accuracy of the information and work performed. SUF ¶¶ 41, 49.

---

[18]  Cf. Jones, 559 U.S. at 350 n.8 (citing with approval In re AllianceBernstein Mut. Fund Excessive Fee Litig., No. 04 Civ. 4885, 2006 WL 1520222, *2 (S.D.N.Y. May 31, 2006), for the proposition that higher fee paid by mutual fund client "resulted from different services and different liabilities assumed").

In contrast, the Subadvised Fund Advisers oversaw the work performed by other service providers for the Subadvised Funds.  SUF ¶ 50.

**Accounting and Tax Services**.  As the Fund's adviser, Davis was responsible for three levels of accounting: portfolio (e.g., records of trades, gains/losses), shareholder transaction (e.g., subscriptions and redemptions, distributions), and financial statement (e.g., balance sheets, cash flows, income statements).[19]  SUF ¶ 40.  Though other service providers also helped perform some of these functions (e.g., the custodian and transfer agent kept records of holdings, gains/losses, and shareholder transactions), Davis's own team acted to verify this information and performed other accounting functions.  SUF ¶¶ 40-41, 49.[20]  Additionally, Davis (working closely with the auditor) assisted with all Fund federal, state, and local tax returns.  SUF ¶ 43. Davis also had to consider tax implications for each holding and trade for the Fund.  SUF ¶ 44. Aside from minimal investment-related communications with custodians for the Subadvised Funds, Davis had almost no accounting responsibilities as subadviser.  SUF ¶ 42.

**Shareholder Services and Investor Relations**.  Davis provided extensive shareholder outreach for the Fund, including answering shareholder inquiries, preparing shareholder letters and management commentaries, and hosting investor education events.[21]  SUF ¶¶ 45-46.  Davis also communicated frequently with third-party mutual fund evaluators (e.g., Morningstar, Lipper) and industry associations.  SUF ¶ 48.  Davis did not perform any of these services for the Subadvised Funds, and did not communicate directly with Subadvised Fund investors. SUF ¶ 47.

---

[19]  The FASA provided Davis an annual fixed fee related to a subset of administrative services.  SUF ¶ 16.  It is undisputed that the fee covered only a small fraction of the costs of providing such services.  SUF ¶ 17.

[20]  Davis's fund accounting group prepared annual and semi-annual SEC reports and assisted with Board reports. Davis also verified/recalculated the financial statements, as it was ultimately responsible for them.  SUF ¶ 41.

[21]  The SSA required Davis to provide services mainly related to servicing shareholder accounts (e.g., supplying a call center) and providing correspondence for exchanges and redemptions.  SUF ¶ 15.  Davis was refunded some (but not all) of its costs from these operations.  SUF ¶ 14.  The SSA did not cover the other shareholder servicing-related tasks described above (e.g., shareholder education efforts, preparing shareholder reports). SUF ¶¶ 13, 45-46.

* * *

Plaintiffs try to argue that the services provided by Davis to the Fund and the Subadvised Funds were the same or substantially similar because Davis performed *some* tasks for the Subadvised Funds in several of the categories identified above. However, they cannot dispute that the extent and level of services differed substantially. See Goodman, 2018 WL 1247459, *7 ("[E]ven assuming *arguendo* that some of the services provided as adviser and as subadviser are 'substantially' the same, Defendants have presented uncontroverted evidence that the risk undertaken and the scale of services are different.").[22]

Moreover, to the extent Plaintiffs may attempt to discount the services as incidental to responsibilities that Davis had under the SSA or FASA, those agreements do not cover the full panoply of services that Davis provided for the Fund, such as board reporting, fund compliance work, shadow accounting, preparing shareholder letters and commentaries, hosting investor education events, outreach to third-parties, overseeing all of the outside service providers, and undertaking the risks associated with advising a registered investment company.

> **b.** **The Substantial Services the Subadvised Fund Advisers Performed for the Subadvised Funds Demonstrate Davis's Limited Role as Subadviser**

The Subadvised Fund Advisers retained many responsibilities for the Subadvised Funds for which they received substantial compensation. Indeed, the Subadvised Fund Advisers each charged advisory fees that were *higher* than the advisory fees Davis charged the Fund, and they retained approximately half that amount as compensation for the services they (not Davis, as subadviser) performed for the Subadvised Funds. SUF ¶¶ 11, 21. Such services included fund

---

[22]  In Goodman, the court noted and quoted from the defense expert's report explaining the differences in risks and roles of adviser and subadviser, and the acknowledgement by the plaintiffs' expert (the same one here) that the adviser assumed different risks. 2018 WL 1247459, at *7-8. Here, Defendants' expert similarly details the many differences between Davis's role as adviser and subadviser. See Cronin Rep. ¶¶ 22-61.

compliance, preparation of regulatory filings and reporting, selecting and overseeing service providers, and providing office space and personnel. SUF ¶¶ 53-55.[23]

Courts have highlighted the additional services performed by a subadvised fund's adviser in concluding that there were substantial differences in advisory and subadvisory services and that the comparison offered by Plaintiffs does not present a triable issue. See e.g., Goodman, 2018 WL 1247459, at *8-9. In Goodman, the court pointed to testimony and evidence (similar to that adduced here) reflecting that the defendant–adviser "provided substantially more compliance services in both 'scale' and 'scope' to [its own fund] as compared to the [s]ubadvised [f]unds." Id. at *8. The court also noted that the advisory agreement at issue in that case, which is *identical* in operative language to some of Davis's agreements with the subadvised funds, explicitly recognized that "the Subadviser is not the compliance agent for [the Subadvised Fund], and does not have access to all of [the fund's] books and records necessary to perform certain compliance testing." Id. See also SUF ¶ 55.

*          *          *

The wide disparity in services provided by Davis to the Fund and the Subadvised Funds is manifest and undisputed. The subadvisory fee rates Davis charged the Subadvised Funds present an "inapt comparison." Jones, 559 U.S. at 350.

### 2.    Plaintiffs' Fee Parity Theory Has Been Rejected by Several Courts

In the alternative, Plaintiffs argue that, even if Davis provided more services to the Fund, Defendants have not proven that the cost of such services equates to the difference in fees.[24] This theory (incorrectly) assumes that there is one acceptable cost/revenue ratio that an adviser

---

[23]    The manager for one of the Subadvised Funds faced its own Section 36(b) suit recently. After a lengthy bench trial, the court concluded that the manager provided sufficient services beyond what the subadvisers did to justify its fee. See Sivolella, 2016 WL 4487857.

[24]    See Rebuttal Report of Ian Ayres at ¶¶ 1, 2, 5-6, 9-10, attached as Ex. 18 to Topetzes Decl.

can charge its clients, and that Davis has the burden to show that any variation in fees between clients are directly attributable to specific differences in costs (and quantifiable), such that the adviser is charging the same cost/fee ratio for all clients.

Section 36(b) does not require such rate regulation or fee parity and does not place the burden on defendants to "justify" differences in rates charged for different services. See Jones v. Harris Assocs. L.P., 611 F. App'x 259, 360 (7th Cir. 2015) (the task in Section 36(b) litigation "is to identify the outer bounds of arm's length bargaining and not engage in rate regulation"); Paskowitz, 232 F. Supp. 3d at 505 (not for court to set the rate). Courts uniformly have recognized that there is a ***range*** of acceptable fees and that, even in an arm's length transaction, different parties can agree to compensate an adviser at different rates. Jones, 559 U.S. at 352. Indeed, the facts in this case bear that out, as different Subadvised Funds had different fee schedules with Davis, even though (as Plaintiffs assert) they were negotiated at arm's length.

### 3. Plaintiffs Have Failed to Meet Their Burden to Show that the Fees Charged to the Fund Were Outside the Range of Acceptable Fees

One undisputed fact bears repeating: The fees charged by Davis as adviser, and the total expense ratio for the Fund, were *below* the median relative to independently-selected peer funds at all times throughout the Relevant Period. SUF ¶ 12. The suggestion that the advisory fees were outside the range of possible arm's-length bargaining is specious.

Plaintiffs have not produced any evidence establishing that the fees charged to the Fund were outside the range of what could be negotiated in an arm's length transaction. Indeed, Plaintiffs produce *no evidence* establishing an acceptable fee range. Without this evidence, Plaintiffs can neither prove that the fees were excessive as a matter of law, nor establish an essential element of purported damages. See Sivolella, 2016 WL 4487857, at *4.

Plaintiffs point to *some* fees that they assert were negotiated at arm's length (i.e., the subadvisory fees charged to the Subadvised Funds) and argue that, because the Fund's advisory fee schedule was higher, it must be outside the acceptable range.[25] As stated above, this presents an inapt comparison.

Even if the Court considered such subadvisory fees to be somewhat relevant, evidence of a fee differential is not enough to preclude summary judgment. "Only where plaintiffs have shown a large disparity in fees that cannot be explained by the different services ***in addition to*** other evidence that the fee is outside the arm's-length range will trial be appropriate." Jones, 559 U.S. at 350 n.8 (emphasis added) (explaining that a plaintiff's ability to present evidence of fee comparisons will not "doom any fund to trial"). Here, Plaintiffs provide no "other evidence" that the Fund's advisory fee was outside the range that could have been negotiated at arm's length. See Jones v. Harris Assoc. L.P., No. 04-cv-8305, 2007 WL 627640, at *8-9 (N.D. Ill. Feb. 27, 2007) (even assuming plaintiffs' fee comparison is valid, it only shows that the range *includes* those lower fees, it does not show the fees paid were outside the acceptable range); Gallus, 675 F.3d at 1180-81 (disparity in fees is not enough).

The undisputed evidence reflects a clear difference in services. As one court recently explained in granting summary judgment based on similar allegations, "the evidence Plaintiffs have adduced establishes at most that others paid different amounts for fewer services[, which] does not allow a reasonable inference that the amounts paid to the Fund[] were outside of the range that could be expected to result from arm's length bargaining." Goodman, 2018 WL 1247459, at *18.

---

[25] Plaintiffs' expert calculates damages as the difference between the amount Davis received from the Fund and the amount it would have received if it charged the Fund the same fee rate it charged to the Subadvised Portfolios. This would cause the Fund to have the fourth- or fifth-smallest expense ratio of 95-105 peer funds, which would implausibly suggest that 95 percent of peer funds are charged fees in violation of Section 36(b). Reuter Rep. ¶ 87.

The fees charged to the Fund were well within the range of those that could be negotiated at arm's length. An independent Board approved the fees on multiple occasions after a thorough review of relevant data with guidance from independent counsel. SUF ¶ 86. In addition, the Fund paid advisory fees lower than each of the Subadvised Funds and most peer funds and received positive ratings on fees from independent sources such as Morningstar. SUF ¶¶ 12, 21, 69.

With respect to the range of what could be produced by arm's-length bargaining, it is relevant to note the undisputed evidence that *other independent boards elected to replace their own advisers and hire Davis at the same (or a higher) fee structure*. In 2005, the (unaffiliated) board of the Clipper Fund, Inc. selected Davis to become the fund's investment adviser. SUF ¶ 88. In 1993, another fund group (Selected American Shares, Inc.) not affiliated with Davis also selected Davis to become the investment adviser to those funds, after evaluating 17 different potential managers. SUF ¶ 89. Significantly, during the Relevant Period, these other boards of directors also annually approved fee schedules nearly identical to that of the Fund. SUF ¶ 90.

**B.     There Are No Genuine Issues of Material Fact That Warrant a Trial on Any of the <u>Gartenberg</u> Factors**[26]

**1.     There are No Genuine Disputes of Material Fact as to the Nature and Quality of the Services that Davis Provided to the Fund**

The record does not reveal any genuine issues of material fact regarding the nature and quality of services that Davis provided the Fund. As explained above, Davis supplied many

---

[26]     The <u>Gartenberg</u> factor related to the Board's independence and conscientiousness is discussed in Section II above, and reveals no genuine issue of material fact. Plaintiffs have also failed to meet their burden to establish evidence related to two of the other factors—economies of scale and fall-out benefits—as their expert acknowledged that his opinions will not cover these topics and it appears Plaintiffs have abandoned any arguments as to them. <u>See</u> <u>Kalish</u>, 742 F. Supp. at 1238 (plaintiff must prove economies of scale existed); <u>Gartenberg</u>, 573 F. Supp. at 1313.

services to the Fund beyond portfolio management and stock selection, and Plaintiffs do not raise any issues regarding the quality of those services.[27]

Plaintiffs' only real objection regarding the quality of services relates to performance. However, evidence on this point is generally undisputed and, in any event, does not amount to a genuine issue of material fact warranting trial. Although the Fund seeks to attract investors that have a long-term investment perspective, performance during the Relevant Period alone has generally been positive for the Fund. In 34 of the past 39 years, the Fund's ten-year rolling returns have outperformed its prospectus benchmark. Moreover, courts recognize that short term performance is not a good indicator for Section 36(b) cases, as actively managed funds will inevitably differ from the benchmark and have up and down years.[28]

The parties' experts disagree as to certain methodologies and calculations, but their conclusions do not differ so as to create a triable issue. Expert witnesses engaged by both parties concluded that the Fund's performance was generally in line with the prospectus benchmark during the Relevant Period.[29] Plaintiffs' expert concedes that his analysis *does not show that the Fund underperformed* its benchmark.[30] Defendants' expert (Dr. Reuter) provides additional data

---

[27]   Under Section 36(b), it is appropriate to consider all services rendered and all compensation and payments received. See S. Rep. 91-184; cf. Gartenberg, 694 F.2d at 931 (cautioning against "exalt[ing] form over substance" when evaluating services performed by adviser and its affiliates).

[28]   See Paskowitz, 232 F. Supp. 3d at 506; Pirundini, 2018 WL 1084140, *8 ("allegations of underperformance alone are insufficient to prove that an investment adviser's fees are excessive" (quoting Amron v. Morgan Stanley, 464 F.3d 338, 344 (2d Cir. 2006))); Migdal, 248 F.3d at 327; Am. Mut., 2009 WL 5215755, at *48.

[29]   Plaintiffs' expert concludes that the Fund did not achieve "superior performance" relative to passive benchmarks during the Relevant Period (i.e., did not exceed the benchmark by a statistically significant amount), but does not conclude that the Fund underperformed the benchmark by a statistically significant amount. Ayres Report at ¶¶ 73-74, attached as Ex. 17 to Topetzes Decl. Defendants' expert concurs. Reuter Rep. ¶¶ 60-70 (concluding that for four out of the five years in the Relevant Period, the Fund outperformed the benchmark but that the results do not reveal a statistically significant difference).

[30]   Only one of 80 specifications that Plaintiffs' expert ran showed a statistically-significant negative return for a one-year period. As Dr. Reuter points out, that result was based on an implausibly high assumption about overall market returns. Reuter Rep. ¶ 79. In any case, the existence of one period of below-market returns does not create a genuine issue of material fact in a Section 36(b) case.

that the Fund's performance was in line with or exceeded that of peer funds,[31] which is

consistent with information provided to the Board.  SUF ¶ 60.[32]

This level of performance does not support a Section 36(b) claim.  See Zehrer, 2018 WL

1293230, *11 ("A fund performing 'as well as, if not better than, comparable funds' is an

indication that the adviser 'deliver[s] value for money.'" (citation omitted)).

## 2.     A Trial Is Not Warranted as to Profitability

Plaintiffs have not adduced evidence regarding profitability to warrant a trial.  As an

initial matter, the Independent Directors received and evaluated detailed information about the

profits Davis earned from its service to the Fund.  The central opinion offered by Plaintiffs'

expert on this topic—that Davis still would have made a profit if the Fund paid the rate Davis

charged for subadvisory services—is irrelevant.  Section 36(b) does not impose a "cost-plus"

rate-setting structure or establish an acceptable level of profit;[33] to the contrary, it recognizes that

an adviser is entitled to make a profit and rejects rate setting.[34]  Essentially, all Plaintiffs do is

offer the argument (rejected by other courts) that the adviser "just plain made too much money."

Kalish, 742 F. Supp. at 1236-37.  This fails to raise a genuine issue for trial.

## 3.     Plaintiffs Have Not Produced Evidence Showing a Genuine Dispute Regarding Comparative Fee Structures

Ample and abundant evidence reflects that the Fund's fees were in line with or below

fees paid by similar funds.  This includes reports by third party evaluators, such as Morningstar,

---

[31]    Reuter Rep. ¶¶ 65-70, 78, 80.  Specifically, he concluded that the Fund outperformed 70 percent of its peers during the Relevant Period and outperformed 90 percent of its peers between 2015 and 2017.  Reuter Rep. ¶ 68.

[32]    Plaintiffs' expert does not dispute this data.  Deposition of Ian Ayres ("Ayres Dep.") at 155:24-156:20, attached as Exhibit 12 to Decl. of Stephen G. Topetzes attached hereto.

[33]    See Gartenberg, 528 F. Supp. at 1045.

that gave the Fund a positive rating for fees, and Lipper reports that revealed the Fund's advisory fee and total expense ratio were always below the average and median for the peer group.  SUF ¶¶ 12, 61.  Defendants' expert reached a similar (unrebutted) conclusion from his own analysis of fees paid by 105 peer funds.  Reuter Rep. ¶¶ 10, 34, 37, 38.  See Jones, 611 F. App'x at 361; Am Mut., 2009 WL 5215755, at *53 (that the fees were lower than average and among the lowest supports finding that they were not disproportionate).

Plaintiffs do not dispute this evidence.  Instead, they assert that the mutual fund industry is not competitive and, therefore, that there is no evidence that fees charged to peer funds were negotiated at arm's length and reflect an apt comparison.  However, Defendants do not need to prove a fee was negotiated at arm's length for it to be a valid comparison point.  See Jones, 559 U.S. at 349-50 (although comparisons may not be perfect, they are still relevant); Struogo, 188 F. Supp. 2d at 384.  Plaintiffs' argument amounts to an inappropriate indictment of the entire mutual fund industry.[35]  See Goodman, 2018 WL 1247459, at *16 (rejecting identical argument by plaintiffs, noting that "it is Plaintiffs' burden to show that the fees are so disproportionately large . . . .  This burden does not belong to Defendant.").[36]

---

[35]  Plaintiffs' expert does not dispute Dr. Reuter's conclusion that the Fund's expense ratio was lower than 95 of 105 peer funds and its advisory fee was lower than 74 such funds.  Ayres Dep. 143:1-11, 147:7-11.  Instead, he says that nearly all funds negotiating with their current adviser (thousands of funds representing a "substantial portion" of the industry) can be disregarded as "captive," without analyzing the actual independence of such boards.  Ayres Dep. 139:7-140:15.  He offered the same opinion in Goodman, where the Court recently granted summary judgment.

[36]  Mutual funds are sold in a competitive environment, directly compete with each other for assets, and have transparency and standardization in fee and performance disclosures.  Reuter Rep. ¶¶ 82-83.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request entry of summary judgment.


Dated: May 15, 2018           By:      S/ Stephen G. Topetzes

**K&L GATES LLP**
Joanna A. Diakos
599 Lexington Avenue
New York, NY 10022
Tel: (212) 536-3900
Fax: (212) 536-3901
joanna.diakos@klgates.com

- and -

Stephen G. Topetzes (*pro hac vice*)
Jeffrey B. Maletta (*pro hac vice*)
Nicholas G. Terris
Nicole A. Baker (*pro hac vice*)
Amy J. Eldridge (*pro hac vice*)
Meghan E. Flinn (*pro hac vice*)
1601 K Street, NW
Washington, DC 20006
Tel: (202) 778-9000
Fax: (212) 778-9100
stephen.topetzes@klgates.com
jeffrey.maletta@klgates.com
nicholas.terris@klgates.com
nicole.baker@klgates.com
amy.eldridge@klgates.com
meghan.flinn@klgates.com