FILED UNDER SEAL PENDING PARTY REVIEW

1 UNITED STATES DISTRICT COURT
2 SOUTHERN DISTRICT OF NEW YORK
3 ------------------------------------------------------x
4
5
6 In re DAVIS NEW YORK VENTURE FUND          No. 14 CV 4318-LTS-HBP
7 FEE LITIGATION
8
9
10 ------------------------------------------------------x
11
12 <u>MEMORANDUM OPINION AND ORDER</u>
13
14          Plaintiffs, who are shareholders of the Davis New York Venture Fund (the

15 "Fund"), bring suit on behalf of and for the benefit of the Fund under section 36(b) of the

16 Investment Company Act of 1940 (the "1940 Act"), 15 U.S.C. § 80a-35(b) ("Section 36(b)"),

17 against Davis Selected Advisers, L.P. ("Davis Advisers"), and Davis Selected Advisers-NY, Inc.

18 ("Davis-NY," and together with Davis Advisers, "Defendants" or "Davis"), alleging that

19 Defendants charged excessive advisory fees to the Fund and thereby violated their fiduciary duty

20 as investment advisers.   Defendants move for summary judgment dismissing this action (Docket

21 Entry No. 102) and to preclude certain opinions and testimony of Plaintiffs' expert, Dr. Ian

22 Ayres (Docket Entry No. 118).   Plaintiffs move to preclude the opinions and testimony of

23 Defendants' expert Jeffrey Keil and evidence regarding Davis' distribution services.   (Docket

24 Entry No. 133.)

25          This Court has subject matter jurisdiction of this action pursuant to 28

26 U.S.C. § 1331.

27          The Court has reviewed the submissions of the parties carefully and, for the

28 following reasons, denies Plaintiffs' motion to preclude evidence and testimony, and grants in

29 part and denies in part Defendants' motion to preclude expert testimony.   The Court grants

30 Defendants' motion for summary judgment dismissing the case.

FILED UNDER SEAL PENDING PARTY REVIEW

1                                  BACKGROUND[1]

2    The Fund

3            The Fund is a series of Davis New York Venture Fund, Inc., an SEC-registered

4    open-ended investment company.  (Def. 56.1 St. ¶ 1.)  The Fund is benchmarked to the S&P 500,

5    but is actively managed in accordance with a long-term growth strategy that is focused on

6    particular sectors.  (Id. ¶¶ 1-2.)

7            The Fund is governed by an eight-member board (the "Board"), which includes

8    six members who have no employment or other affiliation with Defendants.[2]  (Id. ¶ 6.)  The

9    Board's primary counsel is the Greenberg Taurig law firm.  (Id. ¶ 8.)  In order to manage the

10   Fund, the Board contracts with several entities to provide services necessary for the Fund's

11   operation.

12   Services Provided By Davis to the Fund; Other Service Provider Agreements

13           Since January 1, 2001, the Fund has retained Davis "to supervise and assist in the

14   management of the Fund's business, and to provide investment advisory services" through an

---

[1]    The facts recited herein are undisputed unless otherwise indicated.  Facts recited
as undisputed are identified as such in the parties' statements pursuant to
S.D.N.Y. Local Civil Rule 56.1 or drawn from evidence as to which there is no non-
conclusory contrary factual proffer.  Citations to the parties' respective Local
Civil Rule 56.1 Statements ("Pl. 56.1 St." (Docket Entry No. 113), "Def. 56.1 St."
(Docket Entry No. 105), "Pl. 56.1 Resp." (Docket Entry No. 114), "Def. 56.1 Resp."
(Docket Entry No. 125), and "Def. 56.1 Reply" (Docket Entry No. 126)) incorporate by
reference the parties' citations to underlying evidentiary submissions.

[2]    Plaintiffs proffer no evidence to indicate that any of the six board members whom
Defendants characterize as independent was interested in or affiliated with the Fund
within the meaning of 15 U.S.C. sections 80a-2(a)(3) (defining "affiliated person) or 80-
a2(a)(19) (defining "interested person").  Jeffrey Keil, Defendant's expert, identifies only
Christopher and Andrew Davis as interested directors, each holding a partnership interest
in Davis.  (Keil Rep., Topetzes Decl., Ex. 14, App'x C.)

FILED UNDER SEAL PENDING PARTY REVIEW

1  Investment Advisory Agreement ("IAA"). (Id. ¶ 10 (internal quotation marks and alterations

2  omitted).)  The Board also entered into other IAAs with Davis to advise the twelve other funds it

3  oversees, although the Fund is by far the largest as measured by assets under management.  (Pl.

4  56.1 Resp. ¶ 65; Robertson Decl., Ex. 2, at DSA-001487[3].)

5         The IAA is approved by the Board annually in accordance with Section 15(c) of

6  the 1940 Act, 15 U.S.C. § 80a-15(c),  and was amended in 2001, 2004, 2006, 2007, 2008, and

7  2009. (Def. 56.1 St. ¶ 10.)  Davis is compensated with a fee equal to a certain percentage,

8  quantified as basis points, of the Fund's assets under management.  (Id. ¶ 11.)  At all relevant

9  times, the number of basis points charged with respect to the assets varied according to a

10  schedule of breakpoints.  (Id.)  The rates ranged from 55 basis points for the first $3,000,000,000

11  under management to 48.5 basis points for assets under management over $18,000,000,000.

12  (Id.)  Between June 16, 2013, and July 30, 2018 (the "Relevant Period"), the effective fee rates

13  were between 50.3 and 50.1 basis points.  (Id. ¶ 12.)  In 2013, Davis earned $101.5 million in

14  fees, in 2014 it earned $101 million, in 2015 it earned $83.2 million, and in 2016 it earned $62.7

15  million, for a total of $348.4 million during the Relevant Period.  (Pl. 56.1 St. ¶ 61.)

16         The Board entered into several contracts, outside of the IAA, to provide specific

17  services to the Fund with third parties or Davis and its affiliates.  Davis Advisers and the Fund

18  entered into a Shareholder Services Agreement ("SSA") that obligated Davis Advisers to

19  maintain a service to answer shareholder and broker-dealer inquiries, provide general

20  correspondence for mutual fund redemption and exchanges, provide for account maintenance

21  and transfers, and supply all necessary supporting technology.  (Def. 56.1 St. ¶ 13.)  Davis

---

[3]      For example, in 2012, the Fund had over $19 billion of assets under management,
whereas the other Davis funds individually managed between approximately $28 million
and $515 million.

FILED UNDER SEAL PENDING PARTY REVIEW

1    Advisers and the Board also executed a Fund Administrative Services Agreement ("FASA"),

2    which the Board also approved annually, to address the preparation of Securities and Exchange

3    Commission ("SEC") filings, review tax returns, approve expense disbursements, coordinate

4    with auditors, verify the security ledger, and maintain corporate books and records.  (Id. ¶ 15.)

5    The Fund also entered into a Transfer Agency and Service Agreement (the "Transfer

6    Agreement") with Boston Financial Data Services, Inc. ("BFDS"), in 2006, under which BFDS

7    is to act as a transfer agent and establish shareholders' accounts, issue their shares, process

8    redemption requests and dividend and distribution payments, and maintain shareholder records.

9    (Pl. 56.1 St. ¶ 13.)  The Board executed a Custodian Agreement with State Street Bank and Trust

10   Company ("State Street") to provide a variety of accounting and custodial services, including

11   maintaining custody of Fund assets, collecting portfolio income, calculating daily net asset value,

12   making cash disbursements, reporting cash transactions, and maintaining Fund books and

13   records.  (Pl. 56.1 St. ¶ 16; Form N-CSR for fiscal year ending on July 31, 2013, Robertson

14   Decl., Ex. 33 at 20 (stating that State Street "is the Fund's primary accounting provider").)

15   Davis Distributors LLC, pursuant to a distribution agreement (the "Distribution Agreement"),

16   underwrites, distributes for sale, and markets Fund shares.  (Pl. 56.1 ¶¶ 18-19.)  The parties offer

17   divergent perspectives as to the type and scope of services procured by these agreements and

18   whether and to what degree the compensation for providing the services falling into categories

19   covered by the agreements was covered under the particular agreement or subsumed into Davis'

20   duties and compensation as advisor under the IAA.  (See Def. 56.1 St. ¶¶ 10-18; Pl. 56.1 St. ¶¶

21   10-18; Def. 56.1 Reply ¶¶ 10-18.)

FILED UNDER SEAL PENDING PARTY REVIEW

1   <u>Advisory Agreements with Unaffiliated Funds</u>

2         In 1993, Selected Funds elected to replace its adviser with Davis after considering

3   17 other applicants.  (Robert McGough, Directors Revolt, Switch Adviser for Selected Funds,

4   the Wall Street Journal, May 3, 1993, Topetzes Decl., Ex. 59.)[4]  In 2006, the Clipper Fund

5   decided to replace its adviser with Davis, agreeing to a fee ranging from 65 basis points for the

6   first $500 million of assets under management to 48.5 basis points for assets under management

7   exceeding $10 billion.  (Def. 56.1 St. ¶ 88.)  During the Relevant Period, both of these funds

8   agreed to pay Davis advisory fees ranging from 55 basis points for the first $3 billion of assets

9   under management to 48.5 basis points for assets exceeding $10 billion under management.

10   (Topetzes Decl., Ex. 24 at DSA-001509-10.)  These fee structures differ from that of the Fund

11   during the Relevant Period only in that the Fund agreed to 48.5 basis points for assets exceeding

12   $18 billion, rather than the $10 billion breakpoint agreed to by the Clipper and Selected Funds.

13   (Def. 56.1 St. ¶ 11.)  According to its prospectus, the Clipper Fund focuses on capital growth and

14   income and is non-diversified, holding between 15 and 35 stocks.  (Pl. 56.1 Resp. ¶ 90.)  No

15   Davis personnel were on the boards of Selected Funds or Clipper Fund at the time those funds

16   initially selected and retained Davis as adviser.  (Clipper Fund 2017 Annual Rep., Robertson

17   Decl., Ex. 148, at 7; Selected Fund 2017 Annual Report, Robertson Decl., Ex. 151, at 6-7; Def.

18   56.1 St. ¶¶ 88-89.)  Christopher and Andrew Davis, both of whom are Davis officers and

19   members of the Fund's Board, now sit on the boards of both the Clipper and Selected Funds.

20   (<u>Id.</u>)  They have sat on the Clipper Fund's board since 2014 and on the Selected Fund's board

21   since 1998.  (Clipper Fund 2017 Annual Rep., Robertson Decl., Ex. 148, at 33; Selected Fund

---

[4]   This Wall Street Journal article is admissible as an ancient document produced prior to
    1998 for which authenticity is established.  Fed. R. Evid. 803(16); <u>see</u>  Fed. R. Evid.
    902(6) (newspaper articles are self-authenticating).

FILED UNDER SEAL PENDING PARTY REVIEW

1    2017 Annual Report, Robertson Decl., Ex. 151, at 6-7.)  It is undisputed that the members of the

2    boards of the Clipper and Selected Funds were independent when they first contracted with

3    Davis.  (Def. 56.1 St. ¶ 88-89; Pl. 56.1 St. ¶ 88-89.)  It is also undisputed that the members of the

4    boards of the Clipper and Selected Funds, other than Christopher and Andrew Davis, were

5    disinterested as to Davis and thus independent within the meaning of the 1940 Act during the

6    Relevant Period.  (Def. 56.1 St. ¶ 90; Pl. 56.1 Resp. ¶ 90.)

7    <u>Sub-Advisory Agreements with and Services Provided to Unaffiliated Funds</u>

8              Davis also acted as a sub-adviser to other, unaffiliated open-ended funds that were

9    managed by other investment advisory companies (each, a "Subadvised Fund Adviser"),

10   including AXA EQ/Davis New York Venture Portfolio, AZL Davis New York Venture Fund,

11   ING Davis New York Venture Portfolio, Metropolitan Series Funds Davis Venture Value

12   Portfolio, and SunAmerica Series Trust Davis Venture Value Portfolio (collectively, the

13   "Subadvised Funds").[5]  (Def. 56.1 St. ¶ 18.)  The Subadvised Fund Advisers subcontracted to

14   Davis their responsibilities to manage the Subadvised Funds' investment operations in a manner

15   consistent with Subadvised Funds' objectives and guidance.  (Pl. 56.1 Resp. ¶ 18.)  The

16   Subadvised Funds also contracted directly with other service providers for, <u>inter alia</u>, accounting

17   and shareholder services similar to the Fund's contractual arrangements. (Pl. 56.1 St. ¶ 26.)

18             At all relevant times, although there were some variations in the Subadvised

19   Funds' holdings, the Subadvised Funds were managed by the same principal Davis staff

20   according to a long-term large-cap-focused strategy patterned after that employed by Davis on

---

[5]      During the relevant period, Davis also acted as a sub-adviser for other funds, although the
parties do not focus on those for the purposes of this motion practice. (Def. 56.1 St. ¶ 18
n.3.)  Some evidentiary proffers apportioning costs or services provided to the
Subadvised Funds may include these other funds in their analyses.

FILED UNDER SEAL PENDING PARTY REVIEW

1    behalf of the Fund.  (Id. ¶¶ 34, 36-38; see also Def. 56.1 Resp. ¶ 38.)  All Subadvised Funds used

2    the S&P 500 as a benchmark.  (Pl. 56.1 St. ¶ 35.)

3            Subadvised Fund Advisers received higher rates of compensation from their

4    respective funds than Davis received from the Fund during the Relevant Period.  (Def. 56.1 St.

5    ¶¶ 20-21.)  Because of different fees negotiated[6] with the Subadvised Funds' primary advisers

6    and the operation of different breakpoints, the fees charged over the Relevant Period ranged from

7    30  to 35.6 basis points.  (Pl. 56.1 St. ¶ 60 (providing a chart of effective fees charged per fund

8    every year during the Relevant Period).)  Depending on whether the Fund negotiated a rate

9    comparable to the lowest or highest fee charged by a Subadvised Fund in a given year, the Fund

10   would have saved between $106.8 million and $141.8 million in fees during the Relevant Period.

11   (Id. ¶ 61; Def. 56.1 Resp. ¶ 61 (stating that this analysis rests on the assumption that the Fund's

12   assets under management would have remained constant despite a change in fees).)  The parties

13   offer divergent perspectives on the scope of services that Davis provided pursuant to its duties as

14   sub-adviser.  (Def. 56.1 St. ¶¶ 19-55; Pl. 56.1 Resp. ¶¶ 19-55; Def. 56.1 Reply ¶¶ 19-55.)

15   Section 15(c) Annual Contract Approval Process for the Fund

16           In connection with the annual Section 15(c) approvals for the Fund and the other

17   twelve advised funds supervised by the Board, the Board considered information from Davis,

18   primarily in the form of the "Section 15(c) book," and from other sources.  (Def. 56.1 St. ¶ 63.)

19   Ryan Charles, a member of Davis' legal department, described the Section 15(c) process as a

---

[6]    Defendants object to Plaintiffs' assertion in their Local Rule 56.1 Statement that Davis'
contracts with the Subadvised Funds were negotiated at arm's length, as a
mischaracterization of their answer, in which they admitted that Davis negotiated with
the Subadvised Funds.  (See Pl. 56.1 St. ¶ 58; see also Def. 56.1 Resp. ¶ 58; Answer,
Docket Entry No. 80, ¶¶ 110-111.)  Defendants have, however, proffered no evidence
from which the Court could infer that the Subadvised Fund Advisers were somehow
conflicted or otherwise interested.

FILED UNDER SEAL PENDING PARTY REVIEW

1   "year-round compilation of material in advance of" the meeting, including material that Davis

2   anticipated the Board would require and information in response to questions or requests from

3   Board members or its independent counsel.[7] (Charles Tr., Topetzes Ex. 4, at 130:9-22.)  In

4   particular, the Board's independent directors would, after conferring with their counsel, submit a

5   questionnaire to Davis and consider its answers in deciding whether to approve the IAA.  (Def.

6   56.1 ¶ 65; Marsha Williams, Topetzes Decl., Ex. 6, at 34:15-25.)  This questionnaire has evolved

7   over time to include new topics.  (Def. 56.1 ¶ 66.)

8          The Board considered both the short- and long-term performance of the Fund,

9   although, according to one director, long-term performance was more a more apt measure of

10  performance and was better aligned with the Fund's historical focus on long-term growth.  (See

11  Def. 56.1 St. ¶ 68; see Pl. 56.1 Resp. ¶ 68; see also Williams Tr., Topetzes Decl., Ex. 6, at 64:7-

12  65:10 (stating that Marsha Williams, a director, found long-term performance to be a more

13  valuable performance metric).)

14         The Board reviewed reports, by Lipper, Inc.[8] ("Lipper"), and Morningstar,

15  comparing the Fund's performance and expenses to those of other peer firms.[9]  (Def. 56.1 St. ¶

16  69.)  According to Lipper, it seeks to provide a comparator group of approximately seven to

17  twenty funds chosen based on a variety of criteria, including fund type, investment objectives,

---

[7]   Russel Wiese, a Davis employee, stated that it was typical for a director to engage him
      throughout the year on particular issues.  (Wiesse Tr., Topetzes Decl., Ex. 9, at 180:5-
      181:20.)

[8]   During the Relevant Period, Lipper became Broadridge, Inc.  (Def. 56.1 St. ¶ 12 n.2.)

[9]   Charles testified that it was standard industry practice for a board to review expense
      information provided by a third party such as Lipper during the Section 15(c) process.
      (Charles Tr., Topetzes Decl., Ex. 66, at 169:6-15.)

FILED UNDER SEAL PENDING PARTY REVIEW

1   asset comparability, expenses, etc.[10] (See e.g., Lipper Report attached to 2012 Section 15(c)

2   book, Robertson Decl., Ex. 1, at DSA-000558-564.) According to the Lipper reports submitted

3   to the Board each year during the Relevant Period, the management fees and expense ratios

4   incurred by the Fund were below the average and median for their peer groups. (Def. 56.1 St. ¶¶

5   12, 69.) The Board also considered Morningstar reports that generally rated the Fund's fees as

6   "positive" with respect to its Class A shares, through analysis of its expense ratio.[11] (See Def.

7   56.1 St. ¶¶ 61, 69.)

8          The Board also reviewed materials comparing the fees that Davis charged the

9   Fund to those it charged other clients, such as the Subadvised Funds. (Def. 56.1 St. ¶ 70.)

10          Davis' legal department wrote memoranda to the Board detailing the extra work

11   that Davis had to perform for a directly-advised client that was not performed for other types of

12   clients, including interpreting new statutes and rules, but did not quantify this work in terms of

13   time or money expended . (Charles Tr., Topetzes Decl., Ex. 4 ,at 176:22-180:6.) During the

14   Section 15(c) process, Davis communicated to the Board that, as an adviser for a mutual fund, it

15   incurred greater risk than it did with respect to its other clients due to the increasing complexity

16   and more rigorous enforcement of relevant SEC regulations. (Def. 56.1 St. ¶ 51.) Defendant

17   also disclosed in its Form N1-A dated June 9, 2017, that such oversight entails "investment risk,

---

[10]   Lipper describes its reports as non-consultative and intended to reflect its unbiased view
and to simultaneously meet minimum content requirements of the board, advisor, and
legal counsel in the discharge of their Section 15(c) duties. (See e.g., Lipper Report
attached to March 2012 Section 15(c) Book, Robertson Decl., Ex. 1, at DSA-00443.)
Lipper also states that it "does not attempt to measure or assess levels of service or the
general quality of services rendered." (Id.)

[11]   Plaintiffs assert that the Morningstar reports analyzed the total expense ratio incurred by
the Fund, not just the advisory fees incurred under the IAA, which would not include
other expenses incurred pursuant other agreements. (See Pl. 56.1 Resp. ¶¶ 61, 69.)

FILED UNDER SEAL PENDING PARTY REVIEW

1    valuation risk, reputational risk, risk of operational failure or lack of business continuity, and

2    legal, compliance, and regulatory risk." (Topetzes Decl., Ex. 19, at 28; Def. 56.1 St. ¶ 51; see

3    Cronin Rep., Topetzes Decl., Ex. 16, ¶¶ 58-61; see also Reuter Rep., Topetzes Decl., Ex. 15, ¶

4    51.)

5            The Section 15(c) books explained that Davis incurred greater costs as a direct

6    adviser to a mutual fund than it did in advising other types of clients.  (See e.g., Robertson Decl.,

7    Ex. 2, at DSA-001206-1209.)  In particular, the books stated that Davis' clients included

8            Mutual funds, sub-advised accounts, private advisory accounts, and managed
9            money/wrap accounts.  These clients differ in important and fundamental ways,
10          which affects the services, which Davis Advisers provides.  Mutual funds and
11          private advisory accounts (a) have different missions, (b) serve different
12          clienteles, (c) provide different services, and (d) are subject to different laws and
13          regulations.

14    (Id. at DSA-001208.)  The books then note that Davis does not (1) provide the same level of

15    shareholder or compliance services, (2) have the same responsibility for maintaining liquidity,

16    (3) incur the same amount of administrative expenses,  (4) have oversight responsibility over

17    third-party service providers contracted by the board, (5) bear responsibility for hiring and

18    paying Fund officers, (6) assume greater risk as an adviser, or (7) provide the same level of

19    compliance services in connection with its private advisory accounts as it does with respect to its

20    directly-advised mutual fund clients.  (Id. at DSA-001208-9; see also Williams Tr., Robertson

21    Decl. Ex. 166, at 118:3-119:10 (Williams, a director, testified that she understood that, for the

22    purposes of the foregoing comparison, sub-advised account services differed from directly

23    advised mutual fund services in the same way as did private advisory accounts).)  The books

24    further stated that, although Davis (or its affiliates) provided services pursuant to the SSA and

25    FASA, the fees paid by the Fund did not cover all of the expenses Davis incurred in the

26    performance of these duties.  (See e.g., Robertson Decl., Ex. 2, at DSA-001208-1209.)

FILED UNDER SEAL PENDING PARTY REVIEW

1        The Board also received information on Davis' profit margins under the IAA,

2    which, during the Relevant Period, were between 73.33% and 81.43% before tax.  (Def. 56.1 St.

3    ¶¶ 74-75.)[12]  The Board received a memorandum, as well as additional information, analyzing

4    the IAA under the factors described in <u>Gartenberg v. Merrill Lynch Asset Mgmt.</u>, 694 F.2d 923

5    (2d Cir. 1982).  (<u>See</u> Def. 56.1 St. ¶¶ 70-79.)

6        Approximately ten to fourteen days before the annual Section 15(c) meetings each

7    March, the Board would receive the Section 15(c) materials.  (Def. 56.1 St. ¶¶ 62, 80.)  Prior to

8    the Board meetings, the independent directors would meet with their counsel and develop topics

9    to discuss at the meeting.  (<u>Id.</u> ¶ 82.)  At the meetings, the independent directors asked multiple

10    questions of Davis' representatives about topics including the Fund's performance, the Fund's

11    positions in certain securities, fee levels of identified peer funds, Davis staff changes, and Davis'

12    shareholder education initiatives.  (<u>Id.</u> ¶¶ 83-84.)  Although the breakpoint schedule was last

13    amended in 2009 to reduce the Fund's expense ratio at higher breakpoints, Thomas Gayner,

14    another director, testified that the independent directors would discuss and consider the fee

15    schedule at each annual Section 15(c) meeting.  (Gayner Tr., Topetzes Decl., Ex. 11, at 223:6-19;

16    Williams Tr., Topetzes Decl., Ex. 6, at 188:19-189:7.)  The Board has not requested nor has

17    Davis offered a further fee reduction.  (Pl. 56.1 Resp. ¶ 85.)  Christopher Davis, a Davis officer,

18    characterized Davis' interaction with the independent directors as a dialogue rather than a

19    negotiation as to the appropriate terms of the IAA, and noted that, while the Board has never

---

[12]    Davis' profit margin for its work for the Fund during the Relevant Period would have
been between $32.2 and $52.2 annually if the Fund had been billed at the rate Davis
charged for sub-advisory services.  (Pl. 56.1 St. ¶ 77.)  Although, as explained below, the
Court will preclude Dr. Ayres's testimony on this matter, the Court accepts the
mathematical formulation proffered.  Defendants do not object to the aforementioned
calculations, but state that these calculations are hypothetical and assume that the Fund
would have provided the same services under this fee schedule. (Def. 56.1 Resp. ¶ 77.)

FILED UNDER SEAL PENDING PARTY REVIEW

1   made any formal fee proposals, they engaged in discussion about fee trends in the industry and

2   independently-selected comparator funds.  (Davis Tr., Robertson Decl., Ex. 156, at 65:23-73:15.)

3   The Board also considered the fees paid by the Clipper and Selected Funds.  (Def. 56.1 ¶ 90.)

4           During the Relevant Period, the independent directors annually approved the IAA.

5   (Def. 56.1 St. ¶ 86.)  Jeffrey Keil, Defendants' expert, opines that, in his experience, the Board,

6   which consisted of highly qualified members, considered sufficient materials and acted

7   independently in reaching its business decisions to renew the IAA, in accordance with industry

8   standards.  (Keil Rep., Topetzes Decl., Ex. 14.)

9   Performance

10          Defendants' expert Dr. Jonathan Reuter states that there was no statistical

11  difference in monthly returns between the Fund and the S&P 500 benchmark during the Relevant

12  Period.  (Def. 56.1 St. ¶ 58.)  Between 1978 and 2016, the Fund's ten-year rolling returns have

13  outperformed its S&P 500 benchmark in 34 of 39 years.  (Id. ¶ 56.)  Plaintiffs proffer figures

14  showing that the Fund's Class A shares underperformed the benchmark from .68% up to 12.2%

15  on an annual basis from 2007 through 2016, although Defendants note that these figures include

16  one-time charges that were only applicable to a small subset of investors who were not enrolled

17  in a wrap fee program, who held Class A shares, and did not hold their shares for more than one

18  year.  (See Pl. 56.1 St. ¶ 63; Def. 56.1 Resp. ¶ 63.)  Plaintiffs' expert, Dr. Ayres, also concluded

19  that the Fund exhibited a negative Alpha, a metric that seeks to measure the excess monthly

20  return that is attributable to the adviser, from November 2005 through March 2013.  (Ayres Rep.,

21  Topetzes Decl., Ex. 17, ¶¶ 65, 72-73.)

FILED UNDER SEAL PENDING PARTY REVIEW

1 DISCUSSION

2 Motions to Preclude

3       Plaintiffs move to preclude the testimony of Defendants' expert, Jeffrey Keil, and

4 Defendants move to exclude the opinions of Plaintiffs' expert, Dr. Ayres.  Pursuant to Federal

5 Rule of Evidence 702, expert testimony should be admitted if the expert is (1) qualified, through

6 requisite knowledge, skill, training, or experience, (2) his opinion is reliable, and (3) the

7 testimony is relevant and would be helpful to the finder of fact.  See United States v. Lesniewski,

8 No. 11 CR 1091, 2013 WL 3776235, at *8 (S.D.N.Y. July 12, 2013), aff'd sub nom. United

9 States v. Rutigliano, 614 F. App'x 542 (2d Cir. 2015).

10       Keil opines about the sufficiency of the Board's process in approving the IAAs,

11 often based on his experience or in comparison to "industry standards."  Keil's experience is

12 gleaned from prior consulting work and his attendance at over 150 board meetings.  Plaintiffs

13 contend that reliance on his practical experience is unreliable and deprives them of the ability to

14 compare the Board's process to those of all the other boards that Keil has observed or advised

15 and which collectively make up his experience and to test his opinions in a reproducible and

16 verifiable manner.  Nor, Plaintiffs argue, did Keil articulate what industry standards he measured

17 the Board's actions against.

18       An  industry expert, however, need not offer scientifically testable opinions, nor

19 need he correlate his opinions to specific instances of industry practice that he observed or

20 articulate an objective industry benchmark; the reliability of such an expert's opinion may be

21 inferred from his experience.  See Pension Comm. of Univ. of Montreal Pension Plan v. Banc of

22 Am. Sec., LLC, 691 F. Supp. 2d 448, 464-65 (S.D.N.Y. 2010) (permitting experts to opine on

23 industry due diligence practices); see also Equal Employment Opportunity Comm'n & Bailey,

FILED UNDER SEAL PENDING PARTY REVIEW

1   No. 10 C 6139, 2016 WL 5796890, at *9 (N.D. Ill. Sept. 30, 2016) (finding that an expert need

2   not set out an explicit benchmark for industry practice and that her long experience satisfied the

3   court as to the reliability of her ability to conduct such an assessment).  As Plaintiffs do not

4   challenge Keil's qualifications,[13] the Court finds that his opinions are sufficiently reliable and

5   helpful, although Plaintiffs could seek to undermine his credibility at a trial.  Accordingly,

6   Plaintiffs' motion to exclude Keil's testimony is denied.[14]

7          Defendants seek to exclude certain expert opinions and testimony of Dr. Ayres,

8   arguing (1) that he is not qualified to opine on whether the services Davis provided to the Fund

9   and the Subadvised Funds were substantially the same; (2) that Dr. Ayres is not qualified to

10  opine on what fees the Fund would have incurred had Davis charged it at the Subadvised Fund

---

[13]   In their reply brief, Plaintiffs seemingly clarify that they attack only Keil's reliability, not
his qualifications.  (Reply Br., Docket Entry No. 130, at 1.)

[14]   Plaintiffs also request that the Court preclude evidence of educational outreach and
education services that Davis provided to the Fund insofar as they can be characterized as
distribution services, which are primarily intended to sell shares in the Fund, pursuant to
the IAA.  Plaintiffs contend that such evidence is irrelevant because an adviser may not
use fees, except those received under a separate distribution plan pursuant to 17 C.F.R. §
270.12b-1 or through the use of its legitimate profits, to fund programs intended to
promote the sale of shares.  See Bearing of Distribution Expenses by Mutual Funds, 45
F.R. 73898, 73902-903 (Nov. 7, 1980).  Defendants assert that the proffered evidence
represents efforts to educate and foster relationships with current shareholders.  Although
Plaintiffs point to evidence indicating that Davis engaged in outreach efforts to promote
the sale of shares or foster relationships with broker-dealers, Defendants have proffered
evidence that Davis also engages in education efforts with current shareholders.
Moreover, some of the evidence describes efforts which could be variously classified as
being designed to engaged prospective shareholders, current shareholders, or both.  (See
e.g., Memorandum re Annual Review of Each Davis Fund's Rule 12b-1 Distribution Plan
and Distribution Agreement, Robertson Decl. in Supp. of Pl. Mot. to Preclude, Ex. 6, at
DSA-003671.)  Given the ambiguity in this evidence, the Court cannot conclude that the
evidence cited in Defendants' Local Rule 56.1 Statement (¶¶ 45-46) for shareholder
education and outreach is irrelevant and denies Plaintiffs' motion to preclude it.

FILED UNDER SEAL PENDING PARTY REVIEW

1   rate; (3) that Dr. Ayres is not qualified to opine on whether Davis would have still made a profit

2   at the Subadvised Fund rate; (4) that Dr. Ayres's testimony about the similarity between the

3   strategy of the Fund and the Subadvised Funds and the Fund's performance is not disputed and is

4   thus irrelevant; (5) that Dr. Ayres' opinion that the Subadvised Fund Advisers contracted with

5   Davis through an arm's length transaction is a legal conclusion; and (6) that Dr. Ayres' opinion

6   on the level of competition in the mutual fund industry is based on an unreliable methodology.

7       Plaintiffs argue that Dr. Ayres' general expertise in economics, econometrics, and

8   industrial organizations qualifies him to offer opinions on the similarity of services offered by

9   the Fund and the Subadvised Funds.  Defendants argue that he has no particular expertise in the

10  mutual fund industry, and thus is not qualified to opine on the differences in such services, and

11  that he simply reviewed the contracts, prospectuses, other documents, and testimony proffered

12  by Plaintiffs in support of this motion.  Plaintiffs have failed to explain how Dr. Ayres' economic

13  training and experiences will assist the trier of fact; his report simply catalogues and

14  characterizes Plaintiffs' evidence.  Accordingly, Dr. Ayres will be precluded from offering his

15  opinion on this issue.

16      Defendants next argue that Dr. Ayres is not qualified to testify about the

17  difference in fees Davis would have earned had it charged the Fund a rate similar to what it

18  charged for its sub-advisory services, and whether Davis would have made a profit at these sub-

19  advisory rates.  Defendants point out that Dr. Ayres is not an accountant and that Plaintiffs have

20  failed to explain how his economics background would provide expertise helpful to the trier of

21  fact in connection with this issue.  The Court agrees and will preclude Dr. Ayres from testifying

22  on this subject.  Defendants, however, do not dispute these calculations, so the Court will

23  consider them for the purposes of this motion practice.  (See Def. Mem. in Supp. of its Mot. to

FILED UNDER SEAL PENDING PARTY REVIEW

1    Preclude at 18 (Dr. Ayres "offers several opinions about matters that Defendants do not

2    contest.").)

3            To the extent that Defendants contend that Dr. Ayres should be precluded from

4    testifying about the Fund's performance and the similarities between the Fund and the

5    Subadvised Funds' investment strategies because the matter is uncontested, the Court denies the

6    motion.  In the absence of a stipulation, such information could prove useful and relevant to the

7    trier of fact, and any objection to its redundancy can be made pursuant to Federal Rule of

8    Evidence 403.

9            Defendants next argue that Dr. Ayres should be precluded from offering his

10   opinion as to whether the fees charged to the Fund were excessive or beyond those that could be

11   procured by an arm's length transaction, as an impermissible legal conclusion.  See Hygh v.

12   Jacobs, 961 F.2d 359, 36-64 (2d Cir. 1992).  Plaintiffs assert that Dr. Ayres is simply using terms

13   accepted in his field and making factual conclusions, rather than opining on the final issue of

14   liability.  Cf. Andrews v. Metro N. C. R. Co., 882 F.2d 705, 709 (2d Cir. 1989) (excluding

15   testimony that defendant was "negligent").  While terms such as "arm's length" may indeed have

16   an economic meaning, Dr. Ayres' report offers his opinion as to each step of the analysis set

17   forth by the Supreme Court in Jones v. Harris Assocs. L.P., 559 U.S. 335 (2010), and arrives at a

18   conclusion couched in terms of the ultimate legal standard, namely whether the Fund charged an

19   arm's length fee, and would thus not assist the trier of fact, which is capable of weighing the

20   various factual comparisons offered by Plaintiffs and reaching a legal conclusion.  Accordingly,

21   Dr. Ayres is precluded from offering testimony as to the ultimate legal conclusion.

22           Defendants also contend that Dr. Ayres' conclusion that, based on his review of

23   behavioral economic research, the "[m]utual fund industry is characterized by imperfect

FILED UNDER SEAL PENDING PARTY REVIEW

1   competition due to a number of cognitive flaws and biases . . . [that] limited the impact of

2   competition on mutual fund fees relative to a truly competitive market" is not reliable insofar as

3   it is not supported by or connected to the research cited.  (Ayres Rebuttal Rep. ¶ 16.)  Defendants

4   assert that, although some of the cited articles apply the relevant statistical theories or models to

5   a hypothetical investor, none apply their reasoning to fee competition among mutual fund

6   advisers and/or sub-advisers.  To the extent Dr. Ayres' opinion is offered for the proposition that

7   retail investors are likely to remain with a mutual fund despite incentives to remove their

8   investments, the Court finds that the cited literature relied upon provides sufficient support to

9   render Dr. Ayres' opinion reliable enough for admission under Federal Rule of Evidence 702,

10  and that Defendants' objections to the applicability of the supporting research can be addressed

11  by assailing the weight that his opinions warrant.  See Danley v. Bayer (In re Mirena IUD Prods.

12  Liabl. Litig.), 169 F. Supp. 3d 396, 425 (S.D.N.Y. 2016) (objections to conclusions that expert

13  drew from scientific literature may be addressed by cross-examination to impugn the weight of

14  the expert's testimony).  To the extent Dr. Ayres' opinion is offered to assert that cognitive flaws

15  and biases limit competition among advisers and sub-advisers for the business of mutual funds,

16  the Court agrees that Dr. Ayres fails to connect his recitation of research finding the lack of

17  competition in the mutual fund industry to attract retail investors to that conclusion, and that any

18  such opinion is not sufficiently reliable to be admitted.  (See id. ¶¶ 17-37.)

19         Accordingly, Dr. Ayres will be precluded from testifying on the similarities and

20  differences between the services provided by Davis to the Fund and to the Subadvised Funds, the

21  level of competition in the mutual fund industry for advisory and sub-advisory services, whether

22  Davis would still have made a profit at the rates it charged the Subadvised Funds, and whether

23  the Fund's fees were excessive or were not the product of an arm's length transaction.

FILED UNDER SEAL PENDING PARTY REVIEW

1   <u>Motion For Summary Judgment</u>

2              The pending motion is brought pursuant to Rule 56(a) of the Federal Rules of

3   Civil Procedure.  Under Rule 56(a), summary judgment is appropriate when the "movant shows

4   that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

5   matter of law." Fed R. Civ. P. 56(a).  The moving party bears the burden of demonstrating the

6   absence of a material issue of fact, <u>see</u> <u>Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48</u>

7   <u>(1986)</u>, and the court must be able to find that, "after drawing all reasonable inferences in favor

8   of a non-movant, no reasonable trier of fact could find in favor of that party." <u>Marvel Entm't,</u>

9   <u>Inc. v. Kellytoy (USA), Inc., 769 F. Supp. 2d 520, 523 (S.D.N.Y. 2011)</u> (quoting <u>Heublein v.</u>

10  <u>United States, 996 F. 2d 1455, 1461 (2d Cir. 1993)</u>) (internal quotation marks omitted).  A fact is

11  considered material "if it might affect the outcome of the suit under the governing law," and an

12  issue of fact is "genuine" where "the evidence is such that a reasonable jury could return a

13  verdict for the nonmoving party." <u>Holtz v. Rockefeller & Co. Inc., 258 F.3d 62, 69 (2d Cir.</u>

14  <u>2001)</u> (internal quotation marks and citations omitted).  "[M]ere conclusory allegations or

15  denials . . . cannot by themselves create a genuine issue of material fact where none would

16  otherwise exist." <u>Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010)</u> (quoting <u>Fletcher v. Atex,</u>

17  <u>Inc., 68 F.3d 1451, 1456 (2d Cir. 1995)</u>).  A party that is unable to "make a showing sufficient to

18  establish the existence of an element essential to that party's case, and on which that party will

19  bear the burden of proof at trial" will not survive a Rule 56 motion. <u>Celotex Corp. v. Catrett,</u>

20  <u>477 U.S. 317, 322 (1986)</u>.

21              Plaintiffs contend that Davis charged the Fund excessive fees for its advisory

22  services, based on a comparison to the dramatically lower fees Davis charged the Subadvised

23  Fund Advisers for what, Plaintiffs assert, were substantially similar services.  Defendants argue

FILED UNDER SEAL PENDING PARTY REVIEW

1   that Davis provided a much narrower set of services to the Subadvised Funds and assumed a

2   much greater risk in its role as a primary adviser.  Defendants also proffer comparisons to other

3   "peer" funds and two other non-affiliated funds that have hired Davis as primary adviser.

4           Section 36(b) of the 1940 Act, 15 U.S.C.S. § 80a-35(b) (LexisNexis 2010),

5   provides that the investment adviser of a registered investment company "shall be deemed to

6   have a fiduciary duty with respect to the receipt of compensation for services."  The Supreme

7   Court has articulated the standard for a Section 36(b) breach of fiduciary duty claim for

8   excessive fees in Jones v. Harris Assocs. L.P., 559 U.S. 335 (2010).  In Jones, the Supreme Court

9   held that a Section 36(b) plaintiff must prove that "an investment adviser . . . charge[d] a fee that

10  is so disproportionately large that it bears no reasonable relationship to the services rendered and

11  could not have been the product of arm's-length bargaining."  559 U.S. at 346. Resolving a

12  circuit split, the Supreme Court endorsed the Second Circuit's decision in Gartenberg v. Merrill

13  Lynch Asset Mgmt., Inc., 694 F.2d at 928, as "correct" in holding that "all relevant

14  circumstances" must be considered when determining Section 36(b) liability. Id. at 346-47.  The

15  Gartenberg court specifically identified several factors for consideration in weighing "all

16  pertinent" facts: (1) the nature and quality of services provided to the fund shareholders; (2) the

17  profitability of the fund to the adviser-manager; (3) fall-out benefits; (4) economies of scale; (5)

18  comparative fee structures; and (6) the independence and conscientiousness of the trustees. 694

19  F.2d at 929-32.

20          The Jones court, recognizing that "Congress rejected a 'reasonableness'

21  requirement that was criticized as charging the courts with rate-setting responsibilities," stated

22  that "it is important to note that the standard for fiduciary breach under § 36(b) does not call for

23  judicial second-guessing of informed board decisions." Jones, 559 U.S. at 352.  Consistent with

FILED UNDER SEAL PENDING PARTY REVIEW

1    these principles, <u>Jones</u> outlines a two-step analytical process in which a court first examines the

2    adequacy of the procedures employed by an investment fund's board in approving the challenged

3    agreement with a fund's adviser in order to determine the level of deference that should be

4    accorded to the board's business judgment, and then applies the <u>Gartenberg</u> factors in reviewing

5    the substance of the agreement to determine whether the challenged fee was outside of the range

6    of fees that could have been the product of an arm's length negotiation. 559 U.S. at 351-52

7    ("[A] court's evaluation of an investment adviser's fiduciary duty must take in to account both

8    procedure and substance.").

9        <u>The Board's Process</u>

10       Section 15(c) provides that a mutual fund's board may only approve a contract for

11   advisory services by a vote of the majority of non-interested directors.[15]  The board's directors

12   have an affirmative duty to "request and evaluate . . . such information as may be reasonably

13   necessary to evaluate the terms of the contract," which an adviser must furnish. <u>Id.</u>

14       "Where disinterested directors consider all of the relevant factors, their decision to

15   approve a particular fee agreement is entitled to considerable weight, even if the court might

16   weigh the factors differently." <u>Jones</u>, 559 U.S. at 336.  However, the decision of a board reached

17   based upon a deficient process or without the benefit of important information withheld by the

18   adviser requires a court to examine more rigorously the substance of the agreement. <u>Id.</u>  "In

19   general, a plaintiff should not be able to survive summary judgment through armchair

20   quarterbacking and captious nit-picking.  Such a standard would put defendants in the untenable

---

[15]    An interested person is defined to include, <u>inter alia</u>, people who directly or indirectly own or control the power to vote at least five percent of outstanding company securities. 15 U.S.C. §§ 80a-2(a)(3) (defining "affiliated person), (19) (defining "interested person").

FILED UNDER SEAL PENDING PARTY REVIEW

1    posture of defending interminable, manufactured, and protracted litigation involving second-

2    guessing a board's process."  Kasilag v. Hartford Inv. Fin. Servs., LLC, No. CV 11-1083

3    (RMB/KMW), 2016 WL 1394347, at *14 (D.N.J. Apr. 7, 2016), aff'd, 745 F. App'x 452 (3d Cir.

4    2018).

5            Here, it is undisputed that six of the Fund's eight Board members were at all

6    relevant times disinterested, as required by the statute, and that the requisite majority voted to

7    approve the Fund's IAA with Davis.  It is also undisputed that matters relevant to the approval

8    decision were considered at Board meetings, that Davis compiled an extensive "Section 15(c)

9    book" covering information relevant to the Gartenberg factors that was reviewed by all directors,

10   and responded to additional questions propounded informally and in a questionnaire issued by

11   the directors.  The independent directors had their own independent counsel with whom they met

12   separately from the Davis-affiliated directors.  The information that the Board considered

13   included comparisons of advisory fee rates and expense ratios of the Fund and other "peer" funds

14   selected by Lipper and Morningstar, as well as the advisory fees paid to Davis by the other

15   unaffiliated funds for which Davis served as investment adviser—Clipper and Selected Funds.

16           Plaintiffs do not dispute that the Board consisted of qualified and independently-

17   advised directors who engaged with Davis and were provided with information on each

18   Gartenberg factor.  They contend that there are nonetheless material issues of fact concerning the

19   integrity of the process and the weight to be afforded the Board's decision because the six Board

20   members who qualify as disinterested under the statutory criteria had deep ties to the financial

21   services industry; the Board did not attempt to negotiate a lower advisory fee; and the Board did

22   not inquire about issues Plaintiffs contend were important.  Plaintiffs also assert that Davis

23   withheld critical information from the Board.

FILED UNDER SEAL PENDING PARTY REVIEW

1        Plaintiffs' objection to the recognition of the six directors as independent is

2   baseless in fact and law.  Plaintiffs' generalized assertion that persons associated with the mutual

3   fund industry cannot function as independent evaluators of mutual fund advisers is conclusory

4   and speculative.

5        Plaintiffs next contend that Davis withheld from the Board (1) an accurate

6   description of the services Davis provided to the sub-advised funds, (2) an explanation of the

7   services that are provided under the IAA as opposed to separate contracts with the Board, and (3)

8   an estimation of the level of profits Davis would have attained on its Fund advisory services had

9   it been paid at the fee rates charged to the Subadvised Funds.  None of these contentions raises a

10  genuine issue of material fact.  Plaintiffs assert that the Section 15(c) books submitted to the

11  Board compared the services provided by Davis to its directly-advised mutual fund accounts

12  only to those provided to Davis' private advisory clients, and did not address the services

13  provided to Davis' sub-advisory clients, and cite a portion of the deposition testimony of Board

14  member Marsha Williams for the proposition that Davis' documentation did not discuss the

15  services provided to sub-advised clients.  Plaintiffs' reading ignores the context in which the

16  comparison they cite was presented.  The paragraph opens by referring to the fact that there are

17  differences in services provided between mutual funds and sub-advised accounts, private

18  advisory accounts, and managed money/wrap accounts.  Furthermore, the Plaintiffs' selective

19  citation to Williams's deposition omits her testimony that she understood the reference to private

20  advisory accounts in the cited passage of the memorandum to encompass the Subadvised Funds.

21  Therefore, even drawing all reasonable inferences in Plaintiff's favor, a rational factfinder could

22  not conclude that information was withheld from the Board with respect to the differences

FILED UNDER SEAL PENDING PARTY REVIEW

1    between services provided to the Fund and those provided to the Subadvised Funds.[16]  The same

2    sections of the annual Section 15(c) memoranda also disclose that Davis provided services to the

3    Fund pursuant to the SSA and FASA and stated that the fees paid under those contracts did not

4    compensate Davis for the full costs of providing those services.  Plaintiffs have not controverted

5    Defendants' proffer that the service contracts undercompensated Davis' work by more than $3.8

6    million.

7            Finally, Plaintiffs' assertion that Davis withheld a computation of the hypothetical

8    profits it would have generated if it had charged the Fund fees comparable to those paid by the

9    Subadvised Funds does not raise a material fact issue.  Plaintiffs do not dispute that the Board

10   was apprised of Davis' profit margin under the existing IAA and of the fee rates paid by the

11   Subadvised clients.  Plaintiffs have failed to explain why this information was insufficient to

12   enable the Board to reach a conclusion that Davis could have turned a profit even at a lower rate

13   of compensation.  The Court therefore concludes that Plaintiffs have not raised an issue of

14   material fact as to whether Davis withheld important information from the Board.

15           Plaintiffs' contention, based in part on the fact that there has been no fee

16   reduction since 2009,  that the Board failed to assertively negotiate with Davis, is also

---

16    To the extent that Plaintiffs assert that these Section 15(c) memoranda, even if
      understood to compare the services Davis provided to the Fund with those it provided to
      the Subadvised Funds, contained insufficient detail, such an argument is ineffective to
      frame a genuine disputed fact issue in light of the disclosures of significant differences in
      services that were included in the memoranda.  See In re BlackRock Mut. Funds
      Advisory Fee Litig., 327 F. Supp. 3d 690, 720 (D.N.J. 2018) (quoting Kasilag, 2016 WL
      1394347, at *14 ("Although Plaintiffs may disagree with the level of detail or format of
      the Services Checklist, such carping, if sufficient[,] would eviscerate the deference that is
      to be paid to an informed Board . . . under Jones.") (internal quotation marks and
      alterations omitted)); (See e.g., Robertson Decl., Ex. 2, at DSA-001206-1209).

FILED UNDER SEAL PENDING PARTY REVIEW

1    insufficient to demonstrate that the Board's process was deficient.  Plaintiffs also point to

2    testimony that they contend demonstrates that the Board focused on the fees paid to other peer

3    funds, which fees, Plaintiffs assert, were themselves not the product of arm's length transactions.

4    It is undisputed, however, that the Board secured several amendments to the IAA, including a

5    reduction in fees in 2009, and kept abreast of compensation trends in the industry, including the

6    compensation levels paid under the arm's length advisory contracts Davis maintained with the

7    Selected and Clipper funds.[17]  Because the 1940 Act does not impose a duty on a board to

8    negotiate assertively, Plaintiffs' assertion that the Board could have negotiated more aggressively

9    does not provide a basis for a rational finding that the Board's review process was less than

10    robust.[18]  See Chill v. Calamos Advisers LLC, No. 15 CIV. 1014 (ER), 2018 WL 4778912, at

11    *14 (S.D.N.Y. Oct. 3, 2018) ("It is well settled that Section 36(b) does not require negotiation

---

[17]    As explained in the "Background" section above, the Clipper and Selected Funds chose to replace their prior advisers with Davis at times when the companies were unaffiliated with Davis.  While Plaintiffs proffer that the Boards of the two funds have changed since Davis began to advise them and now overlap substantially, it is undisputed that the majority of the Board members are independent as a statutory matter and that there are only two Davis-affiliated individuals on each board.  Plaintiff cites no other evidence indicative of less than arm's length dealings between Davis and those funds in the matter of fee-setting.

[18]    Plaintiffs cite Gallus v. Ameriprise Fin. Inc., 675 F.3d 1173, 1180 (8th Cir. 2012), in support of the proposition that a board is not entitled to deference if it only focuses on the rates that peer funds, who also may not be in arm's length advisory relationships, charge their clients.  That case is distinguishable on the grounds that the Eighth Circuit found that less deference was due because the adviser withheld relevant information about the differences between its direct advisory service and the services provided to institutional clients.  Here, there has been no such showing.  Furthermore, there is evidence that the Fund's Board considered the fees paid by the Clipper and Selected Funds, which, despite Plaintiffs' arguments that they had become "captive," were indisputably independent when they first contracted with Davis and continued to have board majorities comprised of independent directors.

FILED UNDER SEAL PENDING PARTY REVIEW

1   between a board of trustees and [a] fund investment adviser."); see also Zehrer v. Harbor Capital

2   Advisers, Inc., No. 14 C 00789, 2018 WL 1293230, at *7 (N.D. Ill. Mar. 13, 2018) (same).

3           With respect to Plaintiffs' further argument that the Board failed to exercise the

4   requisite diligence in seeking out further information from Davis and other third parties,

5   Plaintiffs do not identify any additional deficits of information that they contend the Board

6   should have obtained.  The Board reviewed material concerning the fees paid in comparison to

7   the fees paid to Lipper peers and other clients, including the Subadvised Funds.  The Board

8   issued a questionnaire to Davis, requested further additional information, were advised by

9   independent counsel, and reviewed reports by third parties such as Lipper and Morningstar.

10   Plaintiffs' generalized assertion that the directors should have asked for more does not, on this

11   record, frame a genuine issue of material fact or undermine Defendants' demonstration of the

12   sufficiency of the process that was employed.

13           Accordingly, Plaintiffs have failed to frame a genuine issue of material fact as to

14   whether the Board's review process was sufficiently robust to warrant a significant degree of

15   deference to the Board's decision to approve Davis' advisory fee.  The Board's business decision

16   is thus entitled to substantial deference as a matter of law.  Having determined the degree of

17   deference to be accorded to the Board in connection with the holistic Gartenberg analysis, the

18   Court must now examine whether Plaintiffs can prove, on this record, that the advisory fee paid

19   to Davis during the Relevant Period was so disproportionately large that it bore no reasonable

20   relationship to the services rendered and was outside the range that could have been produced

21   through arm's-length bargaining.

22           Gartenberg Analysis

FILED UNDER SEAL PENDING PARTY REVIEW

1    The Court now examines, through an evaluation of the Gartenberg factors,

2    whether a factfinder, drawing all reasonable inferences in Plaintiffs' favor, could determine that

3    the advisory fees paid to Davis by the Fund bore "no reasonable relationship to the services

4    rendered and could not have been the product of arm's length bargaining." Jones, 559 U.S. at

5    346. Ultimately, the plaintiffs bear the burden of establishing that the "fees are beyond the range

6    of arm's-length bargaining." Id. at 350 n.8. Although courts tend to focus on a comparison of

7    the fees charged by a defendant in relation to those charged by comparable funds, "a dispute of

8    fact . . . regarding the comparative fees factor, without additional evidence does not 'doom'

9    [d]efendants to trial." In re BlackRock Mut. Funds Advisory Fee Litig. ("In re Blackrock"), 327

10    F. Supp. 3d 690, 729 (D.N.J. 2018) (citing Jones, 559 U.S. at 350 n.8).

11        Comparative Fees

12        A plaintiff may offer other funds as comparators to demonstrate that a defendant's

13    fees are excessive. The Supreme Court has stated that Section 36(b) requires a court to take all

14    relevant considerations into account when conducting its inquiry. Jones, 559 U.S. at 349. A

15    court must, therefore, take into account the differences in the services provided to each fund and

16    "give such comparisons the weight that they merit in light of the similarities and differences

17    between the services that the clients in question require." Id. a 349-50. If the comparisons are

18    inapt, insofar as the examination of the comparator fund is not probative, a court should

19    disregard the comparison. Id. at 350. "By the same token, courts should not rely too heavily on

20    comparisons with fees charged to mutual funds by other advisers . . . [because] these fees, like

21    those challenged, may not be the product of negotiations conducted at arm's length." Id. at 350.

22        Plaintiffs offer the rates paid to Davis by the Subadvised Funds, which no party

23    disputes were the product of arm's length bargaining, as the relevant exemplar of an appropriate

FILED UNDER SEAL PENDING PARTY REVIEW

1    arm's length advisory fee structure, arguing that the substantially lower fees Davis charged to the

2    Subadvised Funds cannot be explained by any substantial difference in the services provided by

3    Davis. Plaintiffs point to the close similarities in management of the investment portfolios of the

4    Fund and the Subadvised Funds, which Plaintiffs contend is the most important service an

5    adviser offers, and contend that Davis provides the same or similar categories of other

6    "ancillary" services to the Subadvised Funds as well as to the Fund. Plaintiffs also contend that

7    many of the services Davis provides only as a primary adviser to the Fund were performed

8    pursuant to a separate contract or by a third-party provider. Defendants argue that Plaintiffs'

9    comparison to the Subadvised Funds is inapt because Davis provides substantially more services

10   to the Fund pursuant to the IAA but only a narrower set of investment-focused services to the

11   Subadvised Funds. Defendants offer favorable comparisons to fees charged to "peer" funds,

12   such as those featured in the Lipper Reports, and comparisons to the Selected and Clipper Funds'

13   fees as conclusive evidence that Davis' advisory fees were within the range that would be

14   secured through an arm's length transaction.

15           Although the parties have contested the relative scope of services rendered

16   pursuant to the IAA and under Davis' agreements with the Subadvised Funds, even assuming

17   that Plaintiffs have met their burden of showing that a comparison with the Subadvised Funds is

18   apt, Plaintiffs have not adduced evidence showing that a comparison with the Clipper and

19   Selected Funds, whose fee structures are nearly identical to that of the Fund, is inapt and thus

20   cannot demonstrate that a reasonable trier of fact could conclude that Davis charged the Fund a

21   fee beyond the range of what could be negotiated at arm's length. Defendants' comparisons with

22   the fees Davis charged to the Selected Fund and, particularly, the Clipper Fund, for primary

FILED UNDER SEAL PENDING PARTY REVIEW

1  advisory services establish that the Fund's fee structure is within the range of fees derived from

2  an arm's-length transaction for primary advisory services.

3          Plaintiffs' efforts to raise a genuine issue of material fact as to the aptness of the

4  comparison to the Clipper Fund are unavailing.  Plaintiffs offer only speculation that the Selected

5  and Clipper Funds initially selected Davis through anything other than an arm's length

6  transaction. See Millennium Pipeline Co., LLC v. Certain Permanent and Temp. Easements, 552

7  Fed. App'x 37, 39 (2d Cir. 2014) (stating that "speculation is insufficient to defeat summary

8  judgment").  The Clipper Fund agreed to a fee schedule with Davis when it initially named Davis

9  as adviser, and in 2009 the Clipper and Selected Funds agreed to a lower fee schedule in line

10  with the 2009 IAA revision between Davis and the Fund.  Plaintiffs argue that the Clipper Fund

11  had become "captive" to Davis and that the Court should thus be wary when using it as an arm's

12  length comparator.  See Jones, 559 U.S. at 336 ("[C]ourts should not rely too heavily on

13  comparisons with fees charged to mutual funds by other advisers, which may not result from

14  arm's length negotiations.").  Plaintiffs have presented no evidence that the Clipper Funds'

15  independent board members, who had shown that they were willing remove their adviser only a

16  few years earlier, were no longer independent or capable of selecting a different adviser when

17  they agreed to the initial fee schedule or when they agreed with Davis to a reduced fee similar to

FILED UNDER SEAL PENDING PARTY REVIEW

1   that charged to the Fund.[19] [20]  If anything, this fee reduction supports an inference of

2   independence.

3            Plaintiffs' arguments concerning the differences in services provided by the

4   Clipper Fund are also unavailing.  While the Fund and the Clipper and Selected Funds may

5   employ different investment strategies, Plaintiffs have failed to explain how this indicates any

6   relevant difference in the scope of advisory services provided.  See Pirundini v. J.P. Morgan Inv.

7   Mgmt. Inc., 309 F. Supp. 3d 156, 165 (S.D.N.Y. 2018), aff'd, No. 18-733, 2019 WL 1254817

8   (2d Cir. Mar. 18, 2019) ("In any event, even if the two funds do have different

9   investment strategies, there is no basis in law or logic for concluding that the investment

10  advisory services JPMIM provides them are different.").  The fact that Clipper is a non-

11  diversified fund, holding only 15-35 stocks, supports an inference that, if anything, it is less

12  expensive to manage and that the fees Davis charges to manage the diversified Fund could

13  properly be even higher than those charged to Clipper.

14            Thus, the Clipper Fund and Selected Fund provide an uncontroverted apt

15  comparison, establishing that the range of arm's length fees encompasses those paid by the Fund

---

[19]   Based on the available evidence proffered, Andrew and Christopher Davis, who each
       hold a partnership interest in Davis, did not begin their tenure as interested directors for
       the Clipper Fund until 2014, and two of the five independent directors of the Clipper
       Fund were replaced in 2006.  (Clipper Fund 2017 Annual Rep., Robertson Decl., Ex. 148,
       at 6-7.)

[20]   Plaintiffs' proffer evidence that Andrew and Christopher Davis had been appointed as
       interested directors for the Selected Fund well before the 2009 negotiation for lower fees
       and that, by 2017, all but one of the independent board members who was in office when
       the fund decided to hire Davis as an adviser had been replaced.  (Selected Fund 2017
       Annual Report, Robertson Decl., Ex. 151, at 6-7.)  Plaintiffs have, however, failed to
       offer any evidence that a majority of these independent directors were too beholden to
       Davis to exercise independent judgment or replace Davis if necessary.

FILED UNDER SEAL PENDING PARTY REVIEW

1   to Davis, even if the Subadvised Funds could be found to be probative as to the lower end of this

2   range.  Although the choice of which comparators are most probative often involves credibility

3   determinations not appropriate for summary judgment, no such determination is required here, as

4   Plaintiffs have not proffered sufficient evidence to permit a rational trier of fact to exclude the

5   Clipper and Selected Funds from the range of fees that could be generated from an arm's length

6   transaction.  Cf. In re Blackrock, 327 F. Supp. 3d at 729 (declining, on summary judgment, to

7   consider defendants' Lipper data as countervailing evidence to the sub-advised funds offered by

8   plaintiffs as comparators.)  Accordingly, this factor weighs against a finding of a Section 36(b)

9   violation.

10          The Fund's Performance

11          Although performance is not a Gartenberg factor,[21] courts have considered the

12   performance of funds as part of a holistic analysis under Jones.  Sivolella v. AXA Equitable Life

13   Ins. Co., No. 11-CV-4194-PGS-DEA, 2016 WL 4487857, at *68 (D.N.J. Aug. 25, 2016), aff'd

14   sub nom. Sivolella for use & benefit of EQ/Common Stock Index Portfolio v. AXA Equitable

15   Life Ins. Co., 742 F. App'x 604 (3d Cir. 2018) ("While underperformance of the mutual fund

16   may be considered, it is not a Gartenberg factor, and courts have been 'wary about attaching too

17   much significance to a fund's financial performance.'" (quoting In re Franklin Mut. Funds Fee

18   Litig., 478 F. Supp. 2d 677, 687 (D.N.J. 2007))).

---

[21]   Some Courts have considered fund performance as part of the nature and quality factor.
See, e.g., Pirundini, 309 F. Supp. 3d at 167-68.  Because the parties have not argued the
nature and quality factor, nor put forth a broader argument as to whether the objective
nature and quality of Davis' service support liability, the Court considers performance
separately.

FILED UNDER SEAL PENDING PARTY REVIEW

1   The parties proffer conflicting evidence as to appropriate performance

2   measurements and whether the Fund performed favorably in relation to its benchmark, with

3   Defendant focusing on rolling 10-year returns, contending that these are most relevant to Davis'

4   long-term strategy, and Plaintiffs focusing on annualized returns.[22]  Plaintiffs' expert also

5   proffers evidence that the Fund exhibited a negative Alpha, meaning that Davis' services did not

6   positively contribute to the Fund's performance, prior to the Relevant Period.  Plaintiffs point to

7   evidence that some of the Subadvised Fund Advisers may have terminated Davis' sub-advisory

8   contracts due to poor performance, which is relevant because the Subadvised Funds employed

9   the same investment strategy as the Fund.  Although Defendants point to positive evidence

10  concerning the Fund's performance, Plaintiffs have proffered sufficient facts to enable a rational

11  factfinder to conclude that Davis' performance was below standard to at least some degree.  Cf.

12  Kasilag, 2016 WL 1394347, at *16.  Plaintiffs have not, however, proffered evidence that the

13  Fund's deviation from its benchmark or negative Alpha was particularly dramatic or unusual,

14  and this factor does not strongly favor liability even when all reasonable inferences are drawn in

15  Plaintiffs' favor.

16      Profitability

17  Plaintiffs also point towards Davis' profitability as a factor in favor of liability.

18  The parties generally agree that, within the Relevant Period, Davis' operating profits derived

19  from its management of the Fund were annually between $66.3 million and $82.6 million, with a

20  profit margin ranging from 73.33% to 81.43%, and that Davis would have generated between

---

[22]   Defendants contend that Plaintiffs' statistics are misleading because they reflect expenses peculiar to a small subset of Fund shareholders who own Class A shares, are not enrolled in a wrap program, and held their shares for less than a year. (Def. 56.1 Resp. ¶ 63.)

FILED UNDER SEAL PENDING PARTY REVIEW

1    $32.2 million and $52.5 million in profits annually if Davis had billed the Fund at the sub-

2    advisory rate.  Defendant cautions that the 1940 Act was not intended to enable courts to set fees

3    nor was it designed to impose a cost-plus-style billing regime.  See Gartenberg, 694 F.2d at 928.

4    As explained below, Plaintiffs have not proffered evidence to demonstrate that, when viewed

5    holistically in the context of the other Gartenberg factors, Davis' profits were out of proportion

6    to the services rendered.  See Schuyt v. Rowe Price Prime Reserve Fund, Inc., 663 F. Supp. 962,

7    989 n.77 (S.D.N.Y.), aff'd, 835 F.2d 45 (2d Cir. 1987) (finding that a profit margin of 77.3%

8    was not excessive, but noting that it could be depending on other factors, such as the quality of

9    the services or the strength of the board's process).

10            Impact of the Gartenberg Factors

11            Having considered all the relevant Gartenberg factors, in light of the substantial

12   deference owed to the Board based on its strong Section 15(c) process, the Court concludes that

13   Plaintiffs have failed to proffer sufficient facts to permit a rational trier of fact to find that Davis

14   breached its Section 36(b) fiduciary duties.  Plaintiffs have not demonstrated that the fees Davis

15   charged to the Fund were beyond the range charged by comparable funds, leaving the Court to

16   consider only the factors of performance and profitability.[23]  That Davis could have still made a

17   profit had it charged the Fund less, where the aggregate fees that it charged fell within the range

18   paid by comparable funds, is insufficient to support a breach of fiduciary duty claim, and finding

19   a violation on this record would effectively amount to imposing a billing regime.  See

20   Gartenberg, 694 F.2d at 928.  Underperformance alone is also insufficient to support a breach of

---

[23]    Plaintiffs have not proffered any argument as to the remaining Gartenberg factors.  These
        factors thus do not support Plaintiffs' claim of breach of fiduciary duty.

FILED UNDER SEAL PENDING PARTY REVIEW

1   fiduciary duty claim, and imposing liability based on profits during periods of poor performance,

2   which Plaintiffs have not established was particularly marked, would similarly put the Court in

3   the position of setting fees in a performance-based billing regime.  See Amron v. Morgan

4   Stanley Inv. Advisers Inc., 464 F.3d 338, 344 (2d Cir. 2006) ("[U]nderperformance alone [is]

5   insufficient to prove that an investment adviser's fees are excessive." (internal quotation marks

6   and citation omitted)).

7           Here, the Board followed a conscientious IAA approval process, warranting

8   substantial deference to its decision, and relevant comparator funds charge similar fees.  See

9   Schuyt, 663 F. Supp. at 979, 988-89 (77.3% profit margin was not excessive enough to support a

10   positive finding on profitability);[24] see also Pirundini, 2019 WL 1254817, at *3 (2d Cir. 2019)

11   (dismissing case where plaintiff made at least some showing with respect to three Gartenberg

12   factors, but did not make sufficient allegations of comparable funds).  Furthermore, Plaintiffs

13   have not proffered sufficient evidence to support a rational conclusion that Davis' performance

14   was so deficient and its profits so great that its fees were disproportionate to its services.

15   Accordingly, Plaintiffs have failed to raise a genuine issue of material fact as to whether the fees

16   paid by the Fund were outside of the range that could have been produced through arm's-length

17   bargaining.

---

[24]   The Schuyt court noted that its holding was not based only on the magnitude of the profit
margin and explained that a similar margin could be excessive in other circumstances,
such as if the quality of the services was poor or if the board was less qualified.  Id. at
989 n.77.  Here, as explained above, significant countervailing factors, including the
evidence that the total fees were within the range of comparable funds and the lack of
evidence that the Fund's underperformance was drastic, preclude liability based on a
profit margin similar to the 77.3% at issue in Schuyt.

FILED UNDER SEAL PENDING PARTY REVIEW

1

<u>CONCLUSION</u>

2          For the foregoing reasons, Defendants' motion for summary judgment dismissing

3   Plaintiffs' complaint is granted.  Defendants' motion to preclude is granted in part and denied in

4   part and Plaintiffs' motion to preclude is denied.

5          The Clerk of Court is respectfully requested to enter judgment dismissing the

6   complaint and to close the case.

7          Docket Entry Nos. 102, 118, and 133 are resolved.

8
9   SO ORDERED.
10
11  Dated: New York, New York
12         May 30, 2019
13
14                                         /s/ Laura Taylor Swain___
15                                         LAURA TAYLOR SWAIN
16                                         United States District Judge